No. 04-70C
(Judge Baskir)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PPL SUSQUEHANNA, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARYJUDGMENT ON LIABILITY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT, AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-353-0534
Fax: 202-514-8624

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

January 18, 2007

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . . . . . . . . . . . . . . 4

A. The Proposed Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. Comments Upon The Proposed Rule . . . . . . . . . . . . . 11

C. The Final Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. PPL’S EXECUTION OF ITS STANDARD CONTRACT . . . . 21

IV. DOE'S ISSUANCE OF THE 1987 MISSION PLAN AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . 23

VI. THE LACK OF DELIVERY COMMITMENT SCHEDULE SUBMISSIONS FROM PPL . . . . . . . . . . . . . . . . . . . . . . . . . 26

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON PPL'S BREACH OF CONTRACT CLAIM BECAUSE PPL HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED . . . . . . . . . . . . . . . . . . . . . . . 30

A. The Standard Of Review For Summary Judgment . . . . 30

B. PPL Cannot Seek A Liability Ruling When DOE Has Not Breached Any Contract Obligation To Accept PPL's Spent Nuclear Fuel And When PPL Cannot Establish Any Damage . . . . . . . . . . . . . . . . . . . 31

C. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules . . . . . . . . . . . . . . . . . . . . . . . 36

D. Under The "Oldest Fuel First" Allocation System, And Based Upon PPL's Failure To Submit Any DCSs, DOE Has Not Yet Breached Any Obligation To Accept SNF From PPL . . . . . . . . . . . . . . . . . . . . . . . . 41

E. PPL's Assertion That DOE Was Obligated To Begin SNF Acceptance From PPL Itself On January 31, 1998, Conflicts With PPL's Past Conduct And The Language Of The Standard Contract . . . . . . . . . . . . . . . . . . . . . . 44

F. Because DOE Is Not Obligated To Accept PPL's SNF During the First Ten Years Of SNF Acceptance Under The Standard Contract, PPL Cannot Identify Any Breach That Runs Directly To PPL . . . . . . . . . . . . 48

G. If the D.C. Circuit's Writ of Mandamus Is Lifted The Government May Also Be Able To Rely Upon The Unavoidable Delay Clause As A Defense To Liability . 50

II. PPL'S GOOD FAITH AND FAIR DEALING CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BASED UPON A DELAY IN CONTRACTUAL PERFORMANCE AND PPL CANNOT PRESENT "WELL-NIGH IRREFRAGABLE PROOF" TO OVERCOME THE PRESUMPTION THAT THE GOVERNMENT ACTED IN GOOD FAITH . . . . . . . . . . 51

III. PPL'S CLAIM FOR AN UNCOMPENSATED TAKING FAILS AS A MATTER OF LAW BECAUSE IT ARISES FROM AN ALLEGED BREACH OF CONTRACT . . . . . . . . . 56

A. The Standard For Dismissal For Failure To State A Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B. The Nuclear Waste Policy Act Did Not Create Any Vested Property Rights For Nuclear Utilities, And A Utility's Right To Acceptance of Its SNF Was Based Upon Its Execution of The Standard Contract . 57

C. To Establish A Viable Takings Claim, PPL Must Establish That It Is Not Merely Seeking A Contractual Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

D. PPL's Claim That, By Failing To Begin Removal Of PPL's SNF From PPL's Susquehanna Plant By The Contractual Deadline, The Government Has Taken Its Real Property, Is Nothing More Than A Breach Of Contract Claim, Which Cannot Be Recharacterized As A Taking . . . . . . . . . . . . . . . . . . . 62

IV. TO THE EXTENT THAT THE COURT WOULD OTHERWISE GRANT THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, THE COURT SHOULD GRANT THE UNITED STATES DISCOVERY PURSUANT TO RULE 56(f) BEFORE DECIDING THAT MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# TABLE OF AUTHORITIES

## CASES

A&S Council Oil Co. v. Lader,
56 F.3d 234 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

Allstate Fin. Corp. v. Utility Trailer of Ill., Inc.,
936 F. Supp. 525 (N.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 54

Alvin Ltd. v. United States Postal Serv.,
816 F.2d 1562 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Asco-Falcon II Shipping Co. v. United States,
32 Fed. Cl. 595 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Bayer AG. v. Biovail Corp.,
279 F.3d 1340 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Beacon Oil Co. v. O'Leary,
71 F.3d 391 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Beraha v. Baxter Health Care Corp.,
956 F.2d 1436 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B & F Trawlers, Inc. v. United States,
27 Fed. Cl. 299 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Buse Timber & Sales, Inc. v. United States,
45 Fed. Cl. 258 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Caldwell & Santmyer, Inc. v. Glickman,
55 F.3d 1578 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Canal Elec. Co. v. United States,
65 Fed. Cl. 650, 656 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 60

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 62

C.B.C. Enterprises, Inc. v. United States,
24 Cl. Ct. 1 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 65

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Consolidated Edison Co. of New York, Inc. v. United States,
67 Fed. Cl. 285 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Cosmo Constr. Co. v. United States,
196 Ct. Cl. 463,
451 F.2d 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

Data Transformation Corp. v. United States,
13 Cl. Ct. 165 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Detroit Edison Company v. United States,
56 Fed. Cl. 299 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

Dombrovskis v. Esperdy,
185 F. Supp. 478 (S.D.N.Y. 1960) . . . . . . . . . . . . . . . . . . . . . . . . 68

Energy Northwest v. United States,
69 Fed. Cl. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Gadsden v. United States,
78 F. Supp. 126 (Ct. Cl. 1948) . . . . . . . . . . . . . . . . . . . . . . . 52

Heagy v. United States,
12 Cl. Ct. 694 (1987), aff'd,
848 F.2d 1244 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

J.J. Henry Co. v. United States,
411 F.2d 1246 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied,
464 U.S. 814 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 69

Kalvar Corp. v. United States,
543 F.2d 1298 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Klamath Irrigation District v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Kucharczyk v. Regents of Univ. of Calif.,
946 F. Supp. 1419 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . 55

