No. 04-70C
(Judge Baskir)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PPL SUSQUEHANNA, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S SUPPLEMENTAL BRIEF ADDRESSING THE APPLICABILITY TO THIS CASE OF THE D.C. CIRCUIT'S WRIT OF MANDAMUS IN NORTHERN STATES POWER CO. V. DEPARTMENT OF ENERGY

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-353-0534
Fax: 202-514-8624

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

December 22, 2006

# TABLE OF CONTENTS


Summary of Argument .................... 1

Factual Background .................... 3

ARGUMENT .................... 15

I. Collateral Attack of the Writ of Mandamus Would Be Permissible Where the Writ Undermines this Court's Exclusive Authority under the Tucker Act to Adjudicate Contractual Liability of the United States .................... 15

II. The D.C. Circuit's Writ Of Mandamus Exceeds The Jurisdiction Of The D.C. Circuit And Correspondingly Infringes Upon The Jurisdiction Of This Court .................... 18

III. The D.C. Circuit's Writ of Mandamus Should Be Void Because There Is No Waiver of Sovereign Immunity .................... 25

CONCLUSION .................... 27

# TABLE OF AUTHORITIES

## CASES


Blinder, Robinson & Co. v. SEC,
837 F.2d 1099 (D.C. Cir. 1988), cert. denied,
488 US 869 (1988) .......... 15

Boston Edison Co. v. United States, ,
64 Fed. Cl. 167 (2005) .......... 20

Broughton Lumber Co. v. Yeutter,
939 F.2d 1547 (Fed. Cir. 1991) .......... 18

Christopher Village, L.P. v. U.S.,
360 F.3d 1319 (Fed. Cir. 2004) .......... 17, 27

Consolidated Edison Co. of New York, Inc. v. U.S. Department of Energy,
247 F.3d 1378 (Fed. Cir. 2001) .......... 26

Durfee v. Duke,
375 U.S. 106 (1963) .......... 16

Gompers v. Bucks Stove & Range Co.,
221 U.S. 418 (1911) .......... 17

Hanlin v. United States,
214 F.3d 1319 (Fed. Cir. 2000) .......... 19

Heasley v. United States,
312 F.2d 641 (8th Cir. 1963) .......... 16

Humane Society of the United States v. Clinton,
236 F.3d 1320 (2001) .......... 25

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) .......... passim

Int'l Air Response v. United States,
324 F.3d 1376 (Fed. Cir. 2003), petition for reh'g denied,
324 F.3d 1376 (Fed. Cir. 2003) ........ 15

Kalb v. Feuerstein,
308 U.S. 433 (1940) ........ 16

Lane v. Pena,
518 U.S. 187 (1996) ........ 25

Massachusetts v. Bowen,
487 U.S. 879 (1988) ........ 26

Murray v. Hoboken Land & Improvement Co.,
59 U.S. 272 (1855) ........ 18

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006) ........ passim

Northern States Power Co. v. Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997) cert. denied,
525 U.S. 1016 (1998) ........ 1, 12, 13

Northern States Power Co. v. United States,
1998 WL 276581 (D.C. Cir. Order, May 5, 1998) ........ 14, 21

Pacific Gas and Electric Co. v. United States,
73 Fed. Cl. 333 (2006) ........ 7

Preseault v. ICC,
494 U.S. 1 (1990) ........ 19

PSEG Nuclear L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) ........ 20, 21

Ex parte Rowland,
104 U.S. 604 (1881) ........ 17

Traynor v. Turnage,
485 U.S. 535 (1988) .................................................... 19

U.S. v. Nordic Village Inc.,
503 U.S. 30 (1992) .................................................... 25

United States v. United States Fid. & Guar. Co.,
309 U.S. 506 (1940) .................................................... 16

## STATUTES and REGULATIONS

5 U.S.C. § 702 .................................................... 2, 25, 26, 27

5 U.S.C. § 704 .................................................... 2, 26, 27

42 U.S.C. §§ 10101-10270 .................................................... 3

42 U.S.C. §§ 10131-45 .................................................... 19

42 U.S.C. § 10139 .................................................... 11

42 U.S.C. § 10139(a)(1)(A) .................................................... 19

42 U.S.C. § 10168(d)(1) .................................................... 9

42 U.S.C. § 10221 .................................................... 8

42 U.S.C. § 10222(a)(1) .................................................... 3

10 C.F.R. § 961.11 .................................................... 5, 6, 8

48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983) .................................................... 4

48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) .................................................. 4

59 Fed. Reg. 27007, 27008 (May 25, 1994) ............................................. 11

60 Fed. Reg. 21793 (May 3, 1995) ........................................................... 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PPL SUSQUEHANNA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-70C |
| | ) | (Judge Baskir) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL BRIEF
ADDRESSING THE APPLICABILITY TO THIS CASE OF
THE D.C. CIRCUIT'S WRIT OF MANDAMUS IN
NORTHERN STATES POWER CO. V. DEPARTMENT OF ENERGY

Pursuant to the Court's orders dated July 27, 2006, and October 4, 2006, Defendant, the United States, respectfully submits this supplemental brief "addressing the applicability to this case of the D.C. Circuit's writ of mandamus" in Northern States Power Co. v. Dept. of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998).

SUMMARY OF ARGUMENT

As this Court recently found in Nebraska Public Power District v. United States, 73 Fed. Cl. 650 (2006), certified for interlocutory review, No. 01-116C, 2006 WL 3754809 (Fed. Cl. Dec. 19, 2006), the D.C. Circuit's writ of mandamus, which prevents the Government from raising certain arguments relating to the "Unavoidable Delays" clause in the Standard Contract at issue here, may be collaterally attacked. A long line of cases

demonstrate that such orders are void, and need not be given res judicata effect, where they exceed the court's jurisdiction and are made without an appropriate waiver of sovereign immunity. Thus, to the extent that the Government can make these showings, it should not be bound by the res judicata effect of the writ.

Here, the D.C. Circuit lacked jurisdiction to issue the writ of mandamus. Section 119 of the Nuclear Waste Policy Act, upon which the court based its jurisdiction, does not grant the court jurisdiction over the matter of contract interpretation at issue here, regardless of how those issues are characterized. In this regard, the D.C. Circuit's contrary analyses in this matter actually represents a break with its prior analyses. Moreover, the writ of mandamus was also improper because it was not supported by a waiver of sovereign immunity. Such waivers must be explicit and separate from the grant of jurisdiction. As there is no waiver under section 119 of the Nuclear Waste Policy Act, the D.C. Circuit relied upon the APA, 5 U.S.C. § 702. However, section 702 may only operate as a waiver where there is no other adequate remedy in court, 5 U.S.C. § 704, which is not the case here.

BACKGROUND

In January 1983, Congress enacted the NWPA, 42 U.S.C. §§ 10101-10270. In Section 302(a) of the NWPA, Congress authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). The statute provided that the contracts should contain the following terms:

> Contracts entered into under this section shall provide that --
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). Other than establishing the manner in which the fees were to be calculated, id. § 10222(a)(2)-(3), the NWPA did not

mandate the remaining terms of the contract. Further, although the NWPA provided that DOE, "beginning not later than January 31, 1998, will dispose of [SNF]," id. § 10222(a)(5), it did not require DOE to have an operational repository by that date, but allowed temporary storage of SNF in alternative facilities pending the availability of a repository. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996) (language of subsection 302(a)(5)(A), dealing with the repository, may not be read into subsection 302(a)(5)(B), dealing with the January 31, 1998 date).

In February 1983, DOE, in furtherance of its obligations pursuant to the NWPA, published for notice and comment in the Federal Register a proposed "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste." That rulemaking was to "have the effect of developing the contractual terms and conditions under which DOE [would] make available nuclear waste disposal services." 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) (Notice of Proposed Rulemaking). After receiving and evaluating comments from interested parties, and after adopting many of the contract provisions requested in those comments, DOE published the terms of the Standard Contract in a final rule. 48 Fed. Reg. 16,590, 16,597

(Apr. 18, 1983); see 10 C.F.R. § 961.11 (containing Standard Contract terms).

The Standard Contract, in accordance with Section 302(a)(5) of the NWPA, provided that DOE would begin accepting spent nuclear fuel from nuclear utility contract holders, as a collective whole, by January 31, 1998. 10 C.F.R. § 961.11, Art. II. However, in the Standard Contract terms that it promulgated, DOE included a contract provision entitled the "Unavoidable Delays" clause, which precludes liability for a delay in the scheduled delivery, acceptance, or transport of SNF arising out of causes beyond the "reasonable control of . . . [the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual capacity:"

> Unavoidable Delays by Purchaser or DOE
>
> Neither the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE – such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather – cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will

> notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

10 C.F.R. § 961.11, Art. IX(A) (emphasis added).[1]

PPL Susquehanna ("PPL") is an electric utility company which operates a nuclear plant known as Susquehanna Steam Electric Station, Units 1 and 2. Compl. ¶5. On or about June 9, 1983, PPL executed its contract with DOE for the disposal of PPL's SNF. A. 358.[2] The Standard Contract that PPL executed did not obligate DOE to begin accepting SNF from each and every contract holder by January 31, 1998. Instead, it obligated DOE to allocate SNF acceptance rights based upon the comparative age of all SNF owned by all Standard Contract holders, with those contract holders owning the oldest SNF earning the first acceptance allocations. A. 367 (Art. IV.B.5(a)). It further contemplated that contract holders would submit delivery commitment schedules ("DCSs") for

---

[1] The Standard Contract also includes an "Avoidable Delays" clause, which the United States Court of Appeals for the Federal Circuit has held does not apply to the delay at issue in these cases. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1341 (Fed. Cir. 2000).

[2]"A. ___" refers to the appendix to this brief. Defendant's Response to Plaintiff's Motion for SummaryJudgment on Liability, Motion for Summary Judgment upon Counts I and II of Plaintiff's Complaint, and Motion to Dismiss Count III of Plaintiff's Complaint.

approval by DOE, pursuant to which DOE would agree to begin accepting specific amounts of SNF by January 31, 1998, and pursuant to which, under the "oldest fuel first" requirement of the contract, DOE would schedule subsequent acceptance of specific SNF at specific times from specific contract holders. A. 367-370 (Art. V).

Despite explicit requests from various nuclear utilities, DOE affirmatively decided not to include in the contract any commitment to accept a particular minimum amount of SNF each month or year after January 31, 1998, or to define minimum obligations regarding the amount of SNF that DOE would take each year. See, e.g., A. 38, 51. DOE determined that it could not agree to begin accepting SNF in 1998 at a particular minimum rate because of technical and political uncertainties regarding the SNF disposal program, because it did not then know what its capabilities in 1998 would actually be, and because it did not believe it appropriate to create contract rights in particular potential SNF acceptance scenarios. See Pacific Gas and Electric Co. v. United States, 73 Fed. Cl. 333, 349 (2006) ("PG&E"). Instead, the parties included in the Standard Contract a mechanism through which, beginning in 1992, DOE would identify allocations for SNF acceptance from each nuclear utility contract

holder for the first 10 years during which DOE was to accept SNF, and nuclear utilities would submit written requests to DOE based upon those allocations seeking DOE commitments to accept SNF at specific locations on specific dates. 10 C.F.R. § 961.11, Art. V.B.5 & Art V.B.6.

Subsequently, DOE began analyzing various sites to determine an appropriate location for a permanent repository and, further, developed a "Mission Plan," which the NWPA required be prepared for submission to Congress, 42 U.S.C. § 10221, identifying its best-effort goals for acceptance of SNF at the permanent repository, including various possible rates at which DOE might accept the contract holders' SNF. A. 188-204. Nevertheless, DOE included in the Mission Plan and all other planning documents written statements that the plans represented only DOE's goals at that time and, further, that the final acceptance rates that DOE actually would use to accept SNF under the standardized contracts would be published in late 1991, just before the contract holders were to submit their first SNF acceptance commitment requests. See e.g. A. 204, 207.

After DOE submitted its final Mission Plan to Congress in 1987, as required by statute, Congress amended the NWPA. See PG&E, 73 Fed. Cl. at 361. The 1987 amendments expressly allowed DOE initially to begin

SNF acceptance at an MRS interim storage facility rather than at a Federal repository. Id. To prevent an MRS from becoming a permanent storage facility, the amendments prevented DOE from commencing operations at an MRS before siting a repository. 42 U.S.C. § 10168(d)(1). Moreover, DOE was only permitted to accept 10,000 metric tons of uranium ("MTUs") at the MRS until a repository became operational. 42 U.S.C. § 10168(d)(3). By November 1989, DOE notified Congress that, because of technical, political, legal, and other issues, it did not anticipate the availability of a repository until 2010, but that DOE also anticipated beginning SNF acceptance in 1998 at an MRS, although it acknowledged that it would need to work with Congress to remove statutory linkages between the start of construction of an MRS facility and the issuance of a construction authorization for the repository. See PG&E, 73 Fed. Cl. at 362; 42 U.S.C. § 10168(d).

In 1991, pursuant to its obligations under the Standard Contract, DOE published its ACR/APR, in which it identified the amounts of SNF that it anticipated it would be able to accept beginning in 1998 through the first 10 years of the SNF acceptance program, as well as the order in which SNF acceptance allocations would be granted to individual contract

holders based the comparable age of all SNF in the nuclear industry (based upon an "oldest fuel first" allocation method). A. 404-463. DOE developed the annual SNF acceptance amounts in the ACR/APR based upon its planning goal at that point in time of having a Federal permanent repository operational by 2010 and then, recognizing the 10,000 MTU limit that Congress had placed upon acceptance of SNF at an MRS, by dividing and allocating the 10,000 MTU limitation across the initial acceptance period from 1998 through 2010. See A. 411. Based upon that division and allocation, DOE announced that it would be willing to commit, through the contractual mechanism for creating such commitments, to accept 900 MTUs per year from the nuclear utility contract holders (after a short two-year ramp-up period of 400 MTUs in 1998 and 600 MTUs in 1999). Although DOE recognized that the NWPA, as amended in 1987, barred DOE from operating an MRS before it had obtained a construction license for the permanent repository, DOE announced that it intended to seek Congress' elimination of that linkage. See PG&E, 73 Fed. Cl. at 363.

Beginning in 1992, in accordance with the contract terms, nuclear utilities began submitting delivery commitment schedules ("DCSs") for DOE's approval, seeking DOE's commitment to accept specific SNF. See

e.g., id. at 371. PPL has not yet submitted any DCSs, presumably because it did not have any allocations in the first 10 years of the program.

By 1995, DOE recognized that it would have neither a repository nor an MRS available by 1998 and that, absent a change in the statutory language, it would not have authority to accept SNF from the contract holders by January 31, 1998. See id. at 365. DOE issued a Notice of Inquiry, in which it identified its "preliminary view" that DOE had "no statutory obligation to accept [SNF] beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA] . . . ." 59 Fed. Reg. 27007, 27008 (May 25, 1994). After receiving comments from interested parties, DOE issued a Final Interpretation on May 3, 1995, which included DOE's belief that the January 31, 1998 date in the Standard Contract for beginning SNF acceptance was conditional and that, if it were unconditional, the "Delays" clause of the Standard Contract would provide an administrative remedy for DOE's failure to begin acceptance. 60 Fed. Reg. 21793 (May 3, 1995). Pursuant to the "Judicial Review" provision of the NWPA, 42 U.S.C. § 10139, several nuclear utility contract holders, although not PPL, challenged DOE's interpretation in the United States Court of Appeals for the District of Columbia Circuit. The court of

appeals limited its analysis and holding in Indiana Michigan to a determination "that section 302(a)(5)(B) [of the NWPA] create[d] an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," and remanded the matter to DOE for further action consistent with that holding. Indiana Michigan, 88 F.3d at 1277.

In late 1996, subsequent to the issuance of the Indiana Michigan decision, DOE issued letters to utilities holding NWPA disposal contracts acknowledging a contractual obligation to begin accepting SNF for disposal by January 31, 1998, but advising that it would be unable to do so. See Northern States Power, 128 F.3d at 757. These letters solicited the views of the recipients regarding the best means to accommodate the anticipated delay in SNF acceptance. Id. On June 3, 1997, after considering the responses that it received, DOE informed the standard contract holders that it viewed its inability to accept SNF beginning January 31, 1998, to constitute an "unavoidable delay" under Article IX.A of the contracts, but that it nonetheless was willing to consider possible contract amendments to mitigate the delay's effect. Id.

Subsequently, various utilities sought a writ of mandamus from the

D.C. Circuit to compel DOE to comply with the holding in Indiana Michigan and to begin contract performance by the January 31, 1998 deadline. The Court declined to issue a broad writ of mandamus, finding that the petitioners had another "potentially adequate remedy" under the remedies provision of the Standard Contract. Northern States, 128 F.3d at 759. However, it issued a limited writ of mandamus ordering DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Id. at 760. The Court stated that, "[m]ore specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." Id. Thus, the Court concluded that

> DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that contravene this court's prior ruling. We hold that this provision in the Standard Contract, insofar as it is applied to DOE's failure to failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an uncor

Id. DOE sought rehearing on the grounds that the court had "erroneously designated itself as the proper forum for adjudication of disputes arising

under the Standard Contract" contrary to the Tucker Act. See Northern States Power Co. v. United States, 1998 WL 276581, at *2 (D.C. Cir. Order, May 5, 1998). The D.C. Circuit denied DOE's petition stating that the mandamus "merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998." Id. It further explained that "[t]he statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA." Id.

DOE was ultimately unable to begin SNF acceptance from the contract holders by January 31, 1998, and this suit followed. PPL seeks damages for DOE's alleged partial breach of the Standard Contract, breach of the implied covenant of good faith and fair dealing, and an uncompensated taking. Compl. ¶¶ 38-55.

## ARGUMENT

### I. COLLATERAL ATTACK OF THE WRIT OF MANDAMUS WOULD BE PERMISSIBLE WHERE THE WRIT UNDERMINES THIS COURT'S EXCLUSIVE AUTHORITY UNDER THE TUCKER ACT TO ADJUDICATE CONTRACTUAL LIABILITY OF THE UNITED STATES

The Court has asked the parties to address the applicability to this case of the D.C. Circuit's writ of mandamus in Northern States Power. As a threshold matter, the Government must address whether that writ may be challenged collaterally in this litigation. While a party generally may not avoid res judicata based upon a court's lack of subject matter jurisdiction, an exception to this rule applies where giving preclusive effect to the prior judgment would "'substantially infringe[ ] the authority of another tribunal or agency of the government,' Restatement (Second) of Judgments § 12(2) (1982), or . . . improperly trench[ ] on sovereign immunity." Blinder, Robinson & Co. v. SEC, 837 F.2d 1099, 1103 (D.C. Cir. 1988), cert. denied, 488 US 869 (1988). Thus, the Federal Circuit has determined that collateral review may be obtained where permitting the prior decision to stand would "directly implicat[e] issues of sovereign immunity." Int'l Air Response v. United States, 324 F.3d 1376, 1380 (Fed. Cir. 2003), petition for reh'g denied, 324 F.3d 1376 (Fed. Cir. 2003). Likewise, the Supreme

Court has repeatedly recognized the importance of permitting judgments to be attacked collaterally in order to preserve sovereign immunity, emphasizing that, where there has been no waiver of sovereign immunity, the judgment is void.. See Durfee v. Duke, 375 U.S. 106, 114 (1963) (prior judgement could be collaterally attacked because claims against the United States "are justiciable only in those courts where Congress has consented to their consideration."); United States v. United States Fid. & Guar. Co., 309 U.S. 506, 513 (1940) ("Consent alone gives jurisdiction to adjudge against the sovereign . . . . Absent that consent, the attempted exercise of judicial power is void.").

These principles have also been specifically applied to court orders. A number of courts have reasoned, in part, that if a judgment is void, as a matter of common sense, an order based upon the judgment must also be void. See e.g. Heasley v. United States, 312 F.2d 641, 648 (8th Cir. 1963). Similarly, the Supreme Court has determined that a court order which involved a subject matter within the exclusive jurisdiction of another court was "not merely erroneous, but was beyond [the court's] power, void, and subject to collateral attack." Kalb v. Feuerstein, 308 U.S. 433, 438-39 (1940). Moreover these principles have been extended specifically to writs

of mandamus. For instance, in Ex parte Rowland, 104 U.S. 604 (1881), the Supreme Court reviewed a writ of habeas corpus involving a state court contempt citation for disobeying a writ of mandamus. The Court concluded that the validity of the contempt citation depended entirely on the power of that court to require the activity involved in the mandamus. "The object of the writ was to enforce the performance of an existing duty not to create a new one." Id. at 612. Thus, "if the comand was in whole or in part beyond the power of the court, the writ, or so much as was in excess of jurisdiction, was void, and the court had no right in law to punish for any contempt of its unauthorized requirements." Id.; see Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 436 (1911).

Relying upon this line of cases, the Federal Circuit has expressly found that either a judgment or an order may be subject to collateral attack in this court. "Respect for the exclusive jurisdiction of the Court of Federal Claims is no less important than respect for the exclusive jurisdiction of the . . . courts in Kalb or . . . Fidelity & Guaranty. The history of the Court of Federal Claims' jurisdiction over suits under the Tucker Act emphasizes the importance that Congress ascribed to the exclusive nature of that jurisdiction." Christopher Village, L.P. v. U.S., 360 F.3d 1319, 1332 (Fed.

Cir. 2004). Moreover, the Federal Circuit has ultimately found other Federal court of appeals' judgments on various contract issues void reasoning that its "ruling, like the ones at issue in Kalb and Fidelity & Guaranty did not merely exceed the court's jurisdiction, it directly implicat[ed] issues of sovereign immunity. . . .'" Thus, the Government may attack the D.C. Circuit's writ of mandamus in this litigation to the extent that its writ exceeded its jurisdiction or was issued without a necessary waiver of sovereign immunity.

## II. The D.C. Circuit's Writ Of Mandamus Exceeds The Jurisdiction Of The D.C. Circuit And Correspondingly Infringes Upon The Jurisdiction Of This Court

This Court recently held that the D.C. Circuit's writ of mandamus is void ab inito. Nebraska Public Power District, 73 Fed. Cl. at 652. The United States is immune from suit except to the extent that it consents to be sued. Murray v. Hoboken Land & Improvement Co., 59 U.S. 272, 283-94 (1855). An analysis of whether consent has been given must not only point to an identifiable waiver of sovereign immunity for the party's specific claim against the United States, but also a waiver of sovereign immunity authorizing that party to sue the United States in that particular court. Broughton Lumber Co. v. Yeutter, 939 F.2d 1547, 1550 (Fed. Cir. 1991).

Waivers of sovereign immunity must be strictly construed, id. at 1552, "a result particularly sensible where it is argued that a new statute, either directly or indirectly effectively preempts the preexisting scope of the Tucker Act." Nebraska Public Power District, 73 Fed. Cl. at 660 (citing Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir. 2000); Preseault v. ICC, 494 U.S. 1, 12 (1990); Traynor v. Turnage, 485 U.S. 535, 547 (1988)).

Here, the D.C. Circuit relied upon section 119 of the NWPA as the source of its jurisdiction. That section provides, in pertinent part, that "the United States court of appeals shall have original and exclusive jurisdiction over any civil action - for review of any final decision or action of the Secretary, the President or the Commission under this part." 42 U.S.C. § 10139(a)(1)(A). The "part" in which this text appears, and to which it refers, is Part A of Subchapter I of Chapter 108 of Title 42, codified at 42 U.S.C. §§ 10131-45, "Repositories for Disposal of High Level Radioactive Waste and Spent Nuclear Fuel." The provisions that deal with the formation and content of the Standard Contracts, however, appear in a different part of the statute – Part C of Subchapter 1, and for the most part, in section 302(a)(5)(B) of that subchapter as amended, codified at 42

U.S.C. § 10222(a)(5)(B). See Boston Edison Co. v. United States, 64 Fed. Cl. 167, 176-77 (2005). "[N]othing in Section 119 of the NWPA purports to provide an alternative, exclusive jurisdictional path that would displace the otherwise generally applicable jurisdictional statute, including, especially, the Tucker Act." Id. at 177.

In fact, the Federal Circuit has considered the scope of the D.C. Circuit's jurisdiction in considering whether it had jurisdiction over certain contract claims. See PSEG Nuclear L.L.C. v. United States, 465 F.3d 1343 (Fed. Cir. 2006). It found that the D.C. Circuit had jurisdiction over whether DOE "properly incorporated . . . obligations" into the contract, but the Federal Circuit had jurisdiction over "whether the DOE breached its contractual obligations, and, if so, to what damages, if any, PSEG is entitled for breach." Id. at 1350-51. Although it found that "agency actions mandated under Title III which relate to the creation of repositories for spent nuclear fuel fall within the class of actions subject to review by the courts of appeals under section 119," id. at 1349, "the Federal Circuit plainly did not intend that any action that remotely related to the repository be within the purview of section 119 as that construction would sweep in all the issues pending before this court." Nebraska Public Power District, 73

Fed. Cl. at 664. "[I]n describing where this court's jurisdiction begins, the Federal Circuit sub silentio described where the D.C. Circuit's jurisdiction ends, to wit, that the latter court's jurisdiction does not extend beyond reviewing agency actions under Title III that relate to the creation of the repository." Id. The Federal Circuit's reading of section 119 does not encompass the interpretations of contract provisions at issue in Indian Michigan and Northern States Power, as they have nothing to do with the "creation of repositories for spent nuclear fuel." PSEG Nuclear L.L.C. v. United States, 465 F.3d at 1349.

As the D.C. Circuit expressly acknowledged in Northern States II, the NWPA merely "requires the DOE to include an unconditional obligation in the Standard Contract [and] does not itself require performance. Breach by the DOE does not violate a statutory duty . . . ." Northern States II, 1998 WL 276581, at *2. The only relevant statutory duty with which DOE was charged was the obligation, pursuant to Section 302(a)(5) of the NWPA, 42 U.S.C. § 10222, to include certain terms in the contracts that DOE would execute. Id. That is, Section 302 of Title III of the NWPA does not mandate that DOE begin SNF acceptance on January 31, 1998. Instead, it provides that DOE include language in contracts which provides

that, in return for the payment of fees, DOE, "beginning not later than January 31, 1998, will dispose" of SNF. 42 U.S.C. § 10222(a)(5). The United States assumed this duty by promulgating contract terms in April 1983, which formed the basis of contracts that nuclear power owners and generators entered in June 1983. Those terms included the January 31, 1998 date, but also included an "Unavoidable Delays" clause that excused liability if the date could not be met for the reasons covered by that clause. To the extent that interested parties believed that DOE had not complied with its statutory requirement, they had 180 days from the promulgation of the Standard Contract to challenge that action pursuant to the NWPA's judicial review provision. See 42 U.S.C. § 10139(c). Once this 180-day period expired without challenge, the terms of the Standard Contract were fixed, and compliance by the United States with the duty to begin accepting fuel became enforceable solely through an action, pursuant to the Tucker Act, for breach of the Standard Contract, in the form in which the Standard Contract was promulgated and executed. When a statutory provision waiving the Government's sovereign immunity "contains a statute of limitations, the limitations period constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota ex rel. Bd. of Univ. & School

Lands, 461 U.S. 273, 287 (1983). Here, once the statute of limitations expired upon the nuclear utilities' ability to challenge DOE's implementation of the contracting provisions in the NWPA, 42 U.S.C. § 10222(a)(5), any waiver of sovereign immunity by the Government through which the D.C. Circuit could have reviewed the contract provisions to ensure compliance with the statutory requirements in Section 302(a)(5) expired.

Further, in issuing the writ of mandamus, the Court of Appeals for the D.C. Circuit did not act to compel performance of the duty, as the petitioners in that case had requested, to begin accepting fuel. Instead, it adjudicated the entirely separate question of whether the delay of the United States in performing was "avoidable" or "unavoidable" – terms that appear solely within the Standard Contract and are wholly absent from the NWPA. The distinction between what the petitioners requested and what the D.C. Circuit actually ordered only serves to magnify the distinction between a writ vindicating rights guaranteed by statute and rights that are properly adjudicated exclusively in an action for breach of contract. Although Congress might have waived the sovereign immunity of the United States with respect to claims seeking to compel performance of a

duty actually required by the NWPA (such as the duty to include particular terms in the Standard Contract), it did not consent to the adjudication in the courts of appeals of disputes concerning the meaning or appropriateness of contractual terms in contracts to which the United States is a party, particularly where the challenge came more than 14 years after the contracts were executed.[3] As the United States Court of Appeals for the First Circuit cogently explained in another context, "Congress did not intend . . . the extraordinary writ of mandamus to be converted into a device for obtaining piecemeal solution of contractual disputes to which the United States is a party." Coggeshall Development Corp. v. Diamond, 884 F.2d 1, 4 (1st Cir. 1989). With all due respect, the D.C. Circuit's writ of mandamus encroached into the realm of interpreting the terms of a contract that had been fixed in accordance with procedures designated by Congress. Its issuance of a writ to correct this process was beyond the scope of its jurisdiction.

[3] The United States district courts have concurrent jurisdiction over claims for breach of contract that do not exceed $10,000. 28 U.S.C. § 1346(a)(2).

III. The D.C. Circuit's Writ of Mandamus Should Be Void Because There Is No Waiver of Sovereign Immunity

Even if section 119 afforded the D.C. Circuit jurisdiction over these matters, the D.C. Circuit still should not have addressed them because there is no waiver of sovereign immunity. Nebraska Public Power District, 73 Fed. Cl. at 666. Section 119 itself does not contain a waiver, as such waivers must be "unequivocally expressed in statutory text" and are "strictly construed in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996). Statutory language that confers jurisdiction does not, by itself, constitute a waiver, as a grant of jurisdiction does not "show Congress has abrogated all defenses to that claim." U.S. v. Nordic Village Inc., 503 U.S. 30, 38 (1992); see Humane Society of the United States v. Clinton, 236 F.3d 1320, 1326 (2001); Moore's Federal Practice ¶ 105.21[1] (3d ed. 1998). Moreover, to constitute a waiver, statutory language must specify the remedy or relief that may be awarded against the United States. Lane 518 U.S. at 196; Nordic Village 503 U.S. at 34.

Accordingly, the D.C. Circuit appears to have relied on the APA, 5 U.S.C. § 702 as a waiver of sovereign immunity. Nebraska Public Power District, 73 Fed. Cl. at 667. However, "while the waiver in section 702 generally supports the exercise of jurisdiction under section 119, it did not

support the portion of the judgment that, in turn, yielded the mandamus entered in Northern States. That is because, as the Supreme Court emphasized in Bowen [v. Masachusetts], 487 U.S. [879,] 892-93 [(1988)], the section 702 waiver applies only if certain statutory requirements are met, inter alia the requirement in section 704 that there be 'no other adequate remedy in another court.'" Id. Although the D.C. Circuit apparently reasoned that the remedies in this Court are inadequate because this Court lacks the ability to award independent injunctive relief, see id., the Federal Circuit does not recognize this fact as a basis for a waiver under the APA. Rather, it "has considered the adequacy of the remedies by viewing, more practically, the impact of a judgment rendered by this court." Id. Thus, it has concluded that "[a] party may not circumvent the [Court of Federal Claims'] exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory, or mandatory relief where the thrust of the suit is to obtain money from the United States." Consolidated Edison Co. of New York, Inc. v. U.S. Department of Energy, 247 F.3d 1378, 1385 (Fed. Cir. 2001). "[A] litigant's ability to sue the government for money damages in the Court of Federal Claims is an 'adequate remedy' that precludes an APA waiver of sovereign

immunity in other courts." Christopher Village, 360 F.3d at 1327. Therefore, under the law of this circuit, "section 704 precluded the D.C. Circuit from relying on the section 702 waiver in issuing the judgment that, in turn led it to issue in Northern States the mandamus at issue. . . [which] provides yet another reason for concluding that, to the extent the judgment in Indiana Michigan covered areas within this court's jurisdiction, the judgment was void." Nebraska Public Power District, 73 Fed. Cl. at 672.

## CONCLUSION

For the foregoing reasons, the D.C. Circuit's writ of mandamus should not be enforceable. Nevertheless, this Court's recent decision in Nebraska Public Power has been certified for interlocutory appeal, and the plaintiff in that case filed a petition with the Federal Circuit on January 5, 2007, seeking permission to appeal. If the petition to appeal is granted, the Federal Circuit's decision regarding the enforceability of the D.C. Circuit's continuing writ should significantly inform further proceedings in these cases.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-353-0534
Fax: 202-514-8624

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

December 22, 2006

CERTIFICATE OF FILING

I hereby certify that on December 22, 2006, a copy of the foregoing "" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield