4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

| | | | | | |
|---|---|---|---|---|---|
| Interest = | Unpaid Balance Due To DOE For Assigned Three Month Period | X | Quarterly Treasury Rate Plus Six Percent (6%) | X | Number of Months Late Including Month Of Payment (Fractions Rounded Up to Whole Months) / 12 |

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice for interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

ARTICLE IX - DELAYS

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE -- such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather--- cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

ARTICLE X - SUSPENSION

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion

of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

ARTICLE XI - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

ARTICLE XII - NOTICES

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

U.S. Department of Energy
Procurement and Assistance Management Directorate
Office of Procurement Operations
Washington, D.C. 20585
Attention:
Thomas S. Keefe

To the Purchaser:

Pennsylvania Power & Light Company

Attn: Mr. D. T. Colbert
Supervisor-Economics & Contracts

Two North Ninth Street
Allentown, PA 18101

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; provided, however, that notice of such changes shall be given by registered mail.

ARTICLE XIII - REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

ARTICLE XIV - ASSIGNMENT

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

ARTICLE XV - AMENDMENTS

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; provided, however, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April 18, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

ARTICLE XVI - DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

ARTICLE XVII - OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

ARTICLE XVIII - COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

ARTICLE XIX - EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

ARTICLE XX - PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

ARTICLE XXI - RIGHTS IN TECHNICAL DATA

A. Definitions.

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B. Allocation of rights.

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

LIMITED RIGHTS LEGEND

This "proprietary data," furnished under "Contract No. ____________" with the U. S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

ARTICLE XXII - ENTIRE CONTRACT

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

C. Appendices:

A. Nuclear Power Reactor(s) or Other Facilities Covered

B. Discharge Information (Ten Year; Annual)

C. Delivery Commitment Schedule

D. Final Delivery Schedule

E. General Specifications

F. Detailed Description of Purchaser's Fuel

G. Standard Remittance Advice

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF ENERGY

BY: [signature]
(Contracting Officer)
Thomas S. Keefe

WITNESSES AS TO EXECUTION ON BEHALF OF PURCHASER

Jerome S. Stefanko
(Name)
Two North Ninth Street
Allentown, PA 18101
(Address)

Donald T. Colbert
(Name)
Two North Ninth Street
Allentown, PA 18101
(Address)

(Purchaser's Company Name)

By: J. T. Kauffman

Title: Executive Vice President-Operations

I, Helen J. Wolfer, certify that I am the Assistant Secretary of the corporation named as Purchaser herein; that J. T. Kauffman who signed this document on behalf of the Purchaser was then Executive Vice President-Operations of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said corporation this 9th day of June, 1983

(Corporate Seal)

Helen J. Wolfer
(Signature)

APPENDIX A

NUCLEAR POWER REACTOR(S) OR OTHER FACILITIES COVERED

Purchaser Pennsylvania Power & Light Company

Contract Number/Date DE-CR01-83NE4404 / June 9, 1983

Reactor/Facility Name Susquehanna Steam Electric Station - Unit One

Location:

Street U.S. Route 11, P.O. Box 467

City Salem Township

County/State Luzerne / Pennsylvania

Zip Code 18603

Capacity (MWE) - Gross 1100

Reactor Type:

BWR [X]

PWR [ ]

Other (Identify) ____________

Facility Description The Nuclear Steam Supply System consists of a General Electric Boiling Water Reactor, BWR/4 with 764 fuel assemblies.

Date of Commencement of Operation Sept. 10, 1982
(actual or estimated)

NRC License #: NPF-14

By Purchaser:

D. P. Colbert
Signature

Supervisor-
Economics & Contracts
Title

June 13, 1983
Date

# APPENDIX A

## NUCLEAR POWER REACTOR(S) OR OTHER FACILITIES COVERED

Purchaser Pennsylvania Power & Light Company

Contract Number/Date DE-CR01-83NE44404 / June 9, 1983

Reactor/Facility Name Susquehanna Steam Electric Station - Unit Two

Location:

Street U.S. Route 11, P.O. Box 467

City Salem Township

County/State Luzerne / Pennsylvania

Zip Code 18603

Capacity (MWE) - Gross 1100

Reactor Type:

BWR [X]

PWR [ ]

Other (Identify) ______

Facility Description The Nuclear Steam Supply System consists of a General Electric Boiling Water Reactor, BWR/4 with 764 fuel assemblies.

Date of Commencement of Operation March, 1984 (estimated)
(actual or estimated)

NRC License #: ______

By Purchaser: D. P. Collett
Signature

Supervisor - Economics & Contracts
Title

June 13, 1983
Date

# APPENDIX B

## TEN YEAR DISCHARGE FORECAST

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ______________

Type: BWR ☐

PWR ☐

Other (Identify) ______________________________

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date - mo/yr (or refueling shut down date) | | | | | | | | | | | |
| Metric tons - initial | | | | | | | | | | | |
| - discharged | | | | | | | | | | | |
| Number of assemblies discharged (per cycle) | | | | | | | | | | | |

By Purchaser:

______________________ ______________________ ______________

Signature Title Date

APPENDIX B
(Enclosure 1)

ACTUAL DISCHARGES

Purchaser ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

Location:
Street ______________________________
City ______________________________
County/State ______________ / ______________
Zip Code ________

Type:

BWR ☐

PWR ☐

Other (Identify) ______________________________

Refueling Shutdown Date ______________

Metric Tons Uranium (Initial/Discharged); ________ / ________
Initial Discharged

Number of Assemblies Discharged: ______________________________

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| Signature | Title | Date |
|---|---|---|

## APPENDIX C

## DELIVERY COMMITMENT SCHEDULE

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ________

Type Cask Required: ______________________________

Shipping Lot Number (Assigned by DOE) ____________

Proposed Shipping Mode: Truck ☐ Rail ☐ Barge ☐

Proposed Delivery Date ____________

DOE Assigned Delivery Commitment Date ____________

Range of Discharge Date(s) (Earliest to Latest) ____ / ____ / ____ To ____ / ____ / ____
Mo Day Yr Mo Day Yr

Metric Tons Uranium: (Initial) ____________
(Discharged) ____________

Number of Assemblies:

BWR ________

PWR ________

Other ______



COF0191221

APPENDIX C

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| Signature | Title | Date |
|---|---|---|

Approved by DOE:

| Technical Representative | Title | Date |
|---|---|---|

| Contracting Officer | Date |
|---|---|

APPENDIX D

FINAL DELIVERY SCHEDULE

(To be submitted to DOE by Purchaser for each designated Purchaser Delivery site not later than twelve (12) months prior to estimated date of first delivery.)

Purchaser: ____________________

Contract Number/Date __________ / __________

Reactor/Facility Name ____________________

Location:

Street ____________________

City ____________________

County/State __________ / __________

Zip Code __________

Type(s) cask(s) required: __________ # Assembilies per cask ___

Shipping Lot Number __________ (Assigned by DOE)

Shipping Mode: Truck ___ Rail ___ Barge ___

Metric Tons Urainum: (Initial) __________ (Discharged) __________

Range of Discharge Date(s) (Earliest to Latest) ___ / ___ / ___ To ___ / ___ / ___ (Mo / Day / Yr To Mo / Day / Yr) (From approved commitment schedule)

Number of Assemblies:

BWR __________

PWR __________

Other __________

Purchaser's Delivery Estimate First ___ / ___ / ___ (Mo / Day / Yr) Last ___ / ___ / ___ (Mo / Day / Mo)

APPENDIX D

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

To confirm acceptability of delivery date(s):

Purchaser Contact ____________ Title ____________
Phone ____________

DOE Contact ____________ Title ____________
Phone ____________

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| ____________ | ____________ | ____________ |
|---|---|---|
| Signature | Title | Date |

Approved by DOE:

| ____________ | ____________ | ____________ |
|---|---|---|
| Technical Representative | Title | Date |
| Contracting Officer | | Date |

# APPENDIX E

## GENERAL SPECIFICATIONS

A. Fuel Category Identification.

1. Categories--Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE, as follows:

   a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in paragraph B below.

   b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as Nonstandard Fuel Classes NS-1 through NS-5, pursuant to paragraph B below.

   c. "Failed Fuel" means SNF that meets the specifications set forth in subparagraphs 1 through 3 of paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below.

   d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

B. Fuel Description and Subclassification--General Specifications.

1. Maximum Nominal Physical Dimensions.

| | Boiling Water Reactor (BWR) | Pressurized Water Reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches |
| Cross Section* | 6 inches x 6 inches | 9 inches x 9 inches |

*The cross section of the fuel assembly shall not include the channel.

NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-1.

## APPENDIX E

2. Nonfuel Components. Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

   NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-2.

3. Cooling. The minimum cooling time for fuel is five (5) years.

   NOTE: Fuel that does not meet this specification shall be classified as Nonstandard Fuel--Class NS-3.

4. Non-LWR Fuel. Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel--Class NS-4. Such fuel may be unique and require special handling, storage, and disposal facilities.

5. Consolidated Fuel Rods. Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS-5.

6. Failed Fuel

   a. Visual Inspection.

      Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel--Class F-1.

   b. Previously Encapsulated Assemblies.

      Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel--Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

   c. Regulatory Requirements.

      Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

# APPENDIX E

C. Summary of Fuel Classifications.

1. Standard Fuel:

   a. Class S-1: PWR
   b. Class S-2: BWR

2. Nonstandard Fuel:

   a. Class NS-1: Physical Dimensions
   b. Class NS-2: Non Fuel Components
   c. Class NS-3: Short Cooled
   d. Class NS-4: Non-LWR
   e. Class NS-5: Consolidated Fuel Rods.

3. Failed Fuel:

   a. Class F-1: Visual Failure or Damage
   b. Class F-2: Radioactive "Leakage"
   c. Class F-3: Encapsulated

D. High-Level Radioactive Waste.

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

DOE/RW-0331P

*Office of Civilian Radioactive Waste Management*

# *Annual Capacity Report*

**December 1991**

*U.S. Department of Energy*
*Office of Civilian Radioactive Waste Management*

Available from:

**U.S. Department of Energy**
Office of Scientific and Technical Information
Post Office Box 62
Oak Ridge, TN 37831

DOE/RW-0331P

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

**December 1991**

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

# CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT . . . . . . . . . . . . 1

1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES . . . . . . . . . . . . . . 2

1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . 2

2.0 WASTE ACCEPTANCE PROJECTIONS . . . . . . . . . . . . . . . . . . . 4

3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . . . . . 6

3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY . . . . 6

3.2 DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . . 7

4.0 ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . . . . . . . . . . 10

4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . 10

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.1

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B.1

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is the fourth in the series published by DOE. In December 1991, the Department published the 1991 Acceptance Priority Ranking (APR) that established the order in which the Department will allocate acceptance capacity. As required by the Standard Contract, the priority ranking for acceptance capacity is based on the date the spent nuclear fuel (SNF) was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR, resulting in individual Purchaser allocations. These allocations are listed in Appendix A and summarized in Table 3.1

The projected waste acceptance rates for SNF presented in Table 2.1 assume: a site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy of 1982, as amended (NWPA) will be modified. During the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA. The annual acceptance rates provide an approximation of the system throughput and are subject to change as the program progresses. The ACR allocates only that portion of the FWMS capacity assigned to SNF originating from reactors and covered by the Standard Contract and DOE-owned SNF from commercial industry and civilian development programs.

Section 1.0 provides a discussion of the requirement for the ACR and the role it plays in the Department's interaction with the Purchasers in implementing the provisions of the Standard Contract. The FWMS projected

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (NWPA)[1] assigns the Federal Government responsibility for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy (Secretary) under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT

Under the terms of the Standard Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance capacity allocations to the Purchasers for ten years following the projected commencement of DOE facility operations. Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers. As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

**Owners or generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

Purchasers. Beginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter. The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser.

## 1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for the effective and equitable implementation of the FWMS are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing sixty-four of the sixty-six owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the

implementation of the Standard Contract provisions. Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

continue to be responsible for storing their spent fuel until acceptance by DOE.

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

## 3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY

DOE is required to accept for disposal all commercial SNF/HLW from owners or generators, as prescribed by the NWPA. However, since acceptance capacity will be limited in any given year, an acceptance priority ranking is established in the Standard Contract to allocate the projected acceptance capacity to individual Purchasers. The ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. Tables in Appendix A list the Purchasers' annual allocations for each of the first ten years of projected FWMS operation. The table in Appendix B is extracted from the 1991 Acceptance Priority Ranking (APR) and chronologically lists the SNF which provides the basis for the allocation of acceptance capacity. Table 3.1 presents a summary of Purchasers' annual allocations for the ten year period covered by this report.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process apportions projected acceptance capacity to the Purchasers on an annual basis. The priority for acceptance capacity allocation is based on the 1991 APR. The permanent discharge date for each spent fuel assembly is the basis for determining the Purchasers' positions in the APR. Acceptance capacity allocated in the ACR is expressed in terms of MTU. All SNF, regardless of its subsequent classification for delivery,* qualifies for an allocation based on an OFF priority on an industry-wide basis. There are currently no procedures for assigning priority ranking to non-fuel components or high-level radioactive waste. Priority ranking has not been afforded to temporarily discharged fuel or to projected SNF discharges.

---

*The Standard Contract (Appendix E) requires the Purchaser to classify SNF as standard, nonstandard and/or failed SNF prior to delivery.

After the SNF was listed in accordance with the APR, it was divided into ten groupings, each of whose cumulative MTU equals the projected annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The Purchasers' allocations for each year are presented in Tables A.1 through A.10 in Appendix A.

The tables in Appendix A list the owners of the SNF alphabetically, with a sublisting of the reactors that were the source of the qualifying SNF by the number of assemblies and their equivalent MTU. The exact order of deliveries within each year will not be specified until the Purchasers' Final Delivery Schedules (FDS) are approved by DOE.

As in past ACRs, allocations in the 1991 ACR are based on a 1-year allocation period. DOE continues to investigate the impacts on the system of expanding these allocation periods from eighteen to thirty-six months. Use of expanded allocation periods could result in a reduction in the frequency of deliveries when serving each Purchaser. Final results of this study are not yet available. DOE will keep Purchasers apprised of the results of this analysis.

## 3.2 DELIVERY COMMITMENT SCHEDULES

The Standard Contract provides that beginning January 1, 1992, Purchasers shall submit to DOE DCSs that identify all SNF the Purchasers plan to deliver to DOE beginning sixty-three months thereafter. Due to the limited projected annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year may be approved.

A summary of Purchaser allocations is presented in Table 3.1. These allocations are the basis for DCS submittals. Among other things, the DCS identifies the range of discharge dates from which the SNF will ultimately be selected for delivery. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation. DCS forms and instructions will be sent to Purchasers in early 1992.

The information contained on the Purchasers' approved DCSs will assist DOE in implementing the waste acceptance process. Approved DCSs will be the basis for the Purchasers' FDSs, to be submitted twelve months prior to delivery. As provided in Article V of the Standard Contract, the Purchasers also have the right to exchange approved DCSs with other Purchasers, subject to DOE approval.

TABLE 3.1 SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | -- | -- | 21.1 | -- | -- | 24.4 | 12.9 | 58.4 |
| ARIZONA PUBLIC SERVICE COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ARK POWER & LIGHT COMPANY | -- | -- | -- | 23.2 | 28.2 | -- | 30.1 | -- | 46.4 | -- | 127.9 |
| BABCOCK AND WILCOX COMPANY | -- | -- | <0.1 | <0.1 | -- | -- | -- | -- | -- | -- | <0.1 |
| BALTIMORE GAS & ELEC COMPANY | -- | -- | -- | 12.6 | 41.4 | 28.5 | 52.1 | -- | 55.3 | 29.5 | 219.3 |
| BOSTON EDISON COMPANY | -- | 3.9 | 25.4 | 82.6 | -- | -- | 11.4 | 5.5 | -- | 42.7 | 171.5 |
| CAROLINA POWER & LIGHT COMPANY | -- | 70.1 | 24.3 | 23.7 | 50.4 | 32.0 | 20.6 | 93.1 | -- | 49.5 | 363.7 |
| CLEVELAND ELEC ILLUM COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| COMMONWEALTH EDISON COMPANY | 21.1 | 60.4 | 153.8 | 121.0 | 163.8 | 175.3 | 66.8 | 107.8 | 98.2 | 98.2 | 1066.4 |
| CONNECTICUT YANKEE ATOMIC POWER | 65.5 | 22.5 | 19.8 | 21.8 | 21.8 | 20.2 | -- | 21.8 | -- | 21.8 | 215.1 |
| CONSOLIDATED EDISON COMPANY | 2.9 | 27.7 | 32.7 | -- | 27.0 | -- | 28.3 | 2.3 | 22.2 | -- | 143.0 |
| CONSUMERS POWER COMPANY | -- | 2.5 | 87.3 | 2.7 | 27.3 | 3.5 | 26.5 | -- | 2.8 | 30.8 | 183.4 |
| DAIRYLAND POWER COOP | 0.7 | 6.0 | 3.0 | 3.9 | -- | 3.4 | -- | -- | 1.4 | 3.3 | 21.7 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. DOE | 18.1 | 11.1 | 3.2 | 4.5 | 7.3 | 72.8 | 16.3 | -- | 3.3 | 19.9 | 156.5 |
| DUKE POWER COMPANY | -- | 24.8 | 47.6 | 62.4 | 58.3 | 56.1 | 61.1 | 31.5 | 63.5 | 66.3 | 471.7 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | -- | -- | -- | 16.6 | -- | -- | 24.4 | 41.0 |
| FLORIDA POWER & LIGHT COMPANY | -- | 20.8 | 37.0 | 40.4 | 32.8 | 40.8 | 71.3 | 33.1 | 52.1 | 37.6 | 366.1 |
| FLORIDA POWER CORP | -- | -- | -- | -- | 1.4 | -- | 26.0 | 20.4 | -- | 30.1 | 78.0 |
| G. E. URANIUM MGT. CORP | 145.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.0 |
| GENERAL ATOMICS | <0.1 | <0.1 | -- | -- | <0.1 | -- | -- | <0.1 | <0.1 | <0.1 | <0.1 |
| GEORGIA POWER COMPANY | -- | -- | -- | 0.7 | 4.5 | -- | 35.2 | -- | 56.4 | 15.2 | 112.1 |
| GPU NUCLEAR | 31.1 | 43.0 | 46.8 | 49.4 | 33.9 | 55.2 | -- | 27.6 | -- | -- | 286.9 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HOUSTON LIGHTING & POWER | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| INDIANA & MICH ELEC COMPANY | -- | -- | -- | 28.5 | 29.1 | -- | 62.4 | 27.9 | 69.7 | -- | 217.6 |
| IOWA ELEC LIGHT & POWER COMPANY | -- | -- | 15.4 | 13.9 | 21.8 | 0.8 | -- | 16.5 | 15.5 | -- | 83.8 |
| KANSAS GAS AND ELECTRIC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LONG ISL LIGHT COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LOUISIANA POWER AND LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| MAINE YANKEE ATOMIC | -- | 26.3 | 57.9 | 27.2 | -- | 50.6 | -- | 26.2 | 28.2 | -- | 216.5 |
| MISSISSIPPI POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NEBRASKA PUB POWER DIS | -- | -- | -- | 23.5 | 13.8 | -- | 31.2 | 28.7 | 21.0 | -- | 118.1 |
| NHY DIVISION OF PSNH | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NIAGARA MOHAWK POWER CORP | 9.3 | 49.0 | 38.8 | 30.7 | -- | 31.1 | -- | -- | 36.8 | -- | 195.8 |
| NORTHEAST UTIL SVC COMPANY | 5.4 | 40.6 | 28.2 | 24.3 | 41.9 | 26.5 | 28.1 | 59.1 | -- | 28.3 | 282.4 |
| NORTHERN STATES POWER COMPANY | -- | 26.1 | 83.5 | 29.8 | 33.9 | 17.5 | 32.5 | 43.2 | 35.7 | 16.0 | 318.3 |
| OMAHA PUB POWER DIST | -- | -- | 9.3 | 12.8 | 18.9 | 16.4 | -- | 14.7 | -- | 14.6 | 86.7 |
| PACIFIC GAS AND ELECT | 7.2 | 6.1 | 2.6 | 13.0 | -- | -- | -- | -- | -- | -- | 28.9 |
| PENNSYLVANIA POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PHILADELPHIA ELEC COMPANY | -- | -- | 36.3 | 68.0 | 47.7 | 48.7 | 51.6 | 51.3 | 40.5 | 50.7 | 394.9 |
| PORTLAND GENERAL ELEC | -- | -- | -- | -- | 0.5 | -- | -- | 24.4 | 16.1 | 17.5 | 58.4 |
| POWER AUTH OF NY STATE | -- | -- | -- | 25.8 | 3.7 | 51.1 | 34.7 | 30.0 | -- | 69.8 | 215.0 |
| PUB SVC COMPANY OF COLORADO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PUB SVC ELEC & GAS COMPANY | -- | -- | -- | -- | -- | -- | 17.5 | 29.4 | -- | 25.8 | 72.7 |
| ROCHESTER GAS & ELEC | 32.0 | 4.6 | 24.4 | 16.0 | 16.1 | 15.7 | -- | 14.1 | 5.9 | 6.7 | 135.5 |
| SACRAMENTO MUNICIP UTIL DISTR | -- | -- | -- | 9.3 | -- | 25.9 | -- | 30.1 | 18.9 | -- | 84.2 |
| SOUTH CAROLINA ELEC & GAS CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| SOUTHERN CALIF EDISON COMPANY | 35.6 | 20.5 | 19.3 | 19.2 | -- | 19.2 | -- | 19.2 | -- | -- | 132.9 |
| TENNESSEE VALLEY AUTHORITY | -- | -- | -- | -- | 58.6 | 5.5 | 115.5 | 65.9 | 116.1 | 52.3 | 414.0 |
| TEXAS UTILITIES GENERATING CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | 25.0 | 25.0 |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| VERMONT YANKEE NUCLEAR POWER CORP | -- | 72.8 | -- | 11.9 | 8.6 | 27.4 | 25.6 | 16.9 | -- | 22.1 | 185.5 |
| VIRGINIA POWER | -- | 8.2 | 69.4 | 43.9 | 54.7 | 20.1 | 23.4 | 32.9 | 29.0 | 52.8 | 334.3 |
| WASH PUB POWER SUPPLY SYSTEM | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| WISCONSIN ELEC POWER COMPANY | 16.3 | 43.0 | 19.8 | 27.1 | 36.7 | 24.8 | 10.0 | 12.8 | 16.1 | 21.7 | 228.4 |
| WISCONSIN PUB SVC CORP | -- | -- | 4.4 | 17.6 | 16.0 | -- | 5.2 | 13.2 | 16.4 | 14.5 | 87.4 |
| YANKEE ATOMIC ELEC COMPANY | 9.8 | 10.1 | 9.7 | 8.6 | -- | 9.4 | -- | -- | 8.5 | -- | 56.1 |
| TOTAL | 400 | 600 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 8200 |

## 4.0 ACR ISSUE RESOLUTION PROCESS

In the 1987 ACR, DOE indicated that many Standard Contract-related issues will require analysis and resolution so that the FWMS can achieve maximum efficiency while attempting to assure equity among the parties. EEI/UWASTE and USCEA established an ACR Committee to represent the Purchasers in staff-to-staff technical exchanges with DOE. The ACR Committee is represented by an ACR Response Team in its interactions with DOE. DOE and the Purchasers' representatives initiated a cooperative effort in 1987, in response to an offer by DOE, to address and ultimately develop recommendations for resolution of Standard Contract-related issues. The dual objectives of this process are to retain SNF/HLW management flexibility and equity among the Purchasers while providing for the effective and economical functioning of the FWMS.

### 4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS

DOE has prepared a list of thirty-four Standard Contract-related issues that are under consideration by the ACR Response Team. In May 1989, DOE submitted preliminary draft discussion papers to the ACR Response Team for review and comment. These papers discussed several issues, including canister specifications, classification of SNF for delivery, DOE acceptance of multi-element sealed canisters and transportable storage casks, failed fuel, and waste selection for delivery.

DOE met with the ACR Response Team in November 1989 to discuss the issue of waste selection for delivery and in March 1990 to discuss the Purchasers' position on proposed canister specifications.

In October 1990, the ACR Response Team met with DOE and presented the Purchasers' positions on seven of the original thirty-four issues. The ACR Response Team indicated that these positions represented the consensus, not necessarily unanimous, non-binding views of the Purchasers. The issues addressed were: clarification of the phrase "all SNF" as applied to DCS

instructions; whether Purchasers should be subject to sanctions for improperly described SNF after DOE acceptance; the Purchaser two-month and ±20 percent flexibility clause in the Standard Contract's DCS/FDS process; whether the ACR and FDS should be adjusted to accommodate for full cask loads; whether acceptance priority should be provided for emergency deliveries and shutdown reactors; and the use of Nuclear Waste Fund (NWF) monies for capital improvements to Purchasers' facilities. In June 1991, the ACR Response Team submitted their consensus positions on eleven additional issues. DOE is evaluating the Purchasers' responses to all eighteen issues.