**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 21, 2007)

| | | |
|---|---|---|
| **PPL SUSQUEHANNA, LLC**, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-70C |
| | ) | (Judge Baskir) |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT**

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859

(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
PPL Susquehanna, LLC

*Of Counsel:*
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Bryan A. Snapp
**PPL Corporation**
Two North Ninth Street
Allentown, Pennsylvania 18101-1179
(610) 774-4397
(610) 774-6726 (fax)

March 21, 2007

# TABLE OF CONTENTS


Table of Authorities ........ ii

Index of Appendix ........ viii

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 5

I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PPL AND THAT BREACH HAS CAUSED PPL TO SUFFER DAMAGES ........ 5

A. DOE Breached Its Standard Contract With PPL ........ 6

B. DOE's Breach Of Contract Resulted In Damages To PPL ........ 12

II. WHETHER PPL SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PPL'S STANDARD CONTRACT ........ 18

A. Submission Of A DCS Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract ........ 19

B. Because Of DOE's Breach, PPL Was Never "Obligated" To Submit A DCS ........ 20

C. PPL Was Not Required To Submit A DCS Because Doing So Would Have Been Futile ........ 22

D. Other Aspects Of The DCS Submittal Process Were Flawed ........ 24

III. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PPL'S GOOD FAITH AND FAIR DEALING CLAIM ........ 28

IV. PPL HAS PROPERLY ALLEGED, AND MAY MAINTAIN, ITS TAKINGS CLAIM ........ 34

B. The Government's Failure To Begin Accepting And Disposing Of Nuclear Utilities' Spent Fuel Resulted In A Taking Of PPL's Property Interest By Requiring SNF Storage At Susquehanna Steam Electric Station For The Public's Benefit ........ 35

C. PPL May Pursue Both A Breach Of Contract Claim And A Takings Claim ........ 38

V. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO TAKE ADDITIONAL DISCOVERY BEFORE RULING ON PPL'S MOTION TO DISMISS ........ 51

CONCLUSION ........ 53

# TABLE OF AUTHORITIES

## Cases

*A&S Council Oil Co. v. Lader*,
56 F.3d 234 (D.C. Cir. 1995)....................50

*Ala. Power Co. v. U.S. Dep't of Energy*,
307 F.3d 1300 (11th Cir. 2002)....................37, 45

*Allegre Villa v. United States*,
60 Fed. Cl. 11 (2004)....................46, 47, 48

*Am-Pro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed. Cir. 2004)....................33

*Armstrong v. United States*,
364 U.S. 40 (1960)....................36

*Boston Edison Co. v. United States*,
64 Fed. Cl. 167 (2005)....................40

*Buse Timber & Sales, Inc. v. United States*,
45 Fed. Cl. 258 (1999)....................43

*Canal Elec. Co. v. United States*,
65 Fed. Cl. 650 (2005)....................42

*Castle v. United States*,
48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part, vacated, & remanded*,
301 F.3d 1328 (Fed. Cir. 2002)....................44, 50

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005)....................29

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)....................47

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003)....................41, 42

*Consolidated Edison Co. of N.Y., Inc. v. United States*,
67 Fed. Cl. 285 (2005)....................40

*Consumers Energy Co. v. United States*,
65 Fed. Cl. 364 (2005)....................11, 23, 34



400543574v2

*Detroit Edison Co. v. United States*,
56 Fed. Cl. 299 (2003) ........................................................................ *passim*

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) ..............................................................20

*Energy Northwest v. United States*,
69 Fed. Cl. 500 (2006) ..................................................11, 12, 19, 23

*Entergy Nuclear Generation Co. v. United States*,
64 Fed. Cl. 336 (2005) ...........................................................11, 27

*Entergy Nuclear Indian Point 2, LLC v. United States*,
64 Fed. Cl. 515 (2005) ...........................................................11, 34

*Essex Electro Eng'rs, Inc. v. Danzig*,
224 F.3d 1283 (Fed. Cir. 2000)..........................................................33

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*,
826 F.2d 239 (4th Cir. 1987) .........................................................37-38

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991)..........................................................36

*Hamlet v. United States*,
873 F.2d 1414 (Fed. Cir. 1989)..........................................................35

*Independence Park Apartments v. United States*,
449 F.3d 1235 (Fed. Cir. 2006), *reh'g granted in part,*
*denied in part*, 465 F.3d 1308 (Fed. Cir. 2006).....................................48

*Indiana Mich. Power Co. v. U.S. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) ("*Indiana Mich. I*") ............................10, 45

*Indiana Mich. Power Co. v. United States*,
57 Fed. Cl. 88 (2003) ("*Indiana Mich. II*"), *appeal dismissed*,
112 Fed. Appx. 37 (Fed. Cir. 2004) ..................................14,15, 25, 28

*Indiana Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ("*Indiana Mich. III*") .....................6, 17, 18

*Integrated Logistics Support Sys. Int'l v. United States*,
42 Fed. Cl. 30 (1998) ........................................................................42

*Jean v. Nelson*,
472 U.S. 846 (1985)...........................................................................50

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949)...............................................................................36

*Klamath Irrigation District v. United States*
67 Fed. Cl. 504 (2005) .......................................................... 40, 41

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) .......................................................... 50

*Lorenz v. United States*,
296 F.2d 746 (Ct. Cl. 1961) .......................................................... 22

*Lynch v. United States*,
292 U.S. 571 (1934) .......................................................... 45

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000) .......................................................... *passim*

*Maxima Corp. v. United States*,
847 F.2d 1549 (Fed. Cir. 1988) .......................................................... 29

*Medina Constr., Ltd. v. United States*,
43 Fed. Cl. 537 (1999) .......................................................... 46

*Morris v. United States*,
33 Fed. Cl. 733 (1995) .......................................................... 22

*Northern Heel Corp. v. Compo Indus., Inc.*,
851 F.2d 456 (1st Cir. 1988) .......................................................... 21, 22

*Northern States Power Co. v. U.S. Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) ("*Northern States I*") .......................... 10, 44

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) ("*Northern States II*") ...................... 8, 9, 29

*Omaha Pub. Power Dist. v. Employers' Fire Ins. Co.*,
327 F.2d 912 (8th Cir. 1964) .......................................................... 22

*Orange Cove Irrig. Dist. v. United States*,
28 Fed. Cl. 790 (1993) .......................................................... 29

*Pac. Gas & Elec. Co. v. United States*,
70 Fed. Cl. 766 (2006) .......................................................... 41

*Palazzolo v. R.I.*,
533 U.S. 606 (2001) .......................................................... 36

*Penn Cent. Transp. Co. v. City of N.Y.*,
438 U.S. 104, *reh'g denied*, 439 U.S. 883 (1978) .................................. 36

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922)....................................................................36

*Prudential Ins. Co. v. United States*,
801 F.2d 1295 (Fed. Cir. 1986)....................................................46

*PSEG Nuclear, LLC v. United States*,
465 F.3d 1343 (Fed. Cir. 2006)......................................................8

*R.A. Weaver & Assocs. v. Haas & Haynie Corp.*,
663 F.2d 168 (D.C. Cir. 1980)......................................................22

*Rockwell Int'l Corp. v. United States*,
147 F.3d 1358 (Fed. Cir. 1998)....................................................51

*RT Computer Graphics, Inc. v. United States*,
44 Fed. Cl. 747 (1999) ..................................................................19

*Sacramento Municipal Utility Dist. v. United States*,
61 Fed. Cl. 438 (2004) ("*SMUD*")........................................... *passim*

*Solar Turbines, Inc. v. United States*,
23 Cl. Ct. 142 (1991)....................................................................34

*Sommers Oil Co. v. United States*,
241 F.3d 1375 (Fed. Cir. 2001)....................................................35

*Southern Nuclear Operating Co. v. United States*,
No. 98-614C, slip op. (Fed. Cl. Apr. 7, 2004)...............................41

*Sun Oil Co. v. United States*,
572 F.2d 786 (Ct. Cl. 1978) .........................................................50

*System Fuels, Inc. v. United States*,
65 Fed. Cl. 163 (2005) ............................................................ *passim*

*System Fuels, Inc. v. United States*,
66 Fed. Cl. 722 (2005) ...................................................11, 12, 19, 24, 27

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005) ..................................................................33

*Tenn. Valley Auth. v. United States*,
60 Fed. Cl. 665 (2004) ("*Tenn. Valley Auth. I")* ..........................31-32, 33

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006) ("*Tenn. Valley Auth. II*") ..............................23, 29

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945)....................................................................36

*United States v. Pewee Coal Co.*,
341 U.S. 114, (1951)....................................................................36

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)....................................................................43

*Vermont Yankee Nuclear Power Corp. v. United States*,
73 Fed. Cl. 236 (2006) ...............................................................11, 24

*Yankee Atomic Elec. Co. v. United States*,
42 Fed. Cl. 223 (1998), *aff'd sub. nom.*
*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000)....................................................40

*Yankee Atomic Elec. Co. v. United States*,
54 Fed. Cl. 306 (2002) ...............................................................10

*Yankee Atomic Elec. Co. v .United States*,
No. 98-126C, slip op. (Fed. Cl. June 26, 2003)...............40, 41, 44, 49, 50

*Yuba Goldfields, Inc. v. United States*,
723 F.2d 884 (Fed. Cir. 1983)......................................................43, 49

**Constitution, Statutes, and Codes**

U.S. Const. amend. V .....................................................................35

42 U.S.C. § 10131..........................................................................6, 7

42 U.S.C. § 10221..............................................................................7

42 U.S.C. § 10222..............................................................................7

**Rules, Regulations, and Draft Standard Contract**

RCFC 56 ......................................................................................1, 51

RCFC 12 ..........................................................................................35

10 C.F.R. Pt. 50, App. F ¶ 3............................................................38

48 Fed. Reg. 16590 (Apr. 18, 1983) ....................................................8

48 Fed. Reg. 5458 (Feb. 4, 1983).......................................................8

Notice of Inquiry,
59 Fed. Reg. 27,007 (May 25, 1994) ..............................................10

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21,793 (May 3, 1995) ................................................10

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 245 (1981)................................21

# INDEX TO APPENDIX


| Description | Appendix Page |
|---|---|
| Deposition of David Zabransky, Excerpts | 1 |
| Trial Testimony from *Northern States Power Co. v. United States*, of David Zabransky, Excerpts | 35 |
| Trial Testimony from *Northern States Power Co. v. United States*, of Christopher Kouts, Excerpts | 37 |
| Trial Testimony from *Northern States Power Co. v. United States*, of Thomas Pollog, Excerpts | 41 |
| Deposition of Nancy Slater Thompson, Excerpts | 46 |
| Deposition of Alan Brownstein, Excerpts | 48A |
| Civilian Radioactive Waste Management Program Mission Plan (Dec. 20, 1983) ("1983 Draft Mission Plan"), Excerpts | 54 |
| Mission Plan for the Civilian Radioactive Waste Management Program (June 1985), Excerpts | 56 |
| 1990 Annual Capacity Report, Excerpts | 60 |
| Voided Delivery Commitment Schedules | 76 |
| DOE Letters to Utilities Suspending DCS Process | 87 |
| Instructions for Completing the Appendix C Delivery Commitment Schedules (2004) ("2004 DCS Instructions") | 101 |
| Acceptance Priority Ranking & Annual Capacity Report (July 2004) ("2004 APR/ACR") | 107 |
| Letter to Allen J. Keesler, Chairman, American Committee on Radwaste Disposal, from James Watkins, DOE (May 27, 1992) | 114 |
| Letter to Krista Sanda, Minnesota Department of Public Service, from John W. Bartlett, DOE (Feb. 14, 1992) | 116 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 21, 2007)

| | |
|---|---|
| **PPL SUSQUEHANNA, LLC**,<br>Plaintiff,<br>v.<br>**THE UNITED STATES,**<br>Defendant. | No. 04-70C<br>(Judge Baskir) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT**

Pursuant to RCFC 56 and this Court's March 12, 2007 order, Plaintiff PPL Susquehanna, LLC ("PPL"), replies in support of its October 31, 2006 motion for summary judgment on liability and responds in opposition to Defendant the United States' (the "Government's") corrected January 29, 2007 brief ("Govt. Br.") moving for summary judgment on PPL's breach of contract and breach of the covenant of good faith and fair dealing claims and moving to dismiss PPL's takings claim.[1]

[1] In support of this filing, Plaintiff is submitting an "Appendix to Plaintiff's Reply In Support Of Its Motion For Summary Judgment On

## SUMMARY OF ARGUMENT

The Court should grant Plaintiff's Motion for Summary Judgment on Liability. Contrary to the arguments set forth in the Government's Motion, there is no question that the United States Department of Energy ("DOE") breached its Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste ("Standard Contract") with PPL. In violation of Article II of the Standard Contract, DOE did not begin to accept spent nuclear fuel ("SNF") from nuclear utilities as of January 1998. In fact, DOE has indicated that the earliest it will begin to perform is 2017. The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has found that DOE's failure to begin accepting SNF as of January 1998 resulted in a breach of the Standard Contract for all Standard Contract holders – the entire nuclear utility industry. Those findings equally apply to PPL's Standard Contract.

The Government argues that PPL suffered no damages as a result of DOE's breach because DOE was not obligated to begin accepting SNF from PPL in January 1998. DOE's breach of the Standard Contract did injure Plaintiff, even if Plaintiff was not at the front of the SNF acceptance

---

Liability And Response In Opposition To Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Defendant's Motion to Dismiss Count III of Plaintiff's Complaint" dated March 21, 2007. That Appendix is cited herein as "Pl. App.".

queue established by DOE. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept PPL's (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. Due to this delay, PPL has incurred – and continues to incur – substantial damages to store SNF that DOE was contractually obligated to take.

The Government also argues that it has no liability to PPL because PPL failed to submit to DOE a Delivery Commitment Schedule ("DCS") for PPL's SNF, which DOE alleges was a condition precedent to DOE's obligation to accept SNF under the Standard Contract. That argument should be rejected because (1) submission of a DCS was not a condition precedent to DOE's acceptance of SNF deliveries; (2) even if submitting a DCS was a condition precedent, once DOE breached the Standard Contract PPL no longer had to satisfy that "condition;" (3) submitting a DCS would have been futile (because DOE stopped approving DCSs) and, therefore, was not required by law; and (4) the DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

The Court also should reject the Government's summary judgment motion regarding PPL's claim that DOE breached the Standard Contract's

implied covenant of good faith and fair dealing. Among other things, DOE's failure to properly implement the DCS process, its attempt to minimize damages to utilities by manipulating the DCS process, its failure to annually publish its Annual Capacity Reports and Acceptance Priority Rankings, and other actions concerning DOE's failure to begin taking SNF as of January 1998, justify a finding that DOE breached the Standard Contract's good faith and fair dealing covenant.

The Court also should reject the Government's motion to dismiss PPL's takings claim. Even prior to the passage of the Nuclear Waste Policy Act of 1982 ("NWPA"), the Government had acknowledged an obligation to remove SNF from commercial utilities. In this regard, PPL's takings claim rely on its independent real property interests, which DOE has taken by essentially converting PPL's real property into a DOE storage facility.

Finally, the court should reject the Government's request that it be permitted to take additional discovery from PPL in the event the court is inclined to otherwise grant Plaintiff's Motion for Summary Judgment. First, PPL has already voluntarily provided the Government with extensive document discovery for precisely the information that it now says it needs. Second, there is no factual question that DOE breached the Standard

Contract when it failed to begin accepting SNF deliveries as of January 1998. Accordingly, discovery is not necessary or proper at this juncture of the proceeding.

For these reasons, PPL respectfully requests that the Court (1) grant Plaintiff's Motion for Summary Judgment on Liability, (2) deny the Government's Motion for Summary Judgment upon Counts I and II of Plaintiff's Complaint, (3) deny the Government's Motion to Dismiss Count III of Plaintiff's Complaint, and (4) deny the Government's request for limited discovery.

## ARGUMENT

### I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PPL AND THAT BREACH HAS CAUSED PPL TO SUFFER DAMAGES

According to the Government, "DOE's failure to begin SNF acceptance from the commercial nuclear industry by January 31, 1998" did not create an injury "to each and every member of the commercial nuclear industry." Govt. Br. at 31-32. Specifically, the Government argues that its delay has not injured PPL, because DOE was not obligated to begin accepting SNF from PPL by January 31, 1998. *Id.* at 31-35. The Government also contends that, before PPL can seek a liability ruling, PPL must establish that DOE had a specific obligation to accept PPL's own SNF

by the date of PPL's complaint and that DOE breached that obligation. *Id.* at 34. For the reasons discussed below, the Government is wrong.

### A. DOE Breached Its Standard Contract With PPL

There is simply no question that the Government breached PPL's Standard Contract.

In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A). To solve this problem, the NWPA imposed upon the Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW); *see also Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1372 (Fed. Cir. 2005) ("*Indiana Mich. III*") ("Congress enacted the NWPA to establish the Federal responsibility, and a definite Federal policy, for the disposal of spent nuclear fuel.") (internal quotation omitted) (citing, *inter alia*, 42 U.S.C. § 10131(b)(2)).

The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222(a)(5)(B). While the NWPA required the utilities to pay for the disposal program and to provide interim storage of SNF, the utilities only bore those responsibilities "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5). In this regard, shortly after the NWPA's enactment, DOE acknowledged that it would provide any additional at-reactor storage that utilities required after 1998. *See* 1983 Draft Mission Plan at 2-1, Pl. App. 55 ("Until 1998, each utility will be responsible for providing its own additional on-site interim storage . . . ."); Mission Plan for the Civilian Radioactive Waste Management Program at 381 (1985), Pl. App. 57 ("[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [*i.e.*, using a steady-state SNF acceptance rate of 3,000 MTU after a five-year ramp-up period], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites."); *see also* 42 U.S.C. § 10221(b) (requiring the submission of draft and final mission plans).

Pursuant to NWPA § 302, DOE created a "Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,"

("Standard Contract"). *Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000) ("*Northern States II*"). In promulgating the final terms of its Standard Contract, DOE recognized, "The 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date." 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983).[2]

On June 8, 1983, PPL entered into a Standard Contract with DOE for its Susquehanna Steam Electric Station. *See* Corrected Appendix to Defendant's Response to Plaintiff's Motion for Summary Judgment on Liability, Defendant's Motion for Summary Judgment upon Counts I and II of Plaintiff's Complaint, and Defendant's Motion to Dismiss Count III of Plaintiff's Complaint ("Def. App.") at 358, 392, 393. PPL's Standard Contract – indeed all of the Standard Contracts – embodies the reciprocal obligations mandated by the NWPA, pursuant to which PPL agreed to pay fees in return for DOE's obligation to begin disposing of SNF no later than

[2] The Government spends a lengthy amount of pages recounting the promulgation of the Standard Contract and the "comments" provided by utilities in response to the proposed "rule." Govt. Br. 4-21. "However, the DOE was not statutorily required to use the administrative rulemaking process or to even develop a Standard Contract. Rather, it did so because it preferred developing a contract with standard provisions that could be used with multiple contractees to the extent practicable." *See PSEG Nuclear, LLC v. United States*, 465 F.3d 1343, 1350 (Fed. Cir. 2006) (citing 48 Fed. Reg. 5458, 5459 (Feb. 4, 1983)).

January 31, 1998. *See Northern States II*, 224 F.3d at 1364. Specifically, Article II of the Standard Contract states: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." Standard Contract, Art. II, Def. App. 363.

By 1992, DOE was claiming that, if it had no facility, it had no legal obligation to begin performance. Letter from James Watkins, Secretary of Energy, to Allen J. Keesler, Jr., Chairman, American Committee on Radwaste Disposal (May 27, 1992), Pl. App. 115 ("If, contrary to our current expectations, we are not able to begin spent fuel receipt at an MRS facility by January 31, 1998, the Department has determined that it is not legally obligated to accept SNF."); Letter from John W. Bartlett, DOE, to Commissioner Krista Sanda, Minnesota Department of Public Service (Feb. 14, 1992), Pl. App. 116 ("Neither the NWPA nor the Standard Contract imposes an unconditional obligation on the Department to accept SNF by January 31, 1998.").[3] In 1994, DOE published a "Notice of Inquiry" in the

---

[3] The Government asserts that the behavior of the parties before the "advent of controversy" should be considered in any liability determination. Govt. Br. at 46. The Government's apparent premise is that the advent of controversy had not occurred by the 1991 timeframe when it issued its

Federal Register with this preliminary interpretation of its duties and "announced that it could not begin disposing of nuclear waste by January 31, 1998, as the [Standard] [C]ontract required, because the repository it planned to build to store the waste would not be available until at least 2010." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1338 (Fed. Cir. 2000); *see Notice of Inquiry*, 59 Fed. Reg. 27,007, 27,007-08 (May 25, 1994). In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), again denying that DOE had a statutory and contractual obligation to begin disposing of SNF by January 31, 1998. *See* 60 Fed. Reg. 21,793 (May 3, 1995). The D.C. Circuit rejected this interpretation of the NWPA. *See Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) ("*Northern States I*"); *Indiana Mich. Power Co. v. U.S. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("*Indiana Mich. I*").

Thereafter, the Federal Circuit held that DOE breached all the Standard Contracts. According to the Federal Circuit, Congress found

---

1991 ACR. However, as Judge Sypolt concluded in her coordinated discovery decision, it was "evident that litigation was 'fairly foreseeable' by the agency as early as September 30, 1991 . . . ." *Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 316 (2002). The DOE letters (referenced above) denying DOE had any obligation to perform by 1998 provides some evidence that the Government was girding for litigation no later than the late-1991 and early-1992 timeframe.

DOE's obligation to begin disposal of Nuclear Waste by January 31, 1998 "so important" when it promulgated the NWPA that Congress "took the unusual action of specifying that all contracts must contain this explicit requirement." *Maine Yankee*, 225 F.3d at 1341-42. Thus, the Federal Circuit found, DOE's breach of its obligation to begin disposing of spent nuclear fuel by January 1998 "*involved all the utilities that had signed the contract – the entire nuclear electric industry*." *Id.* at 1342 (emphasis added). Accordingly, when the Government failed to begin accepting SNF as of January 1998 as required under Article II of PPL's Standard Contract, the Government breached that Contract. *See, e.g.*, *Vermont Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 245 (2006) ("The U.S. Court of Appeals for the Federal Circuit already has determined that the Government breached every utility's Standard Contract, when DOE failed to begin accepting SNF on January 31, 1998."); *Energy Northwest v. United States*, 69 Fed. Cl. 500, 503-05 (2006); *System Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 732 (2005); *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 373-74 (2005); *Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 523-24 (2005); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-44 (2005); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 174-76 (2005).

The Government asserts that Plaintiff's Motion for Summary Judgment on Liability cannot rely on the Federal Circuit's decision in *Maine Yankee* because, unlike the plaintiffs in that case, PPL did not submit a DCS to DOE. Govt. Br. at 46-47. However, the *Maine Yankee* decision clearly stated that the Government breached "all" the Standard Contracts, for "the entire nuclear electric industry." *Maine Yankee*, 225 F.3d at 1342. The Federal Circuit did not limit that finding to utilities who had submitted DCSs. In this regard, the Government has been found liable to other similarly situated utilities without any approved DCSs based on the Government's failure to begin accepting SNF in 1998. *See, e.g.*, *System Fuels*, 66 Fed. Cl. at 732 ("Therefore, the court has determined that, as a matter of law, the Annual Capacity Reports ("ACR") and DCSs did not amend the Standard Contract and SFI's failure to submit a DCS is irrelevant and does not alter the Government's obligation under the Standard Contract to accept and store SNF."); *see also Energy Northwest*, 69 Fed. Cl. at 503-05.

### B. DOE's Breach Of Contract Resulted In Damages To PPL

Notwithstanding the Government's arguments to the contrary, PPL has been injured as a result of the Government's breach.

The Standard Contracts (including PPL's) state that DOE will issue ACRs and annual Acceptance Priority Rankings ("APRs"). Standard Contract, Arts. IV.B.5(a) and (b), Def. App. 367. The ACRs, to be used "for planning purposes," were to set forth the projected annual receiving capacity for DOE's spent fuel storage facility(ies) and the annual acceptance ranking for the disposal of SNF. *Id.*, Art. IV.B.5(b), Def. App. 367. The APRs, in turn, were to identify and prioritize the SNF to be stored based on the age of the SNF. *Id.*, Art. IV.B.5(a). Specifically, the APRs, with a few exceptions,[4] give "[t]he oldest fuel or waste … the highest priority for acceptance." *Id.*, Art. IV. B.5(a), Def. App. 367. In this way, the APRs establish an SNF queue, the order of which is to reflect the age of SNF currently stored by the various contract holders. *Id.*

According to the Government, if DOE had started to accept SNF from Standard Contract holders in 1998 pursuant to DOE's 1995 APR/ACR (which was the last APR/ACR issued by the Government before PPL filed its Complaint), DOE would not have begun accepting SNF from PPL until

[4] The Standard Contracts (including PPL's) provide that, notwithstanding the age of SNF, priority may be given to SNF removed from a reactor that "has reached the end of its useful life and has been shut down permanently for whatever reason." *Id.*, Art. VI.B.1(b); Def. App. 371-72. Priority may also be given to "emergency deliveries." *Id.*, Art. V.D, Def. App. 369. To date, no such priorities have been given.

after January 2008. Govt. Br. at 48-49. The Government claims, therefore, that "the first 'breach' that might have caused an injury to PPL would not have occurred until sometime after January 2008, when PPL's SNF would have been given some allocation rights based upon the age of its SNF." *Id.* at 49-50. The Government argues that, under the "oldest fuel first" allocation methodology, DOE has not yet breached its contractual obligation to PPL. *Id.* at 48-50.

As an initial matter, the SNF allocations used by the Government in the 1995 APR/ACR were contrived and based on several flawed assumptions. The allocations assumed that DOE would accept Standard Contract holders' SNF at a maximum rate of 900 MTU annually, utilizing the capacity of a Monitored Retrievable Storage Facility ("MRS"). But, the MRS, which was never sited, designed, licensed, or constructed, was no longer an option by the time DOE issued the 1995 APR/ACR. *See Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) ("*Indiana Mich. II*"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004); Deposition of David Zabransky (Apr. 17, 2002) ("Zabransky Dep.") at 345, Pl. App. 13 ("At that point in time in 1994 . . . [t]here was no active program looking for a voluntary MRS"); Trial Testimony from *Northern States Power Co. v. United States* of Christopher Kouts at 3476, Pl. App. 40 (acknowledging

that in order to have a facility by 1998, DOE would have had to have a site for an MRS by 1993).[5] A 3,000 MTU annual acceptance rate, as reflected in the APR/ACR DOE recently issued in 2004 (*see* 2004 APR/ACR at 3, Table 1, Pl. App. at 112), and in virtually all other DOE program documents, would have been the appropriate acceptance rate necessary, at a minimum, to meet the program's objectives. *See Indiana Mich. II*, 57 Fed. Cl. at 99-100 (rejecting the 900 MTU rate, and adopting a 3000 MTU rate based upon "uniform support" for such a finding). Had DOE used the appropriate acceptance rate, PPL, in fact, would have had its first deliveries accepted by DOE no later than 2004 (in the sixth year of the waste management system's operation). *See* 2004 APR/ACR at 2 (Tbl. 1) & 3, Pl. App. 111-12; *see also* 1990 ACR at 11, Pl. App. 73 (showing that Pennsylvania Power & Light Company – PPL's predecessor-in-interest –

[5] Mr. Zabransky served as the Contracting Officer's Technical Representative and is currently the Contracting Officer for all the Standard Contracts. Trial Testimony from *Northern States Power Co. v. United States* of David Zabransky at 4326-27; Pl. App. 36. Mr. Kouts is currently Director of the Waste Management Office within DOE's Office of Civilian Radioactive Waste Management and usually the highest ranking DOE official to testify at SNF trials. Trial Testimony from *Northern States Power Co. v. United States* of Christopher Kouts at 3134, Pl. App. 38.

would have its first pick-up in the sixth year of the waste management system using a 3,000 MTU steady-state rate).[6]

Even assuming *arguendo* that PPL's deliveries to DOE would not have started until January 2008, PPL nevertheless suffered damages at the time its complaint was filed. As explained above, the APR/ACR process was designed to establish an SNF queue, based on the age of each utility's fuel. While PPL's SNF did not have a place in the front of the queue, PPL was nonetheless damaged by DOE's failure to begin taking SNF from utilities by January 1998. Once DOE breached its obligation to begin disposing of SNF by January 1998, that breach caused a domino effect on DOE's ability to timely accept delivery of SNF from all other utilities in the queue. Accordingly, any utility whose deliveries would fall after January

[6] Furthermore, the 900 MTU rate that DOE attempted to foist on PPL through the 1995 APR/ACR was a rate derived from the 1991 ACR and would have violated an explicit provision of the NWPA. In order for DOE to assume SNF acceptance in 1998 at an MRS, DOE had to assume a change in law that would have lifted a linkage between the construction of the repository and the MRS. (DOE chose not to assume that Congress would also lift the 10,000 MTU capacity linkage for an MRS.) *See* 1991 ACR at 4, 5 tbl. 2.1, Def. App. 410, 411 ("The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation."); 1995 APR/ACR at 4, Def. App. 294 (using the same nominal rates in table 1 as were in the 1991 ACR's Table 2.1). No such amendment to the NWPA was ever enacted.

1998 necessarily would suffer a delay at least equal to DOE's delay in beginning its overall performance.

Due to these predictable cascading delays, utilities situated later in the queue, such as PPL, have already incurred mitigation-related costs resulting from DOE's breach, including some pre-breach mitigation costs. *See Indiana Mich. III*, 422 F.3d at 1375 (concluding that "mitigation damages are available for pre-breach costs should the obligee elect to treat the obligor's breach as partial"). In PPL's case, these costs include, for example, constructing an independent spent fuel storage installation ("ISFSI") at the Susquehanna plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up. *See* Declaration of Andrew Dyszel ¶¶ 6-7 (Exhibit A to PPL's Memorandum in Support of its Motion for Summary Judgment on Liability). Thus, contrary to the Government's assertion, Govt. Br. at 35 n.4, PPL has provided evidence of the damages it suffered as a result of DOE's breach. Moreover, adopting the Government's argument would lead to absurd results. If PPL cannot suffer injury until DOE actually fails to pick up PPL's spent fuel, DOE could forever avoid PPL's breach claims (and the breach claims of every other utility falling later in the queue) simply by never starting to take deliveries

under the Standard Contract.[7] Such a result is also contrary to the Federal Circuit's conclusion that pre-breach mitigation costs are available. *Indiana Mich. III*, 422 F.3d at 1375.

## II. WHETHER PPL SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PPL'S STANDARD CONTRACT

The Government goes to great length to set forth its understanding regarding how the APR/ACR process and the submittal of DCSs were to operate under the Standard Contract. *See* Govt. Br. at 23-27. According to the Government, submission of a DCS "constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder." *Id.* at 35. The Government repeatedly argues that, since PPL did not submit a DCS, DOE has no liability for breach of PPL's Contract. Id. at 31-32, 40-41, 45-46, 48-49.

---

[7] DOE announced last year that Yucca Mountain will not open before 2017. *See* Statement of Edward F. Sproat III, Director Office of Civilian Radioactive Waste Management U.S. Department of Energy Before the Subcommittee on Energy and Air Quality Committee on Energy and Commerce U.S. House of Representatives (July 19, 2006), *available at* www.ocrwm.doe.gov/info_library/program_docs/testimonies/July_19_**Sproat**_testimony.pdf (visited Jan. 29, 2007). Unofficially, DOE officials have stated that 2020 is more likely. *See* Erica Werner, *Yucca Mountain chief predicts application in 2008, dump by 2020*, Las Vegas Sun, (Mar. 31, 2006), *available at* http://www.lasvegassun.com/sunbin/stories/nevada/2006/mar/31/033110451.html (visited Feb. 5, 2007).

The Court should reject this argument because (1) submission of a DCS was not a condition precedent to DOE's obligations; (2) even if submission of a DCS were a condition precedent, once DOE breached the Standard Contract PPL no longer had an obligation to submit a DCS; (3) submitting a DCS would have been futile (because DOE suspended the DCS process) and, therefore, was not required by law; and (4) the DCS submittal process as implemented by DOE was flawed and inconsistent with the Standard Contract. Moreover, the Court of Federal Claims has rejected DOE's attempt to use the APR/ACR and DCS process as a basis for limiting its liability even for utilities without approved DCSs. *See, e.g.*, *System Fuels*, 66 Fed. Cl. at 732; *see also Energy Northwest*, 69 Fed. Cl. at 503-05.

## A. Submission Of A DCS Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract

Submission of a DCS was not a condition precedent to DOE's obligation to take SNF from PPL under the Standard Contract. Conditions precedent generally are disfavored by courts and "will not be read into a contract unless required by the plain, unambiguous language." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990); *accord RT Computer Graphics, Inc. v. United States*, 44 Fed. Cl. 747, 756 (1999).

Nothing in the Standard Contract suggests that submission of a DCS by PPL is a condition precedent to DOE's obligation to take SNF.

Article V of the Standard Contract addresses "Delivery of SNF and/or HLW." That article states that a utility shall "deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW." Standard Contract, Art. V., Def. App. 367-70. The article does *not* state that DOE's obligation is contingent upon a utility first submitting a DCS. DOE's obligation to take SNF from utilities also is referenced in several other Standard Contract articles, none of which conditions the obligations expressed therein upon the submission of a DCS. *See* Standard Contract, Arts. II, IV.B. & VI, Def. App. 363, 366-67, 370-73.

### B. Because Of DOE's Breach, PPL Was Never "Obligated" To Submit A DCS

Even if submission of a DCS constituted a condition precedent to DOE's performance – which it clearly did not – PPL's "obligation" to submit a DCS never arose.

According to the Government, Standard Contract holders were to submit DCSs after DOE issued an APR/ACR. Govt. Br. 18. The DCS was to identify the SNF that the contract holder wished to deliver to DOE "beginning sixty-three months thereafter." *Id.*; Standard Contract, Art.

V.B.1, Def. App. 368. However, DOE's 1995 APR/ACR (which was the last APR/ACR DOE issued before PPL filed this lawsuit) contained no allocation to PPL through "Year 10." *See* 1995 APR/ACR at 6, Def. App. 296. Given that, under DOE's calculations, PPL had no delivery allocation until after January 2008 and thus, PPL did not need to submit a DCS form until mid to late 2002 (*i.e.*, 63 months before delivery) at the earliest. As discussed above, by the mid-1990s even DOE had admitted that it would not meet the mandated start date, and by January 1998 DOE in fact had not begun to perform. Because DOE breached the January 1998 deadline, any "obligation" of PPL to submit a DCS form was extinguished long before the date on which such DCS would have been due. *See* RESTATEMENT (SECOND) OF CONTRACTS § 245 (1981) ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."); *see also Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 461 (1st Cir. 1988); *cf. also Sys. Fuels*, 65 Fed. Cl. at 173 (excusing a utility's need to pay its one-time fee because the condition precedent of filing a DCS was frustrated).

As the court noted in *Northern Heel*, a breaching party relinquishes "any right to disclaim the contract because of the victim's failure to satisfy conditions precedent." 851 F.2d at 461-62; *see also R.A. Weaver &*

*Assocs. v. Haas & Haynie Corp.*, 663 F.2d 168, 176 (D.C. Cir. 1980); *Omaha Pub. Power Dist. v. Employers' Fire Ins. Co.*, 327 F.2d 912, 916 (8th Cir. 1964). According to the court in *Omaha Public Power*, the "theory underlying this rule appears to be based on the equitable maxim that one cannot profit from or escape liability for his own wrongdoing." 327 F.2d at 916. Thus, given DOE's breach, PPL was never obligated to submit DCSs (even if the submission of such forms were a condition precedent to DOE's performance).

### C. PPL Was Not Required To Submit A DCS Because Doing So Would Have Been Futile

Moreover, any effort by PPL to submit a DCS and seek DOE's approval after 1995 would have been futile. And the law does not require the performance of a futile act. *Northern Heel*, 851 F.2d at 461 (noting that "[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"); *see also Lorenz v. United States*, 296 F.2d 746, 748 (Ct. Cl. 1961) ("It is not to be presumed that the law requires the doing of a futile act."); *Morris v. United States*, 33 Fed. Cl. 733, 751 n.16 (1995).

The Standard Contract required DOE to approve or disapprove DCSs within three months of their submission. Standard Contract, Art.V.B.1, Def.

App. 371-72. Notwithstanding this express contract obligation, DOE, in fact, refused to approve or disapprove DCSs submitted by utilities in 1996 and thereafter. *See* Zabransky Dep. at 32 (Apr. 17, 2002), Pl. App. 5 (admitting that DOE had DCSs submitted to it that it has neither approved nor disapproved). Beginning in March 1997, DOE issued letters to nearly all utilities in which DOE stated that it could not approve or disapprove their DCSs. *See* DOE Letters, Pl. App. 87-100; *see also Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 521 (2006) ("*Tenn. Valley Auth. II*") ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract."); *Consumers Energy*, 65 Fed. Cl. at 370-71 (concluding that DOE "abandoned" the DCS process in 1997). Furthermore, around the same time that DOE began to "hold" DCSs submitted by utilities, DOE also unilaterally voided DCSs that had been submitted by utilities in 1996 and had been previously approved. *See* Voided DCSs, Pl. App. 76-86; Zabransky Dep. at 596, 603-04 (Apr. 19, 2002), Pl. App. 23, 30-31; *Energy Northwest*, 69 Fed. Cl. at 505; *Sys. Fuels*, 66 Fed. Cl. at 731 ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved.").



400543574v2

DCSs submitted after 1995 would not have been approved by DOE, as acknowledged by DOE's Mr. Zabransky – currently DOE's Contracting Officer and formerly the Contracting Officer's Technical Representative. Zabransky Dep. at 353 (Apr. 18, 2002), Pl. App. 17 (acknowledging that "[b]ecause of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct"); Zabransky Dep. at 42 (Apr. 17, 2002), Pl. App. 7 (admitting that, given the Department of Energy's "current guidance" at that time, it was not possible for a utility to get a DCS approved); *see also Sys. Fuels*, 66 Fed. Cl. at 731 ("Thus, according to DOE's current Contracting Officer, it would have been impossible for a nuclear utility to obtain approval for their DCSs during that time period."); *see also Vermont Yankee*, 73 Fed. Cl. at 243 n.7. It would have been futile for PPL to submit such forms, even if required to do so under DOE's process (which PPL was not). For that reason, whether or not PPL submitted DCSs is irrelevant to the question of the Government's liability for breach.

### D. Other Aspects Of The DCS Submittal Process Were Flawed

Although the Government's Response to Plaintiff's Motion For Summary Judgment on Liability places considerable emphasis on the role of DCSs, in reality the entire DCS process as implemented by DOE was

flawed and inconsistent with the Standard Contract and the NWPA (and its Amendments Act).

For example, contrary to Standard Contract requirements, DOE did not allow utilities to submit DCSs identifying "all SNF and or HLW [they wished] to deliver to DOE." Standard Contract Art. V.B.1.; Def. App. 368. Rather, in the 1991 ACR and in separate instructions to utilities, DOE required that utilities submit DCSs identifying for delivery *only* those SNF allocations reflected in DOE's most recent ACR. 1991 ACR at 7, Def. App. 413; 1991 DOE Instructions for Completing the Appendix C Delivery Commitment Schedule ("1991 DCS Instructions") ¶ 7(a), Specific Instructions ¶ 2.7, Def. App. 146, 150. Those directions, however, were completely at odds with the procedures set forth in the Standard Contract. As Judge Hodges held in another spent fuel damages case, "the Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'" *Indiana Mich. II*, 57 Fed. Cl. at 98.

The Government's argument that PPL is not entitled to damages because it did not submit a DCS also ignores that DOE itself did not consider DCSs to be binding. *See* Deposition of Nancy Slater Thompson at 5, 98 (June 13, 2002), Pl. App. 47-48 (Acting Division Director of the

Regulatory Coordination Division in DOE's OCRWM stated, "In my personal opinion, they [DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them."); Deposition of Alan Brownstein at 9-10, 377-78 (Apr. 10, 2002), Pl. App. 48C-48D (the senior policy adviser to the Director of DOE's OCRWM acknowledging that the DCSs were for planning purposes); Deposition of Alan Brownstein at 282 (June 14, 2002), Pl. App. 53 ("The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes."). The ACRs upon which utilities were asked to rely when completing their DCSs expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers." 1990 ACR at 2, Pl. App. 65; 1991 ACR at 1-2, Def. App. 407-08; 1995 APR/ACR at 1, Def. App. 291. Similarly, in the 1991 instructions issued by DOE to utilities regarding the completion of the DCS forms, DOE again explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." 1991 DCS Instructions at ¶ 7(c), Def. App. 146. DOE, in fact, *did* reevaluate previously-approved DCSs.[8]

---

[8] In 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s was irrelevant. 2004 DCS

*See Entergy Nuclear Generation*, 64 Fed. Cl. at 340 n.4 (concluding that the DCSs to be submitted in response to the 2004 APR/ACR were to replace rather than supplement previous DCSs). DOE re-suspended the DCS process in December 2004. *Entergy Nuclear Generation*, 64 Fed. Cl. at 339-40 ("However, this resumption of the DCS process was very brief. By the end of 2004, DOE had again suspended the DCS process, advising that 'the resumption of the DCS process was premature' and declaring that DOE would resume the DCS process '[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository.'") (Judge Lettow quoting letter from DOE to another contract-holder).

As set forth above, in the first quarter of 1997 DOE unilaterally voided a number of previously-approved DCS submissions. *Sys. Fuels*, 66 Fed. Cl. at 731. Moreover, Judge Hodges has pointedly observed that DOE did

---

Instructions, Pl. App. 101-06. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. 102. DOE's current Contracting Officer's Technical Representative, Thomas Pollog, has acknowledged that DCSs that were to be submitted per the 2004 APR/ACR were meant to replace, not supplement, previously approved DCSs. Trial Testimony from *Northern States Power Co. v. United States* of Thomas Pollog at 3604, 3725, Pl. App. 42, 44.

not consider the ACRs and DCSs binding. *Indiana Mich. II*, 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate. The Department of Energy did not consider these forms to be binding.") (footnote omitted).

DOE's faulty implementation of the DCS process, and the explicitly non-binding nature of the DCSs, doom the Government's litigation-generated argument that the submission of DCSs determines whether DOE is liable for breach of PPL's Standard Contract.

## III. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PPL'S GOOD FAITH AND FAIR DEALING CLAIM

According to the Government, PPL's claim that the Government breached the Standard Contract's covenant of good faith and fair dealing should be dismissed because that claim "is nothing more than an allegation that the Government breached the Standard Contract." Govt. Br. at 51-52. To the extent the Government is asserting that PPL may not maintain claims for both breach of contract and breach of the implied covenant of good faith and fair dealing, the Federal Circuit has already rejected such reasoning. *See Maine Yankee*, 225 F.3d at 1342-43 (allowing utility to maintain good faith and fair dealing claim despite Government's assertion



400543574v2

that the claim was a "renamed" contract claim to avoid the disputes clause); *Northern States II*, 224 F.3d at 1367.

DOE's actions evince a breach of the Standard Contract's implied covenant of good faith and fair dealing. For example, DOE's failure to properly implement the DCS process, its repeated cancellation of the DCS process, its failure to publish annual APR/ACRs as required by Article IV.B. of the Contract, and other actions regarding its failure to begin taking SNF as of January 1998 show clear and convincing intent to injure PPL (and other utilities) that justify a finding of a breach of the Standard Contract's covenant of good faith and fair dealing. *See, e.g.*,*Tenn. Valley Auth. II*, 69 Fed. Cl. at 521.

"Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing." *Orange Cove Irrig. Dist. v. United States*, 28 Fed. Cl. 790, 800 (1993) (citation omitted); *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."); *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988) ("The need for mutual fair dealing is no less required

in contracts to which the government is a party, than in any other commercial arrangement. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.") (internal quotation marks omitted).

In the instant case (and in all of the SNF cases), the Government acted contrary to the implied covenant of good faith and fair dealing by failing to meet the justified expectations of the parties to the Standard Contract. As noted *supra* Section II.D., DOE did not allow utilities to identify "all SNF and HLW [they wished] to deliver to DOE," as permitted by the Standard Contract. Standard Contract, Art. V.B.1, Def. App. 368; *see id.*, Art. V.B.2, Def. App. 368 ("Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%) . . . until the submission of the final delivery schedule."). Instead, DOE issued instructions to PPL (and other utilities) informing utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the [1991] ACR; exceeding the allocation will result in disapproval of the DCS(s)." *See* 1991 DCS Specific Instructions ¶ 2.7, Def. App. 150. Moreover, further demonstrating bad faith, the Government's allocation rates in its 1995 APR/ACR were based on construction of an MRS (which



400543574v2

was no longer an option at that time), in order to minimize the Government's liability to utilities.[9]

Second, the Government's actions in voiding DCSs and twice suspending the DCS process further violated the Standard Contract's implied covenant of good faith and fair dealing. As discussed *supra* Section II.C., DOE improperly failed to follow the requirement of the Standard Contract that it approve or disapprove DCSs. Standard Contract, Art. V.B.1, Def. App. 368. Faced with such facts, Judge Lettow concluded that DOE's failure to approve or disapprove DCSs commensurate with the Standard Contract consisted of a breach of the implied covenant of good faith and fair dealing. *Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665

---

[9] *See* Zabransky Dep. at 364-65 (Apr. 18, 2002); Pl. App. 19A-20:

> Q. Why did the Department publish a document to be used as the basis for delivery commitment schedules [the 1995 ACR] using rates which it was not using itself for the purpose of planning the system?
> A. The Department carried over the rates it had in the previous ACR and did not change them.
> Q. Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using [the 1995 ACR]?
> A. I believe that was a consideration.
> Q. Were there any other considerations that you can think of for using those rates?
> A. There was no other basis to develop any other rates at that point in time.



400543574v2

671 n.7 (2004) ("*Tenn. Valley Auth. I")* ("Because there is no dispute as to the facts surrounding DOE's inaction on TVA's DCS submissions, and because the TVA Contract specifically requires DOE's performance, the Court grants TVA's request for summary judgment insofar as DOE breached its obligation to act on TVA's DCSs in good faith and ultimately to accept, transport, and dispose of TVA's SNF.").[10]

Furthermore, as noted in Section II.C, DOE's suspension of the DCS approval process made it impossible and futile for PPL to submit and have a DCS approved. DOE's Contracting Officer's Technical Representative has acknowledged that DOE believed it could unilaterally cut off its obligations by no longer approving DCSs. *See* Trial Transcript from *Northern States Power Co. v. United States* of Thomas Pollog at 3720-21, Pl. App. 43 ("Q: So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs? A: That's what we try to do, yes."). In so doing, DOE intended to limit its liability to utilities. *See* Trial Transcript from *Northern States Power Co. v. United States* of

---

[10] Also, the Standard Contract requires DOE to issue an ACR annually. Standard Contract, Art. IV.B.5(b), Def. App. 367. DOE abruptly stopped issuing ACRs in 1996 and failed to issue another ACR until 2004. This inaction similarly left Plaintiff without a key document for planning purposes in attempting to forecast its needs in mitigating DOE's breach. Thus, this breach also implicates the covenant of good faith and fair dealing.

Thomas Pollog at 3722-23, Pl. App. 43; *id.* at 3739, Pl. App. 45 ("Q: Were you trying to reduce the amount DOE would pay due to its delay in accepting the amounts covered by approved DCSs?" A: Yes. When I say approved, I mean – if it wasn't approved, then it was – there was no liability anymore. We would not have an obligation for that."). The implied covenant of good faith and fair dealing prohibits one party from interfering with the other party's performance. *See Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks omitted). DOE breached the implied covenant of good faith and fair dealing by preventing and hindering PPL's ability to submit DCSs. *See Tenn. Valley Auth. I*, 60 Fed. Cl. at 672. Ultimately, DOE's attempts to limit its liability show a specific intent to injure PPL (and other utilities). *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2004) (stating that an "intent to injure" must be shown in the bid protest context); *but see Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 769 (2005) (concluding that "when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken

by any party to a contract, the presumption of good faith has no application" and the more stringent test set forth in *Am-Pro* does not apply).

The Court should deny the Government's motion for summary judgment on PPL's good faith and fair dealing claim. As set forth above, not only is there sufficient evidence to allow that claim to proceed to trial, *see, e.g.*, *Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142, 156 (1991) (precluding summary judgment based on some evidence that Government breached covenant of good faith and fair dealing), there is a reasonable likelihood PPL will establish at trial that the Government violated the Standard Contract's implied covenant of good faith and fair dealing. *See Consumers Energy*, 65 Fed. Cl. at 373 (denying motion for summary judgment based on implied covenant of good faith and fair dealing in SNF case); *see also Entergy Nuclear Indian Point*, 64 Fed. Cl. at 525 n.15 (denying motion for summary judgment on implied covenant).

## IV. PPL HAS PROPERLY ALLEGED, AND MAY MAINTAIN, ITS TAKINGS CLAIM

As to the substantive takings arguments in the Government's Motion, the Court should deny the Government's Motion to Dismiss for the reasons detailed below.

### A. Standard Of Review

Generally, when reviewing a motion under RCFC 12(b)(6), this Court must assume that the complaint's "factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). "A trial court should not dismiss a complaint for failure to state a claim unless it is 'beyond doubt that the plaintiff can prove no set of facts which would entitle [it] to relief.'" *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)).

### B. The Government's Failure To Begin Accepting And Disposing Of Nuclear Utilities' Spent Fuel Resulted In A Taking Of PPL's Property Interest By Requiring SNF Storage At Susquehanna Steam Electric Station For The Public's Benefit

Contrary to the Government's arguments, PPL's Complaint supports its claim that the Government's failure to begin accepting and disposing of nuclear utilities' fuel constitutes a taking of vested property rights.

The Takings Clause of the Fifth Amendment to the Constitution prohibits the Government from taking private property without just compensation. *See* U.S. Const. amend. V. The Takings Clause's purpose "is to prevent the government from 'forcing some people alone to bear

public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo v. R.I.*, 533 U.S. 606, 617-18 (2001) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

A taking occurs where the Government forces a business to provide land and services for the benefit of the public. *See United States v. Pewee Coal Co.*, 341 U.S. 114, 115-16 (1951) (taking without just compensation where the Government federalized a coal mine for a public purpose); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 3 (1949) (taking occurred where the Government federalized laundry service and retained management and employees to operate plant); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 374-75 (1945) (taking of tenant's leasehold interest occurred where the Government temporarily occupied a building during a portion of a tenant's long-term lease). A taking also occurs if "regulation goes too far," *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), and the character of the governmental action economically impacts a property owner and interferes with distinct investment-backed expectations. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124, *reh'g denied*, 439 U.S. 883 (1978).

The Government's actions have interfered with PPL's use of Susquehanna Steam Electric Station and the economic value thereof. The

Government's delay in taking SNF from PPL reduces the economic value of the Susquehanna station's site by requiring PPL to use portions of that site to store SNF, and to store SNF for a longer period of time than it otherwise would. The Government's failure to take timely delivery of PPL's SNF as required under the NWPA also forces PPL to bear the costs of additional SNF storage at the Susquehanna station's site for the public's benefit.

The Government's Motion disingenuously asserts that no taking occurred because, absent the Standard Contract, DOE would have no obligation or responsibility to accept or dispose of PPL's SNF and that PPL would be "solely" or "wholly" responsible for doing so. Govt. Br. at 60, 65. These statements are disingenuous for at least three reasons. First, lest the Government forget, PPL is paying for the disposal of its SNF; PPL and other utilities have paid billions of dollars (including interest) into the Nuclear Waste Fund for DOE to dispose of the utilities' SNF. *See Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1303 (11th Cir. 2002). Second, since the birth of commercial nuclear power, the Government (whether the Atomic Energy Commission or DOE) has consistently committed that federal facilities would be available for disposing of SNF and HLW. *See, e.g.*, *Florida Power & Light Co. v. Westinghouse Elec.*

*Corp.*, 826 F.2d 239, 246 (4th Cir. 1987); 10 C.F.R. Pt. 50, App. F ¶ 3 ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government."). Third, the NWPA "effectively made entry into . . . contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses" to a utility unless it signed the Standard Contract. *Maine Yankee*, 225 F.3d at 1337. Thus, in order to operate its nuclear power plant, the NWPA required PPL (and other utilities) to sign a requirements contract promising to use DOE as the singular entity for the disposal of PPL's (and other utilities') SNF.

### C. PPL May Pursue Both A Breach Of Contract Claim And A Takings Claim

The Government argues that PPL has failed to state a takings claim upon which relief can be granted because PPL's damages lie in contract remedies, not the Fifth Amendment. Govt. Br. at 61. The Government adds that PPL may not maintain both a breach of contract claim and a takings claim, because PPL's claims derive from the Standard Contract PPL signed with DOE. *Id.* at 60-62. These assertions simply are incorrect.

The Federal Circuit has allowed a utility, on identical facts, to maintain both a breach of contract claim and a takings claim. In *Maine Yankee*, the Federal Circuit expressly allowed another utility with a

Standard Contract to proceed on both its breach of contract claim and takings claim. *See Maine Yankee*, 225 F.3d at 1342 ("Our conclusion that Yankee may maintain its breach of contract claim in Count I also results in affirmance of the Court of Federal Claims' denial of the government's motion to dismiss Counts II [breach of duty of good faith and fair dealing] and III [taking of property without just compensation]"). PPL's case is materially identical to *Maine Yankee*; both cases involve the identical Standard Contract and both utilities have alleged the same three causes of action. Thus, in the very case holding that the Government breached the Standard Contract, the Federal Circuit rejected the Government's present assertion that a breach claim cannot co-exist with a takings claim. That assertion should likewise be rejected here.

Indeed, faced with facts identical to PPL's case, this Court on numerous occasions has found that a utility may maintain both a breach of contract and a takings claim. In *Detroit Edison*, Judge Miller denied the Government's motion to dismiss the plaintiff's takings claim, pointing out that the Federal Circuit in *Maine Yankee* "allowed plaintiff utilities … to maintain both a contract and a takings claim." *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 301 (2003). According to *Detroit Edison*, "[i]f the right at issue is not governed by the terms of the parties' contract, plaintiff

may pursue a takings remedy to vindicate that right." *Id.* at 302. Thus, in *Detroit Edison*, Judge Miller allowed the plaintiff's takings claim to proceed, refusing to "make an early ruling that could prevent plaintiff from vindicating its rights – whether under the Standard Contract or takings jurisprudence …." *Id.* at 303. In similar circumstances, Judge Merow in *Yankee Atomic* denied the Government's motion for summary judgment on a plaintiff's takings claim, allowing trial proceedings to go forward on both breach of contract and takings claims. *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip op. at 4-5 (Fed. Cl. June 26, 2003). (Previously, the Court in *Yankee Atomic* had denied a motion to dismiss the takings count that had led to the Federal Circuit appeal. *See Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 236 (1998), *aff'd sub. nom.*, *Maine Yankee*, 225 F.3d at 1342. Other Judges of this Court likewise have denied the Government's motions to dismiss a plaintiffs' takings claims. *See Sacramento Municipal Utility Dist. v. United States*, 61 Fed. Cl. 438, 442-43 (2004) ("*SMUD*"); *see also Sys. Fuels*, 65 Fed. Cl. at 172-73; *cf. also Consolidated Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285, 291 (2005); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 187-88 (2005).[11]

[11] The Government argues that *Klamath Irrigation District v. United*

The Government, however, urges this Court to ignore *Detroit Edison* and *System Fuels* (and its Cross-Motion does not mention *Maine Yankee*, *Yankee Atomic*, or *SMUD*) and instead follow decisions dismissing the takings claim issued by other Judges of this Court. *See, e.g.*, *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003); *accord Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766, 778 (2006) (adopting the rationale of the *Commonwealth Edison* decision on the Government's motion for summary judgment, not a motion to dismiss); *Southern Nuclear Operating Co. v. United States*, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (granting motion to dismiss "as liability for a partial breach of the SNF contracts by the Government has been found"). Govt. Br. at 63-65. Notably, before ruling on the Government's motion to dismiss the takings claim, the Court in *Commonwealth Edison* already had found the Government liable for partial breach of contract. 56 Fed. Cl. at 656 n.8. According to Judge Hewitt, that procedural posture made *Commonwealth*

---

*States* somehow contradicts SNF decisions that rejected the Government's attempts to dismiss takings claims. 67 Fed. Cl. 504, 532 n.46 (2005); Govt. Br. 64 n.9. First, that decision approvingly cites *Detroit Edison*, which decision supports PPL's position. *See Klamath Irrig.*, 67 Fed. Cl. at 531-32. Second, *Klamath Irrigation* purports to distinguish *System Fuels*, but only on facts inapplicable hear. *Klamath Irrig.*, 67 Fed. Cl. at 532 n.46; *but see Sys. Fuels*, 65 Fed. Cl. at 172. PPL, of course, not only has a contract right with the Government but has an independent real property interest that has been taken by the Government.

*Edison* "distinguishable" from *Detroit Edison* because, at the time Judge Miller denied the Government's motion to dismiss in *Detroit Edison*, Judge Miller had "not yet ruled on the liability of the government under the breach of contract claim." *Id.* PPL's case is in the precise procedural posture as was *Detroit Edison*. No ruling has been made in this case on the question of the Government's liability under the contract. Accordingly, *Commonwealth Edison* by its own terms is inapplicable here.[12]

Moreover, PPL maintains that the Court's dismissal of the takings claim in *Commonwealth Edison* was improper. In addition to *Maine Yankee*, *Detroit Edison*, *SMUD*, and *System Fuels*, other cases indicate that a breach of contract claim does not foreclose a takings claim. *See Integrated Logistics Support Sys. Int'l v. United States*, 42 Fed. Cl. 30, 34 (1998).[13]

---

[12] Likewise distinguishable is the decision in *Canal Electric Co. v. United States*. 65 Fed. Cl. 650 (2005). In that case, Judge Hodges distinguished other SNF takings claims, noting Canal "cannot show that the Government has 'forced storage on [Canal's] private property' in our case." *Canal Elec.*, 65 Fed. Cl. at 654 (distinguishing and quoting *SMUD*). In this regard, Canal Electric Company's claim (unlike PPL's) involved a utility that sold its interest in a nuclear plant and was claiming damages based on diminution in value. *Id.* at 655.

[13] In a footnote, the Government states that no takings claim can arise in this case because the Government is acting in its proprietary, rather than its sovereign, capacity. Government's Motion at 61 n.8. That argument is meritless. The Federal Circuit and other courts have expressed doubt about the usefulness of the sovereign-proprietary

A takings claim is particularly appropriate where a contract does not cover the rights, such as real property rights, respecting some of the property that has been taken. *See Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 262 (1999) ("[I]n cases where the rights respecting the 'taken' material were not reduced to writing by the parties, both takings and breach claims have been permitted." (citations omitted)). In this case, PPL owns the real property on which the Susquehanna station stands. It is the real property interest associated with this plant, not the Standard Contract, which was taken when the Government forced PPL to provide additional storage for the SNF that DOE is obligated to accept.

### D. PPL May Plead Its Breach Of Contract And Takings Claims In The Alternative And The Court Should Determine The Merits Of Both At The Same Time

Even assuming the Federal Circuit had not already resolved this question in *Maine Yankee*, the procedural posture of this case dictates that this Court deny the Government's motion to dismiss. Contrary to the Government's assertions, PPL's takings claim preserves PPL's ability to

---

dichotomy. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983) ("In whatever other context it may be useful, . . . determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis."); *see also United States v. Winstar Corp.*, 518 U.S. 839, 893-94 (1996) (noting that "the dual characters of Government as contractor and legislator" may be "fused" in certain circumstances).

receive full relief on the damages caused by the Government. As the Court held in *Detroit Edison*, *Yankee Atomic*, *SMUD*, and *System Fuels*, PPL's takings claim will be ripe for review only after this Court has fully evaluated the remedies available to PPL under the Standard Contract. *Sys. Fuels*, 65 Fed. Cl. at 172 ("It is appropriate to proceed with both claims until the contract claim reaches fruition. Only after the contract claim has been fully litigated will it be possible to determine if the contract claim is viable.") *Detroit Edison*, 56 Fed. Cl. at 302-303; *Yankee Atomic*, No. 98-126C, slip op. at 4-5 (Fed. Cl. June 26, 2003); *SMUD*, 61 Fed. Cl. at 443.

Generally, a takings claim is appropriate where "the government ha[s] taken away the range of remedies associated with the vindication of a contract." *Castle v. United States*, 48 Fed. Cl. 187, 219 (2000), *aff'd in part, rev'd in part, vacated, & remanded*, 301 F.3d 1328 (Fed. Cir. 2002). Over the last several years, the Government has asserted numerous rationales in attempting to excuse its failure to perform its obligations under the Standard Contract, and has systematically attempted to either eliminate or restrict PPL's full range of remedies. *See Northern States I*, 128 F.3d at 759-60 (rejecting the Government's attempt to avoid paying damages based on the DOE Contracting Officer's decision denying the Government's liability for any failure to begin to accept and dispose of SNF

by January 31, 1998); *Indiana Mich. I*, 88 F.3d at 1273 (rejecting the Government's attempt to avoid contractual obligation based on a Federal Register notice denying the Government's liability for any failure to begin to accept and dispose of SNF by January 31, 1998); *see also Ala. Power*, 307 F.3d at 1314 (rejecting the Government's settlement agreement with one utility, which settlement agreement would have paid damages using utility payments to the Nuclear Waste Fund). In its brief the Government avers that it will seek to revive its assertion of the "Unavoidable Delays" provision of the Standard Contract given the opportunity, Govt. Br. at 50-51, which means the Government (as DOE) intends to blame Congress (also the Government!) for cutting off the benefits the utilities would have received under the Standard Contracts. This would constitute another example of a taking. *See Lynch v. United States*, 292 U.S. 571, 579 (1934) ("The repeal, if valid, abrogated outstanding contracts and relieved the United States from all liability on the contracts without making compensation to the beneficiaries.").

Another damages-limiting initiative of the Government is its attempt to impose an SNF acceptance rate schedule upon the Court and parties that (1) contradicts virtually every system design or other document published by DOE during the last twenty years, and (2) assumes that Congress would

have changed the law that then (as now) prohibited the very facility that DOE relied-upon (as discussed above). Similarly motivated is the Government's argument that PPL had an obligation to file (and continue to file after the Government breached the Standard Contract) DCSs (also discussed above). Adoption of any of the Government's novel and self-serving theories would also limit PPL's full range of remedies.

Furthermore, substantive law supports the procedural rule that a takings claim and a breach of contract claim may be pled in the alternative. *See Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (indicating that plaintiff "may have an alternate avenue of relief under the Takings Clause"); *Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 559-60 (1999) (indicating possibility that plaintiff could "establish facts sufficient to support a Fifth Amendment taking claim as an alternative to its contract claims against the government"). Thus, PPL is entitled to plead and pursue both causes of action to assure that it is made whole.

The Government claims that Judge Miller's decision in *Allegre Villa v. United States*, 60 Fed. Cl. 11 (2004), supports its position that PPL's takings claim should be dismissed. Govt. Br. at 66-67. According to the Government, *Allegre Villa* "concluded that a takings claim is not permitted when the contract at issue is with the Government and the Government is

the breaching party." Govt. Br. at 66. The Government oversimplifies and incorrectly interprets *Allegre Villa*.

The plaintiffs in *Allegre Villa* entered into mortgage agreements with the Government. Among other things, those agreements allowed the plaintiffs to prepay the mortgages. Subsequent statutes expressly restricted the plaintiffs' right to prepay. The plaintiffs sued for breach of contract. The plaintiffs also claimed that the statutes constituted a taking of their property by regulatory imposition.

In reviewing a motion to dismiss the takings claim in that case, Judge Miller first held that the Government committed a breach of contract. *Allegre Villa*, 60 Fed. Cl. at 17. Then, analyzing the takings claim itself, Judge Miller wrote "[i]f the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings action." *Id.* at 18 (citation omitted). Applying that principle, Judge Miller dismissed the takings claim, not because the plaintiff had contracted with the Government, but because "such contracts provide a remedy for the later prepayment restrictions." *Id.* at 19. Judge Miller distinguished *Allegre Villa* from the Federal Circuit's decision in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), pointing out that, in *Cienega Gardens*, the takings claim was allowed to proceed because no contract remedy was available. *Allegre Villa*, 60

Fed. Cl. at 19; *accord Independence Park Apartments v. United States*, 449 F.3d 1235, 1238 (Fed. Cir. 2006) (noting that the Federal Circuit directed the trial court to retry the case based on the pled takings theory rather than a breach of contract theory), *reh'g granted in part, denied in part*, 465 F.3d 1308 (Fed. Cir. 2006).

The existence of a contract between a plaintiff and Government was not controlling in *Allegre Villa*; the critical question was whether a contract remedy was available for breach of the property right at issue. This is confirmed by the fact that the same Judge who decided *Allegre Villa* allowed the plaintiff in *Detroit Edison* to proceed with a takings claim, *even though that plaintiff had entered into a Standard Contract with the Government*. Applying the same principle that she later applied in *Allegre Villa* (*i.e.*, "if the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right"), Judge Miller allowed the *Detroit Edison* takings claim to proceed. *Detroit Edison*, 56 Fed. Cl. at 302. Judge Miller permitted both the takings and the contract claims to go forward, because "[a] more fully developed record will allow the court to assess whether the property right implicated in plaintiff's takings claim falls outside the rights granted under the Standard Contract." *Id.* at 302-303. Thus, in *Detroit Edison* – under facts identical to those at

issue in PPL's case – Judge Miller denied a motion to dismiss the plaintiff's takings claim because it was unclear whether the Standard Contract provided the plaintiff with a remedy for its property rights claim. Accordingly, notwithstanding the Government's arguments to the contrary, allowing PPL's takings claim to go forward in this case would be consistent with *Detroit Edison*.

Furthermore, in *Yankee Atomic*, Judge Merow reached the same conclusion as did Judge Miller in *Detroit Edison*. In *Yankee Atomic*, Judge Merow rejected the Government's motion for summary judgment on plaintiff's takings claim, finding that "a dismissal of plaintiff's taking count would be premature at this point in the proceedings." *Yankee Atomic*, No. 98-126C, slip op. at 4-5 (Fed. Cl. June 26, 2003) (citation omitted). According to *Yankee Atomic*, "[t]aking issues are normally fact intensive and require evidentiary proceedings for their resolution. This case is no exception." *Id.* at 5 (citing *Yuba Goldfields*, 723 F.2d at 887). Thus, Judge Merow expressly refused to resolve plaintiffs' takings count "prior to the conclusion of trial proceedings." *Id.* Judge Braden in *SMUD* likewise permitted plaintiff's takings claim in that SNF case to proceed to trial. *SMUD*, 61 Fed. Cl. at 443.

Like *Detroit Edison*, *Yankee Atomic*, *SMUD*, and *System Fuels*, numerous cases, including those primarily relied on by the Government in its Motion, dispose of the takings-contract question only after a trial or similar evidentiary proceedings. *Sun Oil Co. v. United States*, 572 F.2d 786, 793 n.2 (Ct. Cl. 1978) (indicating that the court ruled based on a "stipulation of facts, accompanied by a large number of documentary exhibits" and did so only "after each side had engaged in exhaustive pretrial discovery"); *see Castle*, 48 Fed. Cl. at 217, 220 (citing *Sun Oil* and ruling "after more than ten years of litigation and four full months of trial").[14] These cases also fully accord with the principle that non-constitutional claims should be resolved before constitutional claims. *See, e.g.*, *Jean v. Nelson*, 472 U.S. 846, 854 (1985). Thus, given the current procedural posture of this case, at a minimum the Court should delay ruling on PPL's takings claims until after trial to allow PPL the benefits of pleading claims in the alternative.

---

[14] Other cases the Government relies on do not involve takings claims. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 703 (1949) ("There is no claim that [the Government's actions] constituted an unconstitutional taking.") (footnote omitted); *A&S Council Oil Co. v. Lader*, 56 F.3d 234, 238 (D.C. Cir. 1995) ("[W]e see no way in which plaintiffs' assertions can properly be classified as 'takings' claims. Plaintiffs made no takings claim in their complaint.").

## V. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO TAKE ADDITIONAL DISCOVERY BEFORE RULING ON PPL'S MOTION TO DISMISS

The Government asks that it be permitted to take additional limited discovery under RCFC 56(f), in the event the Court would otherwise grant PPL's Motion for Summary Judgment on Liability. Govt. Br. 68-69. The Government indicates that it would like the opportunity to seek evidence supporting PPL's supposed argument that it was "entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the 'oldest fuel first' requirement of the Standard Contract." *Id.* at 68. However, PPL has made no such arguments and the Government provides no citation to the contrary. The Government's request should be denied.

Generally, summary judgment is appropriate when there is no genuine issue of material fact. RCFC 56(c); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1361 (Fed. Cir. 1998). There is no genuine issue of material fact here regarding the Government's liability for breach. Even the Government itself does not, nor could it, dispute that it failed to begin taking deliveries of SNF on January 31, 1998 as required in the Standard Contract. The only outstanding factual issue is the measure of damages, which must be resolved at trial. Furthermore, PPL already has voluntarily provided the same types of documents that the Government now alludes it

needs. Accordingly, it is neither necessary nor proper for the Court to allow the Government to conduct additional discovery before ruling on PPL's Motion for Summary Judgment on Liability.

## CONCLUSION

For the foregoing reasons, PPL respectfully requests that the Court (1) grant Plaintiff's Motion for Summary Judgment on Liability, (2) deny the Government's Motion for Summary Judgment upon Counts I and II of Plaintiff's Complaint, (3) deny the Government's Motion to Dismiss Count III of Plaintiff's Complaint, and (4) deny the Government's request for limited discovery.

Dated: March 21, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk
by s/ Daniel S. Herzfeld

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
PPL Susquehanna, LLC

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Bryan A. Snapp
**PPL Corporation**
Two North Ninth Street
Allentown, Pennsylvania 18101-1179
(610) 774-4397
(610) 774-6726 (fax)