**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 21, 2007)

| | | |
|---|---|---|
| **PPL SUSQUEHANNA, LLC,** | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-70C |
| | ) | (Judge Baskir) |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT**

*Of Counsel:*
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Bryan A. Snapp
**PPL Corporation**
Two North Ninth Street
Allentown, Pennsylvania 18101-1179
(610) 774-4397
(610) 774-6726 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859

(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
PPL Susquehanna, LLC

March 21, 2007

400546418v1

# INDEX TO THE APPENDIX


| Description | Appendix Page |
| --- | --- |
| Deposition of David Zabransky, Excerpts | 1 |
| Trial Testimony from *Northern States Power Co. v. United States*, of David Zabransky, Excerpts | 35 |
| Trial Testimony from *Northern States Power Co. v. United States*, of Christopher Kouts, Excerpts | 37 |
| Trial Testimony from *Northern States Power Co. v. United States*, of Thomas Pollog, Excerpts | 41 |
| Deposition of Nancy Slater Thompson, Excerpts | 46 |
| Deposition of Alan Brownstein, Excerpts | 48A |
| Civilian Radioactive Waste Management Program Mission Plan (Dec. 20, 1983) ("1983 Draft Mission Plan"), Excerpts | 54 |
| Mission Plan for the Civilian Radioactive Waste Management Program (June 1985), Excerpts | 56 |
| 1990 Annual Capacity Report, Excerpts | 60 |
| Voided Delivery Commitment Schedules | 76 |
| DOE Letters to Utilities Suspending DCS Process | 87 |
| Instructions for Completing the Appendix C Delivery Commitment Schedules (2004) ("2004 DCS Instructions") | 101 |
| Acceptance Priority Ranking & Annual Capacity Report (July 2004) ("2004 APR/ACR") | 107 |
| Letter to Allen J. Keesler, Chairman, American Committee on Radwaste Disposal, from James Watkins, DOE (May 27, 1992) | 114 |
| Letter to Krista Sanda, Minnesota Department of Public Service, from John W. Bartlett, DOE (Feb. 14, 1992) | 116 |




400546418v1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

\- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of DAVID ZABRANSKY

Washington, D.C.

Wednesday, April 17, 2002

9:38 a.m.

Job No.: 12597-1

Pages 1 through 226, Volume 1

Reported by: Diane Gomez, RPR

you see that?

A Yes.

Q Is that the contract or the form of contract that you reviewed in preparation for your deposition?

A This is the form of the contract. I may have reviewed a later version of this, I believe a '91 or a '92 version of this that was in the Federal Register that has modifications.

Q Okay. What modifications were done in 1991, can you tell me off the top of your head?

A In general there were modifications related to electricity generated and sold and allowances for credits or reductions due to energy losses not delivered to the ultimate consumer as a result of the litigation.

Q All those deal with how the fee is calculated? Is that correct?

A That's correct.

Q Are there any other differences that you know of between the standard contract that was promulgated in 1983 and the one that was contained or

the one you reviewed?
A Not that I recollect.
Q Have you seen this version of the contract before?
A Yes, I have.
Q What is the Department of Energy's obligation under that contract with respect to the quantity and rate of spent fuel acceptance?
MR. CRAWFORD: Objection. Calls for a legal conclusion.
A There's no rate of acceptance established in the contract.
Q Are you saying the Department of Energy does not have any obligation with respect to the rate of spent nuclear fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm saying that the contract does not contain the rate.
Q And my question is what is the department's obligation under the contract with respect to the quantity of spent fuel it would accept in a particular

year from the utilities?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A As a result of the contract the Department of Energy's obligation is as it appears on the approved delivery commitment schedules.

Q If a utility does not have an approved delivery commitment schedule, is it your testimony then that the DOE does not have any obligation to pick up spent fuel from that utility?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A With respect -- if there's not a delivery commitment schedule approved for a given year, there's no obligation for that given year.

Q How does a utility go about getting a delivery commitment schedule approved?

A The contract stipulates how the utility does that.

Q When is the last time the Department of Energy approved a delivery commitment schedule?

A I don't recollect the exact date.

Q Has it had delivery commitment schedules submitted to it that it has neither approved or disapproved?

A That's correct.

Q Why is that?

MR. CRAWFORD: Objection. Vague.

Q Are you responsible for deciding whether a delivery commitment schedule gets approved or not?

A I'm responsible for reviewing them and making a technical recommendation to the contracting officer.

Q Do you know why delivery commitment schedules that have been submitted have not been approved or disapproved?

MR. CRAWFORD: Objection. Vague.

MR. BLANTON: I was asking if he knew.

MR. CRAWFORD: I know. Which DCS are you talking about?

MR. BLANTON: Any DCS.

MR. CRAWFORD: Well, objection. Vague.

A Repeat the question you asked me?

Q Do you know why any DCS that has been

Q Do you recall seeing that letter?
A I don't recall the specific letter.
Q Do you recall seeing letters like that?
A I've seen -- yes, I have seen letters like this.
Q Is that a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Well, objection. Vague.
Q Is Exhibit 3 to your deposition a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Objection. Vague.
A A letter of this type has been sent in response to most of the submittals since we stopped processing them.
Q Okay. And that letter indicates that the DCSs submitted by Southern Nuclear cannot be approved or that the department is unable to approve them. Is that correct?
MR. CRAWFORD: Objection. Best evidence.
A The letter says what it says.

Q I'm sorry. It does not say "unable." It says "Not able at this time to approve your DCS submittal." Is that correct?

A That's what the letter says.

Q Given the Department of Energy's current practice, is there any way for a utility to get a DCS approved at the current time?

A Under the current guidance, no.

Q And that guidance has been the same since the decision in 1996 that the Department of Energy had an unconditional obligation to accept spent fuel in 1998. Is that correct?

A That is my recollection.

Q Now, let me get you to look back at number two again. And referring you to DCS identification of the document with that DCS identification number that ends in 901, how does the utility know how many metric tons of uranium to put in line 2.5?

MR. CRAWFORD: Objection to the extent it calls for speculation.

Q If you know.

A I don't know how Southern Nuclear knows.

Q Well, let me rephrase my question then. Has the Department of Energy given instructions to utilities as to how they should complete these delivery commitment schedule forms?

A Yes, it has.

Q And what are those instructions with respect to the quantities of spent nuclear fuel that are included on a particular delivery commitment schedule?

MR. CRAWFORD: Objection. Best evidence.

A I would have to review the instructions to find out exactly what it says.

(Deposition Exhibit Zabransky 4 was marked for identification and was attached to the transcript.)

Q All right, sir, I'm going to hand you what's been marked as Exhibit 4 to your deposition, which is titled U.S. Department of Energy Instructions for Completing the Appendix C Delivery Commitment Schedule General Instructions. There's one for your lawyer.

A Okay.

Q All right, sir. Do those instructions indicate how a utility is to complete the delivery commitment schedule?

A Yes.

Q Do they indicate how the utility is to quantify on the delivery commitment schedule the amount of spent nuclear fuel that's to be picked up in a particular year?

A Yes.

Q What do they say about that?

A They say in instruction 7A, When submitting DCSs purchasers should base their DCSs on allocations contained in the latest annual capacity report, ACR.

Q All right. What is the latest annual capacity report? When was the latest annual capacity report issued?

A I believe it was issued in March of '95.

Q Okay.

(Deposition Exhibit Zabransky 5 was marked for identification and was attached to the transcript.)

Q Let me show you what I've marked as Exhibit

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY

Washington, D.C.

Thursday, April 18, 2002

9:44 a.m.

Job No.: 112597-2

Pages 227 through 458, Volume 2

Reported by: Diane Gomez, RPR

saw.

Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?

A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.

Q How did you pick the rates that went into the '95 ACR?

MR. OLSEN: Objection, foundation.

A They were the same rates that were in the previous ACR.

Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?

A I don't believe so.

Q Was there any discussion about whether the rates should go up or down?

A I don't recollect that there was.
Q Just cut and paste? Is that how you did the '95?
A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR changed.
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
A I see that.
Q And somebody has written out to the margin "move to page three." Do you see that?
A Okay.
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
A I see that.
Q What were the uncertainties associated with

the date of commencement of the operation of the waste management system at this point in time?

A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.

Q More certain that there would not be an MRS by 1998?

A That's a fair statement.

Q Is that a fair statement?

A That's a fair statement.

Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?

A Yes, I recall that discussion.

Q Who was that with?

A With Mr. Brownstein and Ms. Slater.

Q And yourself?

A And myself.

Q Can you tell me who said what?

A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.

Q Had there ever been one without dates on the years of allocations?

A I believe so. Let me check. Like this one here which says, Year one, Year two, Year three.

Q Let me see.

MR. OLSEN: Let the record reflect that Mr. Zabransky has pointed to exhibit number --

MR. BLANTON: Zabransky 36, which is the December 1991 ACR.

A And the 1990 ACR also has year one, year two, year three.

Q Look at page five of Zabransky 36.

A Okay.

Q There's a table there that has the rates for each year starting in 1998. Is that correct?

A There is, yes.

Q And we can go through this process, but do you remember that all the other ACRs have a similar table?

sometime in the mid-nineties.

MR. OLSEN: Stan, I think Dave needs a short little break. Would this be a good time?

MR. BLANTON: Sure.

(There is a recess from the record.)

Q If you would look back at page four of Exhibit 37. Do you have that in front of you?

A Yes, I do.

Q Do you recognize whose handwriting that is at the bottom of the page that's marked out, has a sentence that says "the waste management system" and then I can't -- I'm not sure what the rest -- envisions --

A I don't.

Q Any idea who wrote that?

A No, I don't. It's like the rest of the -- appears to be the same writing as whoever wrote the rest of it, and I don't know who that is or where this document came from.

Q Okay. Referring back to -- it's easier for us to both have the same language -- Exhibit 5, do the uncertainties associated with the date of commencement

of operation of the waste management system have anything to do with DOE's decision to stop processing DCS submittals?

MR. OLSEN: Objection. Vague.

A I don't think that this statement here and this discussion here had anything to do with that decision.

Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?

A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.

Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?

MR. OLSEN: Objection. Vague.

A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.

Q Well, as -- did I interrupt your answer?
A No.
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?
MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
A I'm not -- I don't know what position you're referring to.
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
A I did say that, yes.
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
A That's correct.
Q Why has the department suspended the DCS process?

MR. OLSEN: Objection. I believe this was asked and answered.

MR. BLANTON: No, he said on advice of counsel, and I think we're entitled to know why the DCS process has been suspended.

A I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment.

Q What was the problem with committing the department to that obligation?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A Again, counsel advised us it would be appropriate, it would be the correct move to stop processing the DCSs.

Q So you wouldn't have that obligation?

MR. OLSEN: I want to direct the witness not to answer to the extent that you're going to have to reveal attorney/client privileged conversations. Also calls for speculation.

MR. BLANTON: I think you put whatever the

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?

A The Department of Energy never used these rates for the planning for the operation of a repository facility.

Q I'm not asking -- not my question.

A Okay. Repeat the question.

Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?

A No, we did not.

Q Let me show you Exhibit 38.

(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)

Q Which is unsigned, but it has "official

file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?

A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.

Q Is that document the one that's marked Exhibit 5?

A That's what this document refers to, yes.

Q And all those initials to the right-hand side indicate various approvals of the document?

A Right, to that point in time.

Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?

A The department carried over the rates it had in the previous ACR and did not change them.

Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?

A I believe that that was a consideration.

Q Were there any other considerations that you can think of for using those rates?

A There was no other basis to develop any other rates at that point in time.

(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)

Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?

A I've seen this document. I'm not familiar with it, but I know what it is.

Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?

A No, I don't believe I did.
Q Do you use it in the course of your duties in the Department of Energy?
A I don't use this document in the course of my duties, no.
Q Let me refer you to page eight of Exhibit 39, Mr. Zabransky.
A Okay.
Q You found it before I did.
A I found it.
Q Do you know where those receipt and placement rates came from?
A I don't know specifically where they came from, no.
Q As far as you know, were those the rates that the DOE was using for planning purposes as of September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
A Those were the rates that were used to cost out a repository and its operations that were used in

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY

Washington, D. C.

Friday, April 19, 2002

10:03 a.m.

Job No.: 12597-3

Pages 460 through 722 - Volume 3

Reported by: Diane Gomez, RPR

Q And why did you void this DCS which you approved one month previously?

MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I direct the witness not to answer as to any communications he had with counsel. Otherwise he may answer the question.

A I was advised to void it.

MS. SULLIVAN: You can testify as to by whom.

A By counsel.

Q At the Department of Energy?

A Yes.

Q Did you agree with that advice?

MS. SULLIVAN: Objection. Foundation.

A I take my lawyer's advice.

Q Prudent perhaps but doesn't quite answer my question. Did you agree with it?

MS. SULLIVAN: Same objection.

A It doesn't matter what I thought about whether or not what the advice was. I followed the advice.

Q Did you disagree with it?

MS. SULLIVAN: Objection. Foundation.
A I wouldn't have done it myself.
Q And why do you say that?
A Because I wouldn't --
MS. SULLIVAN: Objection. Vague.
A I wouldn't have done it myself.
Q Is there some reason for that testimony?
MS. SULLIVAN: Objection, vague.
A I would not have done it. That is the answer.
Q Did it bother you that you were instructed to void something that you previously approved?
MS. SULLIVAN: Objection. Foundation.
A Didn't bother more than anything else I've had to do a lot of times in my life, no.
MR. TOMASZCZUK: Let's mark as Zabransky 59 -- you want to take a break or want to keep going?
THE WITNESS: How long you going to be, 15 minutes?
(There is a recess from the record.)
Q Mr. Zabransky, can you detail for me the process by which a DCS at or about this time, 1995

let's say, was reviewed within DOE?

A From memory I think at that point in time Ms. Slater had established a process where they were sent to the M&O for initial review. They would screen them against insuring the numbers were correct and then sent back to DOE with a recommendation to Ms. Slater and then they would be sent -- she would act upon the recommendation perhaps and then send it on through -- with a letter through counsel eventually through to Beth Tomasoni.

Q And was that the same process that you followed when you served as COTR for purposes of reviewing DCS forms?

A I think that's generally the same process. I think eventually we eliminated M&O from the review because it wasn't necessary to have them check numbers.

Q Okay. Going back to Exhibit 58 for just a moment, which was the OPPD packet, can you direct your attention for a moment to page 414.

A Yes, sir.

Q Which is near the back, four pages from the

back I think.

A Okay.

Q And this appears to a letter from Ms. Tomasoni to Mr. Kloock dated March 13th, 1997.

A That's correct.

Q And the second paragraph is advising OPPD, is it not, that the department is not able to approve its DCS submittal?

A That's what it says, yes.

Q And the department is advising OPPD in this letter that it's waiving until further notice the contract requirement that it provide a revised schedule, correct?

A That's correct.

Q Did you have a role to play in the preparation of this letter?

A I think -- yes, at some point I was involved in a draft of a letter, but it went through an extensive review process.

Q Did you agree at the time that the department was not able to approve OPPD's DCS submittal?

A That was a true statement.
Q It's true that that was the department's position at the time, correct?
A That's true.
Q Was it your personal view as well?
A From a technical perspective, I could have approved this submittal.
Q But were instructed not to?
A That's correct.
MR. TOMASZCZUK: Can we mark as Zabransky Number 59 a set of DCS forms and related correspondence to and from GPU Nuclear.
(Deposition Exhibit Zabransky 59 was marked for identification and was attached to the transcript.)
Q The first question I have for you, Mr. Zabransky, is the first page of this Exhibit 59 appears to be a letter from John Vincent at GPU to the Department of Energy contracting officer, correct?
A It is, yes.
Q And is this the same Mr. Vincent that you alluded to in your earlier testimony?

A That's correct.
Q The second page of this exhibit appears to reflect a letter back to Mr. Vincent approving a DCS that had been previously submitted. Is that a fair statement?
A That's correct.
Q Okay. If I could direct your attention to Bates page 361 in this exhibit, is this your signature in Section 4.0 at the bottom of this page?
A Yes.
Q All right. And on this page there is typed-in language which appears similar to what we saw in the previous exhibit. Do you see that?
A I see that.
Q With the double asterisk.
A I see that.
Q And it appears to state "The proposed delivery date is dependent upon the existence of an operational repository or an inter" -- and then that word appears to be cut off. Do you know what word is?
A I believe it's interim.
Q Thank you. -- "storage facility

constructed under the act." That's what the notation says, right?

A That's correct.

Q And do you know who put that notation on the document?

A I don't know precisely who put that on, no.

Q Is it your understanding today that that was placed on here at the direction of counsel?

MS. SULLIVAN: Objection. Direct the witness not to answer as to communications with counsel. But he may answer the question otherwise.

A Yes.

Q And a similar notation appears on the following page of the exhibit, Bates page 362.

A Yes.

Q And turning back to page 364 of this exhibit.

A Yes.

Q And is that your signature that appears at the bottom under Section 4.0?

A Yes, it is.

Q And it appears here that you approved the

DCS on December 30, 1996?
A That's what it says, yes.
Q Does the word "void" appear above the COTR title on this document?
A Yes, it does.
Q And is that your handwriting?
A Yes, it is.
Q And does it appear to reflect that you voided your approval on March 27, 1997?
A I think it's February 27th but.
Q Oh, I'm sorry. Thank you.
A I don't write very well.
Q I appreciate that. So you believe it was February 27, 1997?
A I believe so.
Q And why did you void this DCS that you previously approved?
MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I direct the witness not to answer as to any communications with counsel. Otherwise you may answer the question.
A I was advised to so void the documents at

that point.

Q And was that advice given to you by counsel?

A Yes.

Q Was that advice given to you orally or in writing?

MS. SULLIVAN: Objection to the extent it calls for attorney/client communication.

A I don't recollect any written communications.

Q Did you ask for advice or was it given to you?

MS. SULLIVAN: Objection. Calls for attorney -- to the extent it calls for attorney/client communication I direct the witness not to answer.

A I don't recollect how this came about, the approval of the documents that were going through the process.

Q Sitting here today do you recall at any time soliciting legal advice with respect to your approval or disapproval of this DCS?

MS. SULLIVAN: Objection. Calls for

attorney/client communications. I direct the witness not to answer as to communications with counsel.

A All the correspondence like this is run through counsel.

Q Do I understand that in this circumstance that you approved this and then the document would have physically left your office?

A Documents like this were prepared in packages, the packages went through counsel's office. After counsel they went to the contracting officer's office.

Q And what I'm trying to find out is a step earlier in the process you got this packet and presumably approved it on or about December 30, 1996. Is that right? I'm at page 364.

A Yes.

Q And what happened to the package after you approved it on or about December 30, 1996?

A It would have gone through what the approval process was, through counsel and then it would have come back to me and gone back -- based upon counsel's comments I would have acted and brought it

back to Ms. Tomasoni subsequent to counsel's approval.

Q At or about the time you approved this particular DCS on December 30, 1996, do you recall whether at the time you approved it you made any request for legal advice from counsel for the Department of Energy?

MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I would direct the witness not to answer regarding discussions with counsel.

A I don't recall any specific request beyond the normal approval process.

Q Have you finished your answer?

A Yes.

MR. TOMASZCZUK: I would like marked as Zabransky 60 a package of DCS forms from New York Power Authority and related correspondence.

(Deposition Exhibit Zabransky 60 was marked for identification and was attached to the transcript.)

Q Do you recognize any of these documents, Mr. Zabransky?

A No. Not until we get back to this dated in 1995.

Q Okay. It's fair to say that some of these predated your arrival at DOE, right?

A Yes, they did.

Q With respect to those that predated your arrival at DOE, do you have any recollection of having seen them before today?

A Just when I was going through the files.

Q That's something you were doing within the last few months?

A Last -- I don't know how many months ago it was but the last, last several months, whatever it was.

Q All right. Okay. I direct your attention to Bates page 442, which appears to be a letter from Ms. Tomasoni to Mr. Taylor dated January 25th, 1996.

A Uh-huh.

Q Do you have that?

A I have that.

Q And in the first paragraph, the second sentence, Ms. Tomasoni is writing Mr. Taylor and