Larson v. Domestic & Foreign Commerce Corp.,
337 U.S. 682 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Librach v. United States,
147 Ct. Cl. 605 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 46, 47, 48

Marathon Oil Co. v. United States,
16 Cl. Ct. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Michael Rose Productions, Inc. v. Loew's Inc.,
141 F. Supp. 257 (S.D.N.Y. 1956) . . . . . . . . . . . . . . . . . . . . . . . 68

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 31

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

Northern States Power Co. v. Dep't of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 50

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 46, 68

Pacific Gas and Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Pacific Gas & Electric,
70 Fed. Cl. 766 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 63

Papasan v. Allain,
478 U.S. 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Puritan Assocs. v. United States,
215 Ct. Cl. 976 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Radioptics, Inc. v. United States,
621 F.2d 1113 (Cl. Ct. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Rochman v. United States,
27 Fed. Cl. 162 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Sanders v. United States Postal Service,
801 F.2d 1328 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 54

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. Apr. 7, 2004) . . . . . . . . . . . . . . . . . . . . . . 64

State of Alaska v. United States,
35 Fed. Cl. 685 (1996), aff'd,
119 F.3d 16 (Fed. Cir. 1997), cert. denied,
1108 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Struck Construction Co. v. United States,
96 Ct. Cl. 186 (Ct. Cl. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Sun Oil Co. v. United States,
572 F.2d 786 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 65

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 31

System Fuels Inc. v. United States,
66 Fed. Cl. 722 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

System Fuels, Inc. v. United States,
65 Fed. Cl. 163 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . 32

Torncello v. United States,
681 F.2d 756 (Ct. Cl. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Transpace Carriers, Inc. v. United States,
27 Fed. Cl. 269 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Village on Canon v. Bankers Trust Co.,
920 F. Supp. 520 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . 55

Winstar Corp. v. United States,
21 Cl. Ct. 112 (1990), aff'd,
64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 62

## STATUTES and REGULATIONS

42 U.S.C. §§ 10101-10270 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 58

42 U.S.C. §§ 10131(a)(4)-(5)(1982) . . . . . . . . . . . . . . . . . . . . . . . . 3, 58

42 U.S.C. § 10221 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 10222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 10222(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

42 U.S.C. § 10222(a)(1) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 58

42 U.S.C. § 10222(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 10222(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

10 C.F.R. § 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

48 Fed. Reg. 16590 (Apr. 18, 1983) . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . passim

48 Fed. Reg. 5462 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

48 Fed. Reg. at 5464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PPL SUSQUEHANNA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-70C |
| | ) | (Judge Baskir) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARYJUDGMENT ON LIABILITY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT, AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT

Pursuant to Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully files this response to the motion for summary judgment on liability that plaintiff, PPL Susquehanna, LLC. ("PPL"), filed in this case and further requests that Court grant summary judgment in defendant's favor upon Counts I and II of the plaintiff's complaint. Defendant further respectfully requests that the Court dismiss Count III of PPL's complaint for failure to state a claim upon which relief can be granted. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the

accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

## STATEMENT OF THE ISSUES

1. Whether PPL has any basis upon which to obtain a liability ruling where it cannot show, based upon the manner in which spent fuel acceptance allocations are assigned, any current damage.

2. Whether PPL's claim asserting breach of the duty of good faith and fair dealing fails because PPL cannot present "well-nigh irrefragable proof" to overcome the presumption that the Government acted in good faith.

3. Whether PPL's takings claim, which arises from an alleged breach of contract, fails to state a claim upon which relief can be granted.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent

storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. at § 10131(b).

The NWPA provided that the Secretary would enter into contracts

with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in

furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF

acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;
>
> (b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).

Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided

for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6).

The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . <u>The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below</u>. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such

> time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW –* Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule

> +2 months, up to the submission of the final delivery schedule.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules, which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

B. Comments Upon The Proposed Rule

DOE received numerous comments in response to the proposed rule. One commenter, Northern States Power Company, stated that "[t]he context of the contract is inverted." A. 38. (emphasis in original).[1] The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." A. 38.

Another commenter, Public Service Company of Colorado, stated that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months." A. 51. (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste

[1] "A __" refers to the Government's appendix in support of our motion for summary judgment.

delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.

Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, suggested that the "definition of 'Delivery Commitment' (Article I.7) is unnecessary and should be deleted," since the term "'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. A. 6.

Another commenter requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." A. 108 (emphasis added); see A. 120 (Comments (after Georgia Power), at 1).

Another commenter, Northeast Utilities, recognized that, in the proposed rule, "DOE is requiring that utilities firm their delivery commitment

five years prior to delivery and allows only minor changes within that five year period." A. 73 (emphasis added).

Another commenter, Mississippi Power & Light Company, stated as follows in its comments:

> Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: ". . . within a specified year, <u>and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B</u>."

A. 85 (emphasis in original).

Yet another commenter suggested that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his <u>commitment</u> should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." A. 106 (emphasis added); <u>see</u> A. 116 ("[i]t should not be necessary to submit firm (within + or - 20%) commitment schedules sixty-three (63) months prior to the delivery date").

Another commenter, Cleveland Electric Illuminating Company, requested that the "Delivery Commitment Schedule" be changed "for the

sake of additional clarification" to "Preliminary Delivery Commitment Schedule." A. 53, 55.

In their comments to the proposed rule, EEI and UNWMG recognized the importance of having DOE receive Delivery Commitment Schedules from all contract holders for a given year:

> If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.

A. 11.

Many commenters suggested a contract change to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. A. 100-01; see A. 53; 86.

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than

> January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added). As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW

> including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b.

The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 annual capacity report ("ACR") and acceptance priority ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added). Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE required to be

unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id.

The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

## III. PPL'S EXECUTION OF ITS STANDARD CONTRACT

In 1983, Pennsylvania Power & Light Company, which was at that time the majority owner of Susquehanna Steam Electric Station, executed a Standard Contract with DOE, which was later assigned to PPL. See Complaint ¶¶ 5, 11. PPL's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983, 10 C.F.R. § 961.11. A. 358-401.1.

## IV. DOE'S ISSUANCE OF THE 1987 MISSION PLAN AMENDMENT

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).

In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE noted the importance of the Annual Capacity Report that would be issued in 1991, which would provide the basis for the submission of DCSs:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

A. 207 (emphasis added).

V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." DOE's ACRs expressly stated that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." A. 210; 212; 216. Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

A. 210; 213; 216 (emphasis added).

Although DOE announced that the 1990 ACR would be the last, DOE decided that it would continue publication of the ACR "after discussion with

the Purchasers." A. 407. DOE provided the following guidance regarding the DCSs in the 1991 ACR:

> The Purchasers' allocations for each delivery year are presented in Tables A.1 through A. 10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser."

A. 408.

PPL did not have any allocations in any of those years. See generally 420-445.

The 1991 and 1992 ACRs contained identical projected SNF acceptance rates for the first ten years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

A. 411; 473.

In 1995, DOE issued a combined Acceptance Priority Ranking and Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." A. 291. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, shown above. A. 294. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. . . . The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

A. 293-94. The 1995 ACR further provided that "<u>[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)</u>." A. 291. (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard

Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." A. 291.

## VI. THE LACK OF DELIVERY COMMITMENT SCHEDULE SUBMISSIONS FROM PPL

On May 11, 1992, the DOE contracting officer issued a letter to each of the contract holders, along with instructions for the submission of DCSs. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." See, e.g., A. 143-52, 153-62, 163-72. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." A. 145, 155, 165. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." A. 145, 155, 165. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs

(e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

PPL is a relatively new operating unit, having started its commercial operations on or about September 10, 1982. A. 392-393. The first SNF discharges at Susquehanna Steam Electric Station, Units 1 and 2, did not occur until 1986, over 20 years after discharges at other older nuclear facilities. A. 243-244.

According to the 1995 APR/ACR, PPL did not have any allocation in 1998 or in any of the first 10 years of the SNF acceptance queue. A. 296. PPL has never submitted a DCS to DOE.

## SUMMARY OF ARGUMENT

PPL alleges in its complaint and its motion for summary judgment that the Department of Energy ("DOE") partially breached its Standard Contract on January 31, 1998, when it failed to begin acceptance of spent nuclear fuel ("SNF") on that date. However, under the terms of the Standard Contract, and contrary to the implications of PPL's briefing, DOE was not obligated to accept SNF from every Standard Contract holder on that date. Instead, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract

holders, including the specific amounts of SNF that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. In accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, PPL would have submitted delivery commitment schedules ("DCSs") to DOE no later than 1992, if it had SNF to be accepted by DOE in January 1998. However, under the terms of the Standard Contract, DOE is obligated to accept SNF from the nuclear utility contract holders in the order in which it was generated, on an "oldest fuel first" basis developed by comparing the age of SNF across the nuclear industry. Because PPL owns a relatively new nuclear reactor, it did not have any SNF allocations for acceptance of its SNF within at least the first ten years of the SNF acceptance program. Although PPL could have submitted DCSs to DOE seeking to obtain DOE's agreement to accept PPL's SNF outside of an "oldest fuel first" acceptance queue, PPL made no effort to do so.

Because PPL has no basis upon which to argue that DOE was obligated to have begun acceptance of its SNF prior to the date upon which it filed its complaint, and because PPL has not identified any basis

upon which it could have accrued any damages without a delivery commitment or even an allocation for acceptance of its SNF, PPL's request for a liability ruling is, at best, premature, given that a liability ruling should not issue without some reasoned evidence of resultant damage. Under straightforward contract law, PPL cannot claim to have suffered a cognizable injury because of DOE’s failure to begin SNF acceptance from other utility contract holders that have earlier allocation rights. PPL can only seek a liability ruling based upon its own damages resulting from a breach of its own contract with DOE. Because PPL had no allocation rights for SNF acceptance before the date on which it filed its complaint and, in fact, would not have been in line for SNF acceptance for many years to come, there can be no liability that runs to PPL because PPL cannot yet have suffered any damage. To the contrary, PPL's claim here is for a liability ruling based upon DOE's failure to accept other contract holders' SNF. PPL has no basis for seeking damages based upon DOE's failure to accept other entities' waste. To establish its own entitlement to damages, it must identify the rights and obligations that DOE had to accept PPL's SNF and that DOE's failure to act in accordance with those obligations caused PPL to incur resultant damages. See Cosmo Constr.

Co. v. United States, 196 Ct. Cl. 463, 469-70, 451 F.2d 602, 605-606 (1971) (quoting Black's Law Dictionary (4th ed.)). Because PPL does not have any basis for asserting that DOE was obligated to accept any of its SNF under the Standard Contract by January 31, 1998, or even by the date upon which it filed its complaint, and because, consequently, it has cannot show that it has incurred any damages, it has no basis for seeking damages from this Court at this time.[2]

## ARGUMENT

### I. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON PPL'S BREACH OF CONTRACT CLAIM BECAUSE PPL HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED

#### A. The Standard Of Review For Summary Judgment

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

[2] Further, PPL's claim for breach of implied covenant of good faith and fair dealing fails as a matter of law because its claim is based on a contract delay and there is no clear and convincing evidence that DOE did not act in good faith. Finally, PPL's claim for an uncompensated taking also fails as a matter of law because it arises from an alleged breach of contract.

247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c).

### B. PPL Cannot Seek A Liability Ruling When DOE Has Not Breached Any Contract Obligation To Accept PPL's Spent Nuclear Fuel And When PPL Cannot Establish Any Damage

PPL does not dispute that the Standard Contract did not require DOE to begin accepting SNF from each and every Standard Contract holder by January 31, 1998, instead understanding that it required DOE to begin its program of accepting SNF from the contract holders as a whole by that date. Yet, PPL's complaint is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to

begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, automatically created an injury-in-fact to each and every member of the commercial nuclear utility industry. See Compl. ¶ 43.[3] Although PPL asserts that it is clear that the Government's delay in beginning SNF and/or HLW acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that delay, in and of itself, does not create liability to any particular contract holder or establish that any particular contract holder has incurred any damages as a result of the Government's breach of contract. Instead, under the terms of the Standard Contract, as will be explained below, DOE's inability to accept SNF identified in approved delivery commitment schedules that creates and defines the scope of DOE's liability.

The existence of a breach of contract is but one component of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)" (italics in original));

[3] "Compl. ¶ ___" refers to the complaint that the plaintiff filed in this case. "A. ___" refers to the appendix to this brief.

see also Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Further, the Court of Claims has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so ...

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co., 196 Ct. Cl. at 469 n.3, 451 F.2d at 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). In an action bifurcated as to entitlement and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the entitlement phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability

is not purely academic." Id. at 469-70, 451 F.2d at 605-06 (emphasis in original).

Here, as will be discussed below, PPL could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility contract holders by January 31, 1998, under the Nuclear Waste Policy Act program. Instead, any injury that PPL incurred would result from DOE's failure to accept PPL's SNF as identified in PPL's approved DCSs. However, as discussed below, because PPL has never submitted a DCS to DOE for approval, it has no basis for asserting that DOE failed to act in accordance with the terms of the Standard Contract with regard to its DCS submissions or acceptance of its SNF. Because the January 31, 1998, deadline for beginning SNF acceptance is not a deadline that required DOE to begin accepting SNF from each and every contract holder by January 31, 1998, but, instead, is a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole, PPL must establish, before it can seek a liability ruling, that DOE had a specific obligation to accept particular SNF from PPL by the date that it filed its complaint and that DOE breached that specific obligation to PPL. Absent such a showing, PPL has

not identified any injury-in-fact that could provide this Court with a basis to consider a liability ruling or any cause of any damage to PPL.[4]

As explained below, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, to timely submit a DCS to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

---

[4]In Energy Northwest v. United States, 69 Fed. Cl. 500 (2006), this Court found that the plaintiff there, which also did not possess any SNF acceptance allocations in the first ten years of contract performance, had submitted sufficient evidence of damage to justify a liability ruling. We disagree with that decision. Nevertheless, PPL has submitted no such evidence here.

### C. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules

As this Court recently recognized in an extensive discussion in Pacific Gas and Electric Co. v. United States, 73 Fed. Cl. 333 (2006), the Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the

contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed

schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first

year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. Absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved

[DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[5] Id.

D. Under The "Oldest Fuel First" Allocation System, And Based Upon PPL's Failure To Submit Any DCSs, DOE Has Not Yet Breached Any Obligation To Accept SNF From PPL

One of the stated objectives of the Standard Contract was to dispose of SNF in the order that it is discharged from reactors. To achieve that

[5] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

goal, the Standard Contract specifically provided for SNF acceptance priority among contract holders upon an "oldest fuel first" basis. 10 C.F.R. § 961.11, Art. VI.B.1. The Standard Contract provided for the issuance of an acceptance priority ranking, based on the oldest fuel first principle, beginning in April 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

In compliance with the NWPA and the language of the Standard Contract, DOE issued the 1991 Acceptance Priority Ranking in December 1991. That APR stated:

> The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of the Federal waste management facility operations may submit Delivery commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

According to that APR, the first SNF discharge dates recorded were in November 1967. The first SNF discharge recorded for PPL's facility at Susquehanna Steam Electric Station was in September 1987. A. 246 (1991 APR, p. 27). Given Susquehanna Steam Electric Station's recent vintage, it did not have fuel old enough to be placed into the allocation ranking for acceptance by DOE within the first ten years. In fact, the 1995

Acceptance Priority Ranking ("APR") and Annual Capacity Report ("ACR") shows that, had DOE begun SNF acceptance from the contract holders in 1998, PPL would not have had any allocation in at least the first ten years of DOE's acceptance of SNF. A. 296 (1995 APR/ACR, Table 2, p. 6). Further, PPL never submitted any DCSs to DOE to indicate that it had any expectation that DOE was obligated to accept its fuel in January 1998 or at any other time to the present date.

Having accepted the DCS process based upon the 1991 ACR/APR, including the oldest fuel first allocation system reflected in the APR "to approximate the acceptance rate which DOE would have used had it performed the Standard Contract by accepting the utilities' spent fuel beginning no later than January 31, 1998. . . ," see PG&E, 73 Fed. Cl. at 398, this Court considered virtually identical circumstances in PG&E. That is, it evaluated a claim regarding a plant which did not have any acceptance allocations as of the time of trial. Id. at 400 (discussing Diablo Canyon Power Plant). Based upon the plant's priority ranking and the rate set forth in the 1991 ACR, the Court concluded that DOE "would not have accepted any of the spent fuel being stored by PG&E's Diablo Canyon Power Plant by the end of 2007" and, accordingly, had not suffered any

damages. Id. Likewise, this Court should find that neither unit of the PPL Susquehanna plant has suffered damages sufficient to justify a liability ruling.

### E. PPL's Assertion That DOE Was Obligated To Begin SNF Acceptance From PPL Itself On January 31, 1998, Conflicts With PPL's Past Conduct And The Language Of The Standard Contract

In its motion for summary judgment, PPL suggests that it was entitled to have DOE begin accepting its SNF by January 31, 1998. As previously explained, any such requirement would completely conflict with the "oldest fuel first" acceptance requirement in the Standard Contract. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), this Court recognized the nature of the Standard Contract and the fact that the January 31, 1998 date identified in the Standard Contract did not mean that every Standard Contract holder would have its SNF accepted by that date:

> It bears noting, however, that TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. See Standard Contract Art. V.B.1. TVA submitted its first proposed DCS, for the collection of 58.7 MTU from the Sequoyah plant, in April of 1997. Consequently, the earliest scheduled pickup

> of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674.

Further, PPL never took any action during the course of contract performance that would have allowed DOE to take any of its SNF by January 31, 1998. Had it wanted DOE to begin acceptance of its SNF by that date, it would have had to have submitted a DCS in 1992, identifying the SNF that it wanted taken and the time period within which it wanted that SNF taken. Yet, it has never submitted a DCS to DOE. Apparently, PPL now believes that DOE was simply supposed to appear at its site on January 31, 1998, and "begin" to take some undefined amount of its SNF. Yet, outside the DCS procedures identified in the Standard Contract, there is no other mechanism through which the parties notify each other of the dates upon which DOE will accept specific amounts of SNF from a particular contract holder.

The costs that DOE incurs to prepare to accept SNF from a particular site, including travel and transport, are extensive, and it also takes time for the nuclear utility to prepare to deliver the SNF to DOE. PPL's suggestion that no mechanism exists in the Standard Contract for ensuring that, if

DOE travels to a site, the contract holder will actually have SNF to deliver to DOE is extraordinary. Given that PPL has never satisfied the only procedure contained in the Standard Contract for obtaining an acceptance and delivery obligation in 1998, PPL's assertion that DOE breached its contract by not accepting its SNF in 1998 is ludicrous. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1566 (Fed. Cir. 1987). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983).

PPL implies that the Government's position that plaintiff is not entitled to damages directly stemming from the January 31, 1998 acceptance date are barred by the United States Court of Appeals for the Federal Circuit's decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d

1336 (Fed. Cir. 2000). PPL is incorrect. At the time that the Government filed its interlocutory appeal in Maine Yankee in July 1999, all three of the plaintiffs-appellees in that appeal had previously submitted and obtained approval of DCSs that required DOE to begin acceptance of specific amounts of their SNF either by January 31, 1998, or January 31, 1999. Accordingly, because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach, and no reason existed to note the contractual mechanisms for establishing the specific SNF delivery and acceptance commitments. As a result, unlike this case, the Government did not raise in the Maine Yankee appeal the point concerning the DCS process or the lack of specific commitments absent approved DCSs under the Standard Contract's schedule terms.

Because the Government did not, and did not need to, raise the issue presented here in the Maine Yankee appeal, the Maine Yankee decision does not constitute stare decisis regarding whether DOE partially breached the Standard Contract with regard to the plaintiff in this case. "Stare decisis applies only to legal issues that were actually decided in a prior action" and not to issues that "were not litigated or resolved" in a prior

action. Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Because the issues regarding plaintiff's need to submit DCSs and the role of DCSs in the contractual scheme of defining acceptance commitments was not evaluated or decided in Maine Yankee, that decision does not constitute stare decisis regarding that issue and does not, in any event, establish that DOE breached every single Standard Contract on January 31, 1998, in a manner that creates liability to each contract holder.[6]

F. Because DOE Is Not Obligated To Accept PPL's SNF During the First Ten Years Of SNF Acceptance Under The Standard Contract, PPL Cannot Identify Any Breach That Runs Directly To PPL

Pursuant to the 1995 APR/ACR, DOE's obligation to accept PPL's SNF will not arise until some date after January 2008. Accordingly, PPL

[6] Further, to the extent that PPL were to attempt to argue, which it has not, that the Government is somehow barred by collateral estoppel from attempting to raise the DCS issue here in arguing against plaintiff's standing to maintain its claims, the argument would fail. As previously explained, because of the factual circumstances surrounding the three plaintiffs-appellees in the Maine Yankee appeal and that DOE had made (and breached) commitments to accept SNF from all of those plaintiffs-appellees prior to the appeals at issue, it was unnecessary to raise the DCS issue in that appeal. Accordingly, collateral estoppel would not somehow apply the pronouncements in the Maine Yankee decision to this case because "determination of the issue in the prior litigation was [not] a critical and necessary part of the judgment in that action." Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1345 (Fed. Cir. 2002).

has not yet accrued any right to have DOE accept its SNF under the Standard Contract. Although PPL could have submitted a DCS to DOE as early as 1992, seeking to have DOE agree to accept its SNF outside of the "oldest fuel first" allocation queue,[7] PPL never made any such effort. Accordingly, PPL could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Any injury that PPL incurred would result from DOE's failure to accept PPL's SNF as identified in PPL's approved DCSs. However, as explained above, PPL did not submit any DCSs that required DOE to begin SNF acceptance of PPL's SNF. Consequently, PPL has no basis for arguing that DOE's failure to accept SNF on January 31, 1998, caused it to incur damages. Instead, it appears that the first

[7] We are not suggesting that PPL's effort would have been successful. For DOE to have agreed to have accepted PPL's SNF outside of the "oldest fuel first" allocation system required by the Standard Contract, PPL would have had to have identified a reason under the "Priority for Shutdown Reactors" or the "Emergency Deliveries" provisions of the Standard Contract for DOE to accept PPL's SNF earlier than it would under an "oldest fuel first" allocation. 10 C.F.R. § 961.11, Art. VI.B.1.b & VI.B.1.d. We are aware of no basis upon which PPL could have made such a request. In any event, PPL never submitted such a request to DOE, leaving PPL to the allocations that it would receive under the "oldest fuel first" allocation system. Those allocations would have been at some point after January 2008.

"breach" that might have caused an injury to PPL would not have occurred until sometime after January 2008, when PPL's SNF would have been given some allocation rights based upon the age of its SNF.

G. If the D.C. Circuit's Writ of Mandamus Is Lifted The Government May Also Be Able To Rely Upon The Unavoidable Delay Clause As A Defense To Liability

Article III of the Standard Contract provides that "[n]either the Government nor the purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." That provision further defines circumstances beyond the reasonable control of DOE as including "acts of the Government in either its sovereign or contractual capacity." In Northern States Power Co. v. Dep't of Energy, 128 F.3d 754, 757 (D.C. Cir. 1997), however, the D.C. Circuit issued a writ of mandamus restricting the Government's ability to rely upon the "Unavoidable Delays" clause. As the Government expects to discuss in a supplemental brief that the Court has requested in this case, this Court in Nebraska Public Power District v. United States, 73 Fed. Cl. 650 (2006), concluded that the D.C. Circuit's writ of mandamus is void ab initio because it exceeded that court's jurisdiction

and was made with out an appropriate waiver of sovereign immunity. The Nebraska decision has been certified to the Federal Circuit, and a petition for permission to appeal is pending before the appellate court. We respectfully reserve our right to address the "Unavoidable Delays" clause to the extent and when we are authorized to do so.

## II. PPL'S GOOD FAITH AND FAIR DEALING CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BASED UPON A DELAY IN CONTRACTUAL PERFORMANCE AND PPL CANNOT PRESENT "WELL-NIGH IRREFRAGABLE PROOF" TO OVERCOME THE PRESUMPTION THAT THE GOVERNMENT ACTED IN GOOD FAITH

In its complaint, PPL asserts that "[t]he Standard Contract between Plaintiff and Defendant contains an implied covenant of good faith and fair dealing, pursuant to which Defendant has a duty to perform its obligations under the Contract in good faith and not to take actions detrimental to Plaintiff's contractual rights." Compl. ¶47. PPL claims that "DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF." Id.

PPL's contention that the Government breached the covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting PPL's SNF by January 31,

1998, is nothing more than an allegation that the Government breached the Standard Contract. Nevertheless, even if this claim could survive independently from its breach of contract claim, this allegation, without more, cannot form the basis for a claim for breach of the covenant of good faith and fair dealing. As the Federal Circuit held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by Government officials. Id. at 1240. In fact, in this very same context, this Court has found that a utility plaintiff has not overcome this high standard. System Fuels Inc. v. United States, 66 Fed. Cl. 722, 735 (2005).

To establish that the Government's delay in performance was in bad faith, PPL must present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), "designedly oppressive," Struck Construction Co. v. United States, 96 Ct.

Cl. 186, 222 (Ct. Cl. 1942), or "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959), cited in Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976), and Am-Pro Protective Agency, 281 F.3d at 1240. Here, PPL cannot present any evidence, let alone "clear and convincing evidence," to indicate that the Government's delay in accepting PPL's SNF was in bad faith. In fact, PPL's allegation amounts to nothing more than a claim for breach of contract as a result of delay in performance. However, when performance of the contract at issue is highly regulated, where the contract involves disposal of nuclear waste, and where performance was initially contemplated to require over 15 years of preparation and many more years to complete, the Government's delay in performance cannot be said to be in bad faith. To the extent that its partial breach contract claims otherwise survive this motion, its motion premised upon the duty of good faith and fair dealing should be dismissed. See Am-Pro Protective Agency, 281 F.3d at 1240 ("the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith"); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("contractor can overcome [the presumption that the government

acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it"); Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("there is a strong presumption in the law that administrative actions are correct and taken in good faith"); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (Government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

Even if well nigh well-nigh irrefragable evidence of bad faith were not required to substantiate this type of claim, PPL would still fail in its efforts to pursue this claim. Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205, "[t]he obligation of good faith . . . is not an 'independent source of duties for parties to a contract.'" Allstate Fin. Corp. v. Utility Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992)). "Rather, it guides the construction of explicit terms of an agreement." Allstate, 936 F. Supp. at 529 (emphasis added). "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create

obligations not contemplated in the contract." Kucharczyk v. Regents of Univ. of Calif., 946 F. Supp. 1419, 1432 (N.D. Cal. 1996); see State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996) ("implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties"), aff'd, 119 F.3d 16 (Fed. Cir. 1997), cert. denied, 1108 (1998). "[S]uch generalized obligations as not interfering with the other party's performance, or failure to act in good faith, must have a contract performance referent to have any relevance." C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). There must be a "nexus alleged between the Government's allegedly tortious breach of these implicit conduct obligations and any express term of the contract." Id.; see Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) (duty of good faith "does not create any new contractual rights" other than those expressly stated in the contract itself, "nor does it provide an independent basis for recovery"); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 598 (1994) ("defendant only had a duty to render a decision within a reasonable time if it had an explicit contractual obligation to take some action on the applications"); Heagy v. United States, 12 Cl. Ct. 694 (1987) (no breach of contract can exist unless it is

based upon actual requirement contained in the contract), aff'd, 848 F.2d 1244 (Fed. Cir. 1988). To prevail upon its claim for a breach of the duty of good faith and fair dealing, the plaintiff must identify an express requirement within the contract that DOE breached through an inappropriate exercise of discretion. Outside of the context of its breach of contract claim, PPL has not identified any "bad faith," or exercises of discretion with other than good faith, by DOE giving rise to any contract claim here.

## III. PPL'S CLAIM FOR AN UNCOMPENSATED TAKING FAILS AS A MATTER OF LAW BECAUSE IT ARISES FROM AN ALLEGED BREACH OF CONTRACT

### A. The Standard For Dismissal For Failure To State A Claim

In considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, this Court will grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957), quoted in B & F Trawlers, Inc. v. United States, 27 Fed. Cl. 299, 302 (1992). In making this decision, the Court will accept the factual allegations set forth in the complaint as true. E.g., Papasan v. Allain, 478 U.S. 265, 268 (1986); B & F Trawlers, 27 Fed. Cl. at 302.

However, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, since "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162 (1992) (quoting 2A J. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5], at 12-84 to -85 (2d ed. 1995)).

### B. The Nuclear Waste Policy Act Did Not Create Any Vested Property Rights For Nuclear Utilities, And A Utility's Right To Acceptance of Its SNF Was Based Upon Its Execution of The Standard Contract

In Count III of its complaint, PPL asserts a cause of action for an uncompensated taking, claiming that "Defendant's failure to dispose of PPL's SNF amounts to a Fifth Amendment taking of Plaintiff's real property on which Susquehanna is located, without just compensation." Compl. ¶ 55. PPL further states that "[t]he Government's failure and refusal to comply with its obligations for acceptance and disposal of PPL's SNF has deprived, and will continue to deprive, PPL and its co-owner of the full value and economic use of the real property on which the SNF is stored at Susquehanna." Id. at ¶ 54. PPL thus concludes that it "is entitled to just compensation for this taking in an amount to be determined at trial." Id. at ¶ 55.

Although PPL attempts to ground its takings claim upon the Nuclear Waste Policy Act of 1982 ("NWPA"), codified at 42 U.S.C. §§ 10101-10270, the NWPA did not create any vested property rights for nuclear utilities. One of the purposes of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel." Id. § 10131(b)(2). In passing the NWPA, Congress included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of SNF, although Congress also found that the costs of the interim and permanent storage and disposal of SNF were the responsibility of those entities that created the SNF. 42 U.S.C. § 10131(a)(4)-(5).

Pursuant to section 302(a) of the NWPA, 42 U.S.C. § 10222(a), the Secretary of Energy was "authorized to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). Further, the Secretary of Energy was barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary

under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." 42 U.S.C. § 10222(b)(2) (emphasis added). As a result, DOE's obligation to dispose of a utility's SNF was conditioned upon the existence of a contract between the utility and DOE. DOE implemented the requirements of section 302(a) of the NWPA by promulgating the Standard Contract, 10 C.F.R. § 961.11 (1983). The Standard Contract required DOE to begin "[t]he services to be provided by DOE" under the Standard Contract "not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II.

In 1983, Pennsylvania Power & Light Company, which was at that time the majority owner of Susquehanna Steam Electric Station, executed a Standard Contract with DOE, which was later assigned to PPL. See Complaint ¶¶ 5, 11. Absent that Standard Contract, DOE would not have any obligation to accept any SNF generated at PPL's Susquehanna Steam Electric Station nuclear reactor. Other than through the Standard Contract, the Department of Energy has no statutory, regulatory, or other legal obligation to accept or dispose of the SNF that PPL generates through its production of nuclear power. See Pacific Gas & Electric v. United States

70 Fed. Cl. 766, 779, 780 (2006) (utility plaintiff's "claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy"); Canal Elec. Co. v. United States, 65 Fed. Cl. 650, 656 (2005) ("Plaintiff has not shown that it is entitled to damages under a theory independent of the rights accorded Canal Electric under the Standard Contract"). To the contrary, without the Standard Contract, PPL is solely responsible for the storage and protection of the SNF that it generates.

### C. To Establish A Viable Takings Claim, PPL Must Establish That It Is Not Merely Seeking A Contractual Remedy

"In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). As the Court of Claims has long recognized, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978). If "alleged damage is due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, plaintiffs' claim that the wrong originated in some statutory" or constitutional "violation does not strip the case of its contractual nature." A&S Council Oil Co. v. Lader, 56 F.3d 234,

241 (D.C. Cir. 1995). "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil, 572 F.2d at 818; see also J.J. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct. Cl. 1969); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).[8]

That is, remedies for alleged infringement of any rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 572 F.2d at 818; see Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court); Buse Timber & Sales, Inc. v. United States, 45 Fed. Cl. 258, 263 (1999) ("the express terms of the contract define the parties' respective rights and responsibilities which address the eventualities at issue before this court,"

[8] When the Government is acting in its contracting, or proprietary, capacity, rather than in its sovereign capacity, no "taking" under the Fifth Amendment can arise because the Government's dealings "are contractually oriented, not taking intended or motivated." Data Transformation Corp. v. United States, 13 Cl. Ct. 165, 177 (1987) (citing Radioptics, Inc. v. United States, 621 F.2d 1113, 1126-29 (Cl. Ct. 1980)).

precluding a taking claim). In short, there are no extra-contractual rights that arise from the failed performance of a contract, just damages that accrue from the breach. Castle v. United States, 301 F.3d 1328, 1341-43 (Fed. Cir. 2002) ("[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance") (citing Winstar v. United States, 518 U.S. 839, 919 (1996) (Scalia, J., concurring)).

### D. PPL's Claim That, By Failing To Begin Removal Of PPL's SNF From PPL's Susquehanna Plant By The Contractual Deadline, The Government Has Taken Its Real Property Is Nothing More Than A Breach Of Contract Claim, Which Cannot Be Recharacterized As A Taking

PPL asserts that DOE's "failure and refusal to comply with its obligations for acceptance and disposal of PPL’s SNF has deprived, and will continue to deprive, PPL and its co-owner of the full value and economic use of the real property on which the SNF is stored at Susquehanna.” Compl. ¶ 54. It further alleges that this failure “amounts to a Fifth Amendment taking of Plaintiff’s real property on which Susquehanna is located, without just compensation. Compl. ¶ 55. PPL thus seeks damages to compensate it for the alleged taking of its property.

This Court has rejected similar arguments by other contract holders. For instance, Commonwealth Edison Company ("ComEd"), pursued a takings claim alleging that the Government's breach of the Standard Contract prevented ComEd from decommissioning its nuclear plant sites and depriving it of the commercial use of its real property. Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 654 (2003). However, this Court rejected ComEd's claim in its entirety, even though ComEd, like PPL, claimed that it had rights in its real property that were "separate and distinct" from its rights under the Standard Contract, finding that, "prior to the Standard Contract DOE did not have an obligation to accept or dispose of [ComEd's] SNF." Id. at 656. Because ComEd would have been obligated to conduct the same or similar storage activities that it had asserted gave rise to a takings claim, this Court found that ComEd's rights were enforceable through a contract remedy and dismissed ComEd's takings claim. Id.

More recently, in Pacific Gas & Electric v. United States, 70 Fed. Cl. 776 (2006), this Court "adopt[ed] fully the reasoning in [the ComEd] case with respect to the possibility of a taking arising out of the government's breach of the Standard Contract." Id. at 778. As in ComEd, this Court

concluded that, "[w]hile it may be true that plaintiff 'ha[s] real property interests that are separate from its interests under the Standard Contract, plaintiff does not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract.'" Id.; see also Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished) (dismissing Standard Contract holders' takings claims, finding that "plaintiff's taking claim is grounded on the SNF contracts that [plaintiffs] executed with the United States").[9]

---

[9] This Court has reserved judgment upon whether the plaintiff could state a claim for a taking under the Standard Contract in Detroit Edison Company v. United States, 56 Fed. Cl. 299 (2003); System Fuels, Inc. v. United States, 65 Fed. Cl. 163 (2005); Consolidated Edison Co. of New York, Inc. v. United States, 67 Fed. Cl. 285 (2005); and Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005). However, this court has explicitly rejected the approach taken in System Fuels in Klamath Irrigation District v. United States, 67 Fed. Cl. 504, 532 n.46 (2005), stating that these cases reflect a misunderstanding of the rationale for the rule favoring contract remedies, which "depends upon a symetry between the contract rights to be enforced and the contract damages that are potentially available. Once this symmetry is established, a finding on the merits that no breach occurred does not break that relationship, but merely reflects that the contract rights that were asserted either never existed or were not adversely affected by the government's actions."

Further, although the Government respectfully disagrees with decisions like Detroit Edison, and Boston Edison, the Government also notes that the reasoning in those specific decisions does not prevent the Government from prevailing upon its motion in this case. In those cases, the Court explained that it chose not to dismiss the takings claim because

Indeed, as previously discussed, any rights that PPL possesses with regard to DOE's removal of its SNF were conferred upon it by the Standard Contract. See Commonwealth Edison, 56 Fed. Cl. at 656. Absent the Standard Contract that PPL executed with DOE, DOE would have no responsibility to accept PPL's SNF. PPL cannot divorce its Standard Contract from its new claim that the contractual delay in beginning SNF acceptance somehow constitutes a taking of its real property. As previously discussed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818. Because its claim for a taking of its real property is wholly dependent upon the existence of its Standard Contract, and because PPL would have been wholly responsible for the storage and

---

a more fully developed record would allow it to assess whether the property right implicated was outside of the rights granted under the Standard Contract. Detroit Edison, 56 Fed. Cl. at 302-03; Boston Edison, 64 Fed. Cl. at 187. Moreover, in Detroit Edison, the Court rejected the contention that utility could use its takings claim to obtain remedies unavailable to it pursuant to the Standard Contract, concluding that its takings claim would not be "fatally flawed" only if it could not recover contract damages pursuant to the Standard Contract. Detroit Edison, 56 Fed. Cl. at 302-03.

disposal of its SNF absent its Standard Contract, PPL's claim for an uncompensated taking pursuant to the NWPA fails as a matter of law.

Some plaintiffs in the SNF cases have suggested that the appellate court's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), supports a contract holder's right to pursue both a takings claim and a breach of contract claim. This Court recently addressed the application of Cienega Gardens and concluded that a takings claim is not permitted when the contract at issue is with the Government and the Government is the breaching party. See Allegre Villa v. United States, 60 Fed. Cl. 11 (2004). The plaintiffs in Cienega Gardens had entered into loan agreements with third parties that were insured by the Department of Housing and Urban Development. The Government subsequently restricted the plaintiffs' prepayment rights in those contracts. Because their contracts were with third parties, the plaintiffs in Cienega Gardens were not in privity with the Government and, therefore, had no contract claim against the Government. Consequently, the plaintiffs in Cienega Garden were allowed to proceed upon a takings theory because they had no contract with the Government upon which to base a breach of contract claim and had property rights that were created outside of a contractual

relationship with the Government. Conversely, because the plaintiff in Allegre Villa had a contract with the Government and was in privity of contract with the Government, this Court required it to pursue the breach of contract claim and dismissed its takings claims:

> Because their contracts were with private lenders, plaintiffs in Cienega Gardens and Chancellor Manor were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

Allegre Villa, 60 Fed. Cl. at 19. Applying the analysis of Allegre Villa to the facts of this case, PPL's takings claim should be dismissed. PPL is seeking to recover damages based upon rights that it obtained solely through its contract with DOE: a right to acceptance of SNF. Therefore, the Court should enter summary judgment in favor of the Government upon PPL's takings claim.

## IV. TO THE EXTENT THAT THE COURT WOULD OTHERWISE GRANT THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, THE COURT SHOULD GRANT THE UNITED STATES DISCOVERY PURSUANT TO RULE 56(f) BEFORE DECIDING THAT MOTION

In the event that the Court finds that there is not ample evidence to rebut PPL's allegations regarding a liability ruling, the Government respectfully requests that it be permitted to take limited discovery on the relevant issues, pursuant to RCFC 56(f), to further support this motion. See, e.g., Dombrovskis v. Esperdy, 185 F. Supp. 478,484 (S.D.N.Y. 1960); Michael Rose Productions, Inc. v. Loew's Inc., 141 F. Supp. 257, 263 (S.D.N.Y. 1956). Specifically, we have found no evidence in the Government's files to support any argument that PPL understood at any time prior to the Government's alleged breach that it was entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the "oldest fuel first" requirement of the Standard Contract. As previously discussed, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni, 41 Fed. Cl. at 591. "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin, 816 F.2d at 1566. "A principle of contract

interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's, 697 F.2d at 1058.

Here, although we were able to serve extremely limited document production requests in the coordinated discovery proceedings that preceded PPL's complaint in this case, and PPL voluntarily provided some discovery this fall, that discovery was not as thorough as that to which we ordinarily would be entitled against a party in litigation. To the extent that the Court finds insufficient information in the Government's arguments and appendix to rebut PPL's entitlement to a ruling on liability, we respectfully request that, pursuant to RCFC 56(f), we be granted a right to conduct discovery against PPL upon these issues.

## CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment upon Counts I and II of plaintiff's complaint and our motion to dismiss Count III of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-353-0534
Fax: 202-514-8624

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

January 18, 2007

## CERTIFICATE OF FILING

I hereby certify that on January 18, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT UPON COUNTS I, II AND III OF PLAINTIFF'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield