IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, November 17, 2006
Volume 14

The parties met, pursuant to the notice of the Judge, at 10:32 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



31f576c6-1915-412d-b34e-e757d9669556

At that time, they said, we're not going to get a pick-up until 2001 at the earliest, so we need dry storage because we have to go until then. Now, before the Court of Federal Claims, as part of this litigation, when it benefits them most to assume an earlier first pick-up, they assume 1999. We're simply showing the contrast between the two stories, Your Honor.

The fact that whatever most benefits NSP at the particular time it happens to be talking, that's the story that it tells. We are not arguing that 2001 would have been the first pick-up date.

THE COURT: Now, who will be questioning, Ms. Sullivan?

MS. SULLIVAN: Yes, Your Honor.

THE COURT: Do you wish to call Mr. Zabransky?

MS. SULLIVAN: Yes, Your Honor.

THE COURT: Mr. Zabransky, would you come forward, please? The witness stand is over to my left, Mr. Zabransky, and I ask that you raise your right hand, please.

Whereupon--



DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: I would like you to state your name, Mr. Zabransky, then spell your last name for the reporter, and also give the reporter your home address.

THE WITNESS: Okay. It's David Kevin Zabransky, that's z as in zebra, a-b-r-a-n-s-k-y. My home address is 10221 Waterford Drive, Manassas, Virginia.

THE COURT: You may question, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Zabransky, where are you currently employed?

A. Currently employed at the U.S. Department of Energy in Washington, D.C.

Q. Within what office of the Department of Energy?

A. Within the Office of Civilian Radioactive Waste Management, also known as RW or OCRWM, and --



Q. What --

A. And there, I work with the, it's now called the Waste Management Office.

Q. And what is your title at the Department of Energy?

A. I believe, now, it's nuclear industry specialist, nuclear utility specialist, not sure exactly what the right word is, but it's one of those two things.

Q. And what are your responsibilities in that position?

A. Among the things I do is administer -- I act as contracting officer for the standard contract for the utilities, for disposal of spent nuclear fuel. I do other technical studies and technical work for -- related to spent fuel management issues and other policy related issues.

Q. To whom do you report?

A. I report to Christopher Kouts.

Q. When did you become the contracting officer?

A. I believe it was around July of 2002.

Q. Have you also served as the technical representative to the contracting officer or



COTR?

A. Yes, I served as the COTR from, I believe, sometime in 1995 to the time I was the contracting officer.

Q. And what were your responsibilities as the contracting officer's technical representative?

A. As COTR, COTR responsibilities are to provide technical advice to the contracting officer with respect to issues under the standard contract.

Q. When did you first join DOE?

A. I came to DOE in July of 1994.

Q. Prior to joining DOE, where were you employed?

A. Prior to joining DOE, I had been employed at Wisconsin Electric Power Company from 1978.

Q. Until?

A. 1994.

Q. And what were your positions at Wisconsin Electric?

A. Well, when I started at Wisconsin Electric, I was a technician, and I was still going to college, so I started off in the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Monday, November 13, 2006

VOLUME 10

The parties met, pursuant to the notice of the Judge, at 10:04 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



6ca8d3b8-e05c-451e-a70a-6e0fe21bf61d

Page 3131

understand. But once they buy that dry storage facility, they are buying the world of mandates.

THE COURT: I don't think you can separate the hardware from all the rest of the conditions that were imposed. And if you acknowledge that you are responsible for the hardware costs and the costs of moving your share of the casks out there, I think you buy the rest of the costs as well.

MR. LO RE: Understood, Your Honor, but I will say just maybe one last thing.

THE COURT: It's never the last thing.

MR. LO RE: It's never the last thing, is it, Your Honor? One other thing, if you will.

I'm hesitating because I think this is where the foreseeable factor comes in. In other words, it's easy to say, okay, conceptually we're going to forget about the foreseeability. But it's hard to pull foreseeability out.

THE COURT: I know.

MR. LO RE: That's our position, is that certainly at the time of contract, and certainly even at the time that they made -- NSP made their decision to pursue dry storage, nobody imagined that we would be in that world. I think

Page 3132

Mr. Metcalfe testified a little bit to that just now with Mr. Ekman. This is a unique situation, not something that we seek damages and award for, certainly from the perspective of DOE, who in 1983 signed a contract.

And you're going to start to hear the DOE's story momentarily.

THE COURT: All right. Why don't we get on to the DOE story.

MR. LO RE: Thank you. The government calls its first witness, Mr. Christopher Kouts to the stand.

THE COURT: Mr. Kouts, would you take the stand, please.

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Please state your name in full and spell your last name, and give the reporter your home address.

THE WITNESS: Okay.

MR. TOMASZCZUK: I just want to indicate, Your Honor, as the government did with respect to our case in chief, we will invoke the

Page 3133

rule on witnesses with respect to the government's lineup of witnesses.

THE COURT: Very well. Do we have any -- Mr. Lo Re.

MR. LO RE: No, Your Honor. Other than our party representative, Mr. Pollog.

THE COURT: Okay.

MR. TOMASZCZUK: And also the rule on sequestration will apply while the witness is testifying.

THE COURT: That's fine. Same rule.

MR. LO RE: That's fine.

THE COURT: I'm sorry, Mr. Kouts, please state your name in full, spell your last name and give your home address.

THE WITNESS: Christopher Alexander Kouts, K-O-U-T-S. Home address, 5307 Massachusetts Avenue, Bethesda, Maryland, 20816.

THE COURT: You may question, Mr. Lo Re.

MR. LO RE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LO RE:

Q Good afternoon, Mr. Kouts.

A Good afternoon.

Q I think you've gotten the first question

Page 3134

under your belt, what is your full name, so I'll move right along.

Mr. Kouts, where are you currently employed?

A I'm currently employed with the Office of Civilian Radioactive Waste Management at the US Department of Energy.

Q And if I could just remind you, Mr. Kouts, since we are making a record today, it would be best if -- I will try to speak slowly, I would appreciate you to try to speak a little slowly so the court reporter can get everything.

A I'll do my best.

Q Thank you. What is your title in the Office of Civilian Radioactive Waste Management?

A I am of the director of the Waste Management Office.

Q How long have you held that position?

A Well, I've held the position essentially since, on an acting basis since October 2002. And it's the same office that was reorganized earlier this year. So simplistically I've held the responsibility for the same duties since October of 2002. But the name of my office has changed due to a reorganization.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 14, 2006

VOLUME 11

The parties met, pursuant to the notice of the Judge, at 10:02 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



76c5d185-b88d-4b42-8aa2-ab1768b69301

Page 3475

facility from adversely affecting the incentive to complete a repository.

So I think that summarizes the findings since I essentially read them into the record.

BY MR. SILBERG:

Q And the GAO identified a number of events, if you look on the top of page 16, which would have to occur. I think we probably would both agree that one of them was the Negotiator must find a volunteer site.

Do you agree with that?

A Yes.

Q And then the Negotiator would have to conclude an agreement with a host site.

A That's correct.

Q And, finally, the Negotiator would have to obtain Congressional approval. And I think those are all laid out in a sentence at the top of page 16 that starts first.

You would agree with those?

A Yes, I would.

Q The prior sentence says: DOE bases its planned schedule for an MRS on several events that are not likely to occur.

I assume that's the GAO conclusion and

Page 3476

was not DOE's at the time?

A That's correct.

Q But if you go down two sentences later, it says: For an MRS facility available by 1998, all of these activities, according to DOE, must be completed by late 1992.

As of September '99 -- 1991, was that a correct statement from DOE's standpoint?

A Well, I don't know specifically who they talked to at DOE. And I don't know the rationale for that. I do think that post 1992, if we got an agreement in 1993, I think it was still possible.

And as we -- as we got closer to 1998, obviously that -- the ability of the Department to deploy such a facility without aggressive legislation, and I stated this earlier, was limited.

So I don't know that I would agree with -- that everything had to be completed by late 1992. I think it still could have been completed sometime after that, but not long after that.

Q About that same time, the Draft Mission Plan Amendment came out, did it not?

A I believe so, yes.

Page 3477

Q And that document -- and I can show it to you, if you would like -- said that DOE was developing a contingency plan. Is that correct?

A I'd have to go back to the document.

Q Okay. If we could pull up DX-102.

MR. SILBERG: Before we do that, Your Honor, I would like to move to admit Plaintiff's Exhibit 288, the GAO report.

MR. LO RE: No, objection, Your Honor.

THE COURT: Very well. We will receive Plaintiff's 288 into evidence.

(Exhibit Number PX-288 was received into evidence.)

BY MR. SILBERG:

Q And if we look at page 18 of that document -- I'm sorry. Strike that. Yeah, I think it is page 18.

It says in that paragraph, about halfway down, paragraph that starts: The Amendments Act?

A Yes.

Q It says: Our strategy is based on siting through the Negotiator. But we are developing a contingency plan for siting the MRS facility and will decide on the basis of the MRS schedule and status of external efforts as to the

Page 3478

appropriateness of implementing that contingency plan.

What was the contingency plan?

A I really don't remember at that time. I can't specifically recall what that plan was.

Q Was that ever implemented? Was any contingency plan ever implemented to find a site?

A Not that I'm aware of.

Q And I think we would agree that, if the linkages were maintained, that your estimate was that the earliest an MRS could be on line was in 2007. Am I correct there?

A At that point in time?

Q Yes.

MR. LO RE: Counsel, did you mean MRS or repository?

MR. SILBERG: I'm sorry. You'll have to read back the answer. I can't restate it.

(The reporter read the record as requested.)

MR. SILBERG: Yes. An MRS.

MR. LO RE: Okay. Thank you.

THE WITNESS: I'm struggling to remember when the time that a construction authorization from the repository would be available, given the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



fe47c76d-fb42-4dd2-a347-fc8e597166af

A In -- as the current organization is structured, probably 6 months, but performing the same function since 1996.
Q What are your current responsibilities?
A Assist in the implementation of the Standard Contract with the utilities.
Q Do you also serve as the contracting officer's technical representative?
A Yes, I do. On an unofficial basis.
Q And when did you assume the responsibilities of the contracting officer's technical representative?
A I believe that was in 2002.
Q And what are the responsibilities of the contracting officer's technical representative?
A To provide the contracting officer technical advice concerning implementation of the terms and conditions of the contract.
Q To whom do you report?
A Christopher Kouts.
Q And would you please describe briefly your post-high school educational background.
A Yes. I received a bachelor of science degree in nuclear engineering from the Pennsylvania State University. I received a



master's of science in environmental systems engineering from Clemson University.
Q And when did you receive those degrees?
A I received my bachelor's in 1981 and my master's in 1988.
Q After graduating, receiving your master's in 1988, where were you employed?
A I accepted a position in the Office of Civilian Radioactive Waste Management.
Q And which -- was there a specific office within the Office of Civilian Radioactive Waste Management?
A Yes. I was in the systems development branch.
Q And what were the responsibilities of that office?
A To develop systems to assist the utilities in spent fuel management.
Q And how long were you in that office?
A For approximately 6 months.
Q And then where did you go?
A Then I was assigned in the systems integration branch. I was in that position for approximately about a year, year and a half. And in that position, we developed the technical



baseline for the -- our program.
Q And after you left -- and when did you leave the systems integration branch?
A In middle or latter part of 1990. And then I joined the utility interface and logistics branch, which is -- performed the waste acceptance function for the organization. So I was moving waste acceptance issues from that point on, until 1992.
Q And where did you go in 1992?
A I took a three-year leave of absence from the Department of Energy and accepted an assignment with the International Atomic Energy Agency in Vienna, Austria. And that lasted until the end of 1994.
Q And at the end of 1994, did you return to DOE?
A Yes, I did. I returned to the engineering division, which we were responsible for producing technologies for use by -- for our program. Essentially I was working on the cask development program and the MPC program.
Q And how long were you with that office?
A Approximately a year and a half.
Q And then where did you go?



A I went back to working in the waste acceptance area.
Q And is that the position that you've held to the present day?
A Yes.
Q Thank you. Mr. Pollog, I would like to hand you Plaintiff's Exhibit 56.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, you may. I think we have 56 memorized. All of us do.
MS. SULLIVAN: We should. It's the contract.
And, Your Honor, 56 of course has been admitted.
BY MS. SULLIVAN:
Q Mr. Pollog, would you identify Plaintiff's Exhibit 56 for the record.
A Yeah. It is a copy of the contract for disposal of spent nuclear fuel and/or high-level radioactive waste between United States Department of Energy and Northern States Power for their Prairie Island nuclear generating plant.
Q Mr. Pollog, can I direct your attention to page 10 of the Standard Contract. And can I

Page 3720

what we're examining is this witness' understanding of how the fulfillment of its contract responsibilities can exist side by side with the suspension of the delivery-commitment schedule process.

MS. SULLIVAN: Understood, Your Honor. Thank you.

THE COURT: So that's where we are.

MS. SULLIVAN: That's fine, Your Honor.

MR. HERZFELD: Okay. Now I am going to hopefully introduce this into evidence because --

THE COURT: I'm not sure that we got the last question answered.

MR. HERZFELD: He did not answer. Well, then I guess I would -- if I could ask you to answer the last question. If you could read it back.

(The reporter read the record as requested.)

THE WITNESS: Well, that's what we believe we did, so yes.

BY MR. HERZFELD:

Q So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs?

Page 3721

A That's what we try to do, yes.

Q Thank you.

THE COURT: What do you mean by obligation? What do you understand the term obligation to mean in the context of counsel's question to you?

THE WITNESS: I'm referring to a specific obligation to take a specific amount of material in a specific period. This has to be taken, these 10 metric tons of uranium in 2003 or 2007. A specific commitment to accept a specific amount of material by a specific time period. That's what I believe he's asking me.

BY MR. HERZFELD:

Q So if I understand your answer correctly, the DCS just commits you to the amount of fuel. It doesn't actually commit to the time period.

So, for example, if DOE didn't begin performing until 2025, it would have no obligation -- no contractual obligation?

A The DCS --

MS. SULLIVAN: One moment, Your Honor. Your Honor, we'll just let the question go. Thank you.

Page 3722

THE WITNESS: The DCS does contain a time period. It has a year on it. So it has a year and an amount.

BY MR. HERZFELD:

Q Okay. And I must have misunderstood your answer. Because I thought you said it was a definite commitment to the amount but not the year?

A No. I said year and amount because they're both clearly on the DCS form.

Q So let me shift gears just slightly and ask you, is your understanding of the purpose of DOE stopping the approval of DCSs was to limit DOE's liability?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion. The question could be his understanding as to the effect or something. Your Honor, limiting liability, that's a province for the general counsel's office.

THE COURT: All right. With that modification --

MR. HERZFELD: I don't think -- I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?

Page 3723

THE COURT: You may answer that question. Yes.

THE WITNESS: Yes.

BY MR. HERZFELD:

Q Okay. If I could get you to turn your attention to Plaintiff's Exhibit 334, which is binder 62.

A This was 330? What was the number again?

Q Binder 62. Plaintiff's Exhibit 334.

Now, do you recognize this document?

A Yes.

Q And do you recognize it to be the 2004 DCS instructions that accompanied the 2004 APR/ACR?

A Yes.

Q And you drafted this document, correct?

A Yes.

Q And if I could direct your attention to page 2, paragraph 7 (a). And if I could have you read into the record the last two sentences of paragraph 7 (a).

MS. SULLIVAN: Your Honor, if I could just -- I understand the Court's ruling when this issue was discussed with Mr. Kouts yesterday. But

Page 3724

if we could just enter a standing objection for the relevance of this document, given it was 2004 and past the time of the issues that are before the Court with the damages.

I understand what the Court said yesterday about how this interplays, but we have concerns about the relevance of the 2004 ACR process.

THE COURT: Well, I think I probably said yesterday that it helps explore the nature of the commitment that DOE sees coming out of the delivery commitment -- delivery -- DCS process, yes.

If that's not what I said yesterday, that's what I should have said yesterday. But that's where we are with this.

MS. SULLIVAN: And I understand that that's why the Court allowed it yesterday and will allow it today.

THE COURT: All right.

MS. SULLIVAN: We have concerns about the relevance of the documents and the questions with regard to, specifically, the 2004 process.

THE COURT: Okay. We're not looking at 2004. We're really exploring the nature of the

Page 3725

legal relationship growing out of the DCS.

MS. SULLIVAN: Thank you, Your Honor.

BY MR. HERZFELD:

Q Okay. If I could have you just read in the last two sentences of paragraph 7 (a). And it's on page 2 of Plaintiff's Exhibit 334.

A DOE recognizes that many purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010.

Q And do I understand correctly, in separate correspondence, DOE also stated that the new DCSs would replace, not supplement the original DCSs that have been submitted; isn't that correct?

A Yes.

MR. HERZFELD: Now, Your Honor, it's about five till 1:00. I've probably got about 15, 20 minutes, maybe half an hour more. We can break for lunch. I can come back and finish up.

THE COURT: Let's do that. Let's come back at 10 after 2:00.

Page 3726

(Whereupon, at 12:57 p.m., the hearing was recessed, to be reconvened at 2:10 p.m. this same day.)

Page 3727

AFTERNOON SESSION (2:13 p.m.)

THE COURT: Mr. Herzfeld, you may continue with cross-examination.

MR. HERZFELD: Thank you, Your Honor.

BY MR. HERZFELD:

Q Mr. Pollog, can I ask you to take out binder 127. And in particular, I'm going to ask you to go to Plaintiff's Exhibit 1019.

Now, this exhibit includes cover letters to the Senate Committee on Appropriations and House Appropriations Committee and attached report entitled, quote, Report to Committees on Appropriations, Spent Fuel Management Alternatives Available to Northern States Power Company, Inc. and the Federal Government for the Prairie Island Nuclear Plant Units 1 and 2.

Have I identified this document correctly?

A Yes.

THE COURT: Now, Ms. Sullivan, you have something you wish to say?

MS. SULLIVAN: Yes, Your Honor. I would like to object to the relevance of this document. This is a document prepared in 2001 after NSP made the decisions and incurred the costs that are the

Page 3736

regarding implementation of any alternative. Furthermore, the Department takes no position on the degree to which any of these alternatives may be or have been applied at Prairie Island, nor the degree to which they may be effective, alone or in combination, in extending the duration of the operation of the Prairie Island Units 1 and 2.
Q Thank you. Mr. Pollog, if you had been asked to perform a similar analysis for another plant owned by another utility, would your list of options have been different?
A Possibly, yes.
Q Could it have been the same list of options?
MR. HERZFELD: Objection. Asked and answered. And leading.
THE COURT: I sustain that objection.
BY MS. SULLIVAN:
Q Mr. Pollog, did you discuss the situation at NSP with anyone at NSP prior to the preparation of this report?
A No, we did not.
Q Okay. What is the status of PFS today?
MR. HERZFELD: Objection. Calls for speculation. And relevance.

Page 3737

THE COURT: I'm assuming, since the witness exhibited knowledge of the existence of a private full storage facility at the time that report was authored in '01, I'm assuming that he is able to answer the question today regarding that facility status.
MS. SULLIVAN: Your Honor, I can lay a foundation for the question and then ask it.
THE COURT: This witness has put out in his report as among the alternatives that Northern States may rely upon the availability of a private storage facility. That exhibits his knowledge of that facility and, thus, the relevance and permissibility of the question asked.
MR. HERZFELD: We withdraw our objection.
BY MS. SULLIVAN:
Q Mr. Pollog, what is the status of PFS today?
A As far as I know, it's dead right now.
THE COURT: As far as I know, it is what, Mr. Pollog?
THE WITNESS: Dead.
THE COURT: Okay.
MR. HERZFELD: Thank you. I didn't hear

Page 3738

him either, Your Honor.
BY MS. SULLIVAN:
Q Mr. Pollog, do you recall you testified on cross --
THE COURT: Excuse me. May I interrupt?
MS. SULLIVAN: Yes.
THE COURT: How did you learn about the private fuel storage facility in the first instance?
THE WITNESS: The initiative was in nuclear periodicals.
THE COURT: I see.
THE WITNESS: Journals. There was discussions of it in different conferences, seminars throughout the nuclear industry, seminars, symposiums, conferences concerning spent fuel management in the nuclear industry.
THE COURT: I see.
BY MS. SULLIVAN:
Q Is this the same source for your current understanding is the current status of PFS?
A Yes.
Q Mr. Pollog, during questioning by Mr. Herzfeld, there was an exchange with regard to DOE's -- whether Department of Energy was

Page 3739

attempting to limit its liability to the suspension of the DCS process. What did you mean when you testified about limiting liability?
A Well, the DCSs were an obligation the Department had entered into. If we stopped approving them, we were essentially stopping our liability -- we were not increasing it any more than we already had incurred.
Q Was the process suspended to limit or reduce DOE's liability in this case?
A I don't know the answer because I don't know what the status was of all of NSP's DCSs if they had been submitted or not, the ones that they were able to submit, that is. So if they had DCSs that they still could have submitted to the Department, then it would have done that, yes. It would, we believe, limited our liability in this case.
Q Were you trying to reduce the amount DOE would pay due to its delay in accepting the amounts covered by approved DCSs?
A Yes. When I say approved, I mean one -- if it wasn't approved, then it was -- there was no liability anymore. We would not have an obligation for that.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC             :
COMPANY, MAINE YANKEE ATOMIC       :
POWER CO., and CONNECTICUT         :
YANKEE ATOMIC POWER CO.,           : Case No. 98-126C
                        Plaintiffs : 98-474C, 98-154C
          -v-                      : (Senior Judge
                                   :  Merrow)
UNITED STATES OF AMERICA,          :
             Defendant             :
- - - - - - - - - - - - - - - - - - X
```

Washington, D.C.

Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

cover with you today.

What is your current position?

A. I am the acting division director of the regulatory coordination division.

Q. How long have you been in that position?

A. I have been in that position since January of 2001.

Q. What was your position before that one?

A. Team leader in the regulatory coordination division.

Q. How did your duties change when you moved from the team leader position to the acting director position?

A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.

Q. Are there any other teams in that division other than the one in which you were team leader?

A. No, there are not.

Q. How many people are in that division?

A. There are, including details, four in

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. Certified Copy :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



Pl. App. 48A

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

P R O C E E D I N G S

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, would you state your name for the record, please?

A. Alan Brownstein.

Q. And by whom are you employed, sir?

A. Department of Energy.

Q. And what is your title?

A. I'm a director of the Regulatory Coordination Division, and I'm on detail right



Pl. App. 48C

now as a special advisor to the, special, senior policy advisor to the director.

Q. You said director of regulatory enforcement division?

A. Regulatory Coordination.

Q. And I'm sorry -- senior policy advisor?

A. Right, to the director; that's a detail right now.

Q. To the director of OCRWM?

A. Of OCRWM.

Q. And that is all within the Department of Energy, correct?

A. Right. Um-hm.

Q. My name is Alex Tomaszczuk. We met prior to going on the record.

I'm counsel for various of the utility plaintiffs in this case.

I'm going to ask some questions about your knowledge with respect to the management of spent nuclear fuel.

If you don't understand my question, please tell me, and I'll try and rephrase it so that --

A. Okay.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. CERTIFIED COPY :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.

For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.

We ought to know how many truck casks and how many rail casks we ought to have available.

In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.

I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

DCSs and the FDSs.

I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.

BY MR. TOMASZCZUK:

Q. Okay. Mr. Brownstein, did you have a role to play in the preparation of what I'll refer to as the TSLCC reports -- total system life cycle cost reports?

A. No. Again, I may have, consistent with, I may have reviewed drafts, you know, as my responsibilities as a division director or as a branch chief, but in terms of its preparation, no.

Q. Okay. Same question with respect to fee adequacy reports -- did you have a role to play in the preparation of those?

A. At one time in the organization, for one short period of time, I did, but under the time that I had that responsibility, I don't recall that we actually issued it during that time period.

Q. Can you put a year on that activity for me?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

you'll see this paragraph does not indicate that it was being disapproved on that basis. So that's obvious from the document. But do you know whether this kind of inconsistency would be a basis for disapproval?

A. I do recall that they would not be a basis for disapproval.

Q. Do you recall why that was so, why this kind of inconsistency would not be a basis for disapproval?

A. The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes. And planning purposes as I have testified before had, you know, some use to the utilities, they had some use to us; for us in the early stages of trying to put together a system and whether to early plan for what type of cask we would need, whether it would be a BWR or a PWR or a rail or a truck cask. And we -- this was another piece of the puzzle.

When the FICA, the facility interface capability assessment -- we had a large database that provided a lot of information, some all being old, on each utility site. And we thought we understood what the capabilities and flexibilities of those sites

# CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM MISSION PLAN

VOLUME I

OVERVIEW AND CURRENT PROGRAM PLANS

DECEMBER 20, 1983

DRAFT

U.S. DEPARTMENT OF ENERGY
OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

PLAINTIFF'S
EXHIBIT # 275

SN045167 [D]

## II. PROGRAM STRATEGY

The objective of the Department's radioactive waste management strategy is to accept high-level radioactive wastes for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. The Department has executed contracts with all current owners and generators of civilian nuclear wastes specifying the obligations and terms whereby the Department will accept these wastes. The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998. The planning approach adopted by the Department has been designed to assure that an acceptable facility will be available when needed, as in the case of Federal Interim Storage, or within eight to eleven years after Congressional approval (1993 to 1996) in the case of Monitored Retrievable Storage.

This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radio-active wastes sufficiently early to determine their on-site interim storage needs prior to 1998. Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certifed for the Federal Interim Storage program.

DOE/RW-0005
Volume 1 of 3 Volumes

# Mission Plan
## for the Civilian Radioactive Waste Management Program

### Volume I

Part I Overview and Current Program Plans
Part II Information Required by the Nuclear Waste Policy Act of 1982

June 1985

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

HQ0005264

Northern States
Defendant's Exhibit
0045 Vol. I

HQR-003-1088

more than 70,000 MTU of spent fuel or the high-level waste resulting from reprocessing such an amount of spent fuel. From the information available for the sites currently under review, it does not appear that more than two repositories would be required to accommodate the projected volume of waste if one of the repositories would be able to accept less than 70,000 MTU.

### 9.3 CONSTRUCTION SCHEDULE

The construction schedule for the first repository is discussed in detail in Section 3.1.7 of Part I.

### 9.4 WASTE-ACCEPTANCE SCHEDULE AND THE NEED FOR INTERIM STORAGE

As described in Chapter 2 of Part I, two alternative waste-acceptance schedules are presented: The first (shown in Table 9-2) is based on the DOE's reference waste-management plan (i.e., the emplacement capability of two geologic repositories). In this case, waste acceptance at the first repository is scheduled to start in 1998.

The second schedule (shown in Table 9-3) is based on the improved-performance plan (i.e., the operating characteristics of the integrated waste-management system); it reflects not only the repository emplacement capability but also the acceptance capability of the monitored retrievable storage (MRS) facility. The primary functions of the MRS facility are to accept waste from reactors, prepare it for disposal, and provide temporary storage, if necessary. If Congress approves the DOE's proposal for the integrated waste-management system, then the second waste-acceptance schedule will be applicable. In this case, waste acceptance at the MRS facility will begin in 1996.

The at-reactor storage capacity required by these waste-acceptance schedules will have to be provided by the electric utilities that own the spent fuel. However, if the DOE fails to meet the schedule shown in Table 9-2 or 9-3, then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites.

Table 9-2. Waste-Acceptance Schedule for the Authorized System
(Metric tons of uranium (MTU) per year)

| Year | Spent-Fuel Generation[A] | | First Repository | | | | Second Repository | | Cumulative Spent-Fuel Acceptance | Spent-Fuel Backlog |
|---|---|---|---|---|---|---|---|---|---|---|
| | Annual | Cumulative | Spent Fuel | High-Level Waste[B,C] | Total | Cumulative | Spent Fuel | Cumulative | | |
| Pre 1998 | | 40,100 | | | | | | | | 40,100 |
| 1998 | 2900 | 43,000 | 400 | | 400 | 400 | | | 400 | 42,600 |
| 1999 | 3000 | 46,000 | 400 | | 400 | 800 | | | 800 | 45,200 |
| 2000 | 3000 | 49,000 | 400 | | 400 | 1,200 | | | 1,200 | 47,800 |
| 2001 | 3000 | 52,000 | 900 | | 900 | 2,100 | | | 2,100 | 49,900 |
| 2002 | 3000 | 55,000 | 1800 | | 1800 | 3,900 | | | 3,900 | 51,100 |
| 2003 | 3100 | 58,100 | 3000 | 400 | 3400 | 7,300 | | | 6,900 | 51,200 |
| 2004 | 3300 | 61,400 | 3000 | 400 | 3400 | 10,700 | | | 9,900 | 51,500 |
| 2005 | 3400 | 64,800 | 3000 | 400 | 3400 | 14,100 | | | 12,900 | 51,900 |
| 2006 | 3800 | 68,600 | 3000 | 400 | 3400 | 17,500 | 900 | 900 | 16,800 | 51,800 |
| 2007 | 4100 | 72,700 | 3000 | 400 | 3400 | 20,900 | 1800 | 2,700 | 21,600 | 51,100 |
| 2008 | 4700 | 77,400 | 3000 | 400 | 3400 | 24,300 | 1800 | 4,500 | 26,400 | 51,000 |
| 2009 | 4500 | 81,900 | 3000 | 400 | 3400 | 27,700 | 1800 | 6,300 | 31,200 | 50,700 |
| 2010 | 4500 | 86,400 | 3000 | 400 | 3400 | 31,100 | 1800 | 8,100 | 36,000 | 50,400 |
| 2011 | 4000 | 90,400 | 3000 | 400 | 3400 | 34,500 | 2400 | 10,500 | 41,400 | 49,000 |
| 2012 | 4100 | 94,500 | 3000 | 400 | 3400 | 37,900 | 3000 | 13,500 | 47,400 | 47,100 |
| 2013 | 4200 | 98,700 | 3000 | 400 | 3400 | 41,300 | 3000 | 16,500 | 53,400 | 45,300 |
| 2014 | 4200 | 102,900 | 3000 | 400 | 3400 | 44,700 | 3000 | 19,500 | 59,400 | 43,500 |
| 2015 | 4300 | 107,200 | 3000 | 400 | 3400 | 48,100 | 3000 | 22,500 | 65,400 | 41,800 |
| 2016 | 4300 | 111,500 | 3000 | 400 | 3400 | 51,500 | 3000 | 25,500 | 71,400 | 40,100 |
| 2017 | 4500 | 116,000 | 3000 | 400 | 3400 | 54,900 | 3000 | 28,500 | 77,400 | 38,600 |
| 2018 | 4700 | 120,700 | 3000 | 400 | 3400 | 58,300 | 3000 | 31,500 | 83,400 | 37,300 |
| 2019 | 4700 | 125,400 | 3000 | 400 | 3400 | 61,700 | 3000 | 34,500 | 89,400 | 36,000 |
| 2020 | 4900 | 130,300 | 3000 | 400 | 3400 | 65,100 | 3000 | 37,500 | 95,400 | 34,900 |
| 2021[D] | | | 3000 | 400 | 3400 | 68,500 | 3000 | 40,500 | 101,400 | 28,900 |
| 2022 | | | 1100 | 400 | 1500 | 70,000 | 3000 | 43,500 | 105,500 | 24,800 |
| 2023 | | | | | | | 3000 | 46,500 | 108,500 | 21,800 |
| 2024 | | | | | | | 3000 | 49,500 | 111,500 | 18,800 |
| 2025 | | | | | | | 3000 | 52,500 | 114,500 | 15,800 |
| 2026 | | | | 8000[E] | | | 3000 | 55,500 | 117,500 | 12,800 |
| 2027 | | | | | | | 3000 | 58,500 | 120,500 | 9,800 |
| 2028 | | | | | | | 3000 | 61,500 | 123,500 | 6,800 |
| 2029 | | | | | | | 3000 | 64,500 | 126,500 | 3,800 |
| 2030 | | | | | | | 3000 | 67,500 | 129,500 | 800 |
| 2031 | | | | | | | 800 | 68,300 | 130,300 | |

[A]Data from Commercial Nuclear Power 1984: Prospects for the United States and the World, DOE/EIA 0438(84), November 1984. Includes discharge from decommissioned reactors.

[B]Approximate waste-acceptance rates for high-level waste from atomic energy defense activities and commercial high-level waste from the West Valley Demonstration Project. Quantities have been "normalized" to metric tons of uranium (MTUs) on a curie-equivalent basis. Direct comparison with spent fuel is not equivalent, because defense high-level waste (DHLW) and commercial high-level waste (CHLW) resulted from the reprocessing of spent fuel. In the example, 400 MTU of defense waste equals 800 canisters. Actual acceptance rates are to be negotiated between Defense Programs and the Office of Civilian Radioactive Waste Management in the DOE.

[C]The first repository currently is designed to begin operation in two phases. This example shows the acceptance of DHLW and CHLW in the first phase when the second phase reaches its maximum receipt rate.

[D]The Energy Information Administration projects spent-fuel generation only through the year 2020. For waste created after 2020, either the capacity of the first two repositories could be increased or additional repositories could be built.

[E]The example shows a total of 8000 MTU of DHLW and CHLW emplaced by the year 2022. Additional DHLW can be accommodated by extending the operation of the first repository, emplacing DHLW in the second repository, or constructing additional repositories, as indicated in footnote D.

Table 9-3. Waste-Acceptance Schedule for the Improved-Performance System
(Metric tons of uranium (MTU) per year)

| Year | Spent-Fuel Generation[A] Annual | Spent-Fuel Generation[A] Cumulative | MRS Acceptance[B] | MRS Inventory | First Repository: SF from MRS | First Repository: High-Level Waste[C] | First Repository: Total | First Repository: Cumulative Total Waste | Second Repository: Spent fuel | Second Repository: Cumulative | Cumulative Spent-Fuel Acceptance | Spent-Fuel Backlog |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre 1998 | | 40,100 | 2200 | 2,200 | | | | | | | 2,200 | 37,900 |
| 1998 | 2900 | 43,000 | 3000 | 4,800 | 400 | | 400 | 400 | | | 5,200 | 37,800 |
| 1999 | 3000 | 46,000 | 3000 | 7,400 | 400 | | 400 | 800 | | | 8,200 | 37,800 |
| 2000 | 3000 | 49,000 | 3000 | 10,000 | 400 | | 400 | 1,200 | | | 11,200 | 37,800 |
| 2001 | 3000 | 52,000 | 3000 | 12,100 | 900 | | 900 | 2,100 | | | 14,200 | 37,800 |
| 2002 | 3000 | 55,000 | 3000 | 13,300 | 1800 | | 1800 | 3,900 | | | 17,200 | 37,800 |
| 2003 | 3100 | 58,100 | 3000 | 13,300 | 3000 | 400 | 3400 | 7,300 | | | 20,200 | 37,900 |
| 2004 | 3300 | 61,400 | 3000 | 13,300 | 3000 | 400 | 3400 | 10,700 | | | 23,200 | 38,200 |
| 2005 | 3400 | 64,800 | 3000 | 13,300 | 3000 | 400 | 3400 | 14,100 | | | 26,200 | 38,600 |
| 2006 | 3800 | 68,600 | 3000 | 13,300 | 3000 | 400 | 3400 | 17,500 | 900 | 900 | 30,100 | 38,500 |
| 2007 | 4100 | 72,700 | 3000 | 13,300 | 3000 | 400 | 3400 | 20,900 | 1800 | 2,700 | 34,900 | 37,800 |
| 2008 | 4700 | 77,400 | 3000 | 13,300 | 3000 | 400 | 3400 | 24,300 | 1800 | 4,500 | 39,700 | 37,700 |
| 2009 | 4500 | 81,900 | 3000 | 13,300 | 3000 | 400 | 3400 | 27,700 | 1800 | 6,300 | 44,500 | 37,400 |
| 2010 | 4500 | 86,400 | 3000 | 13,300 | 3000 | 400 | 3400 | 31,100 | 1800 | 8,100 | 49,300 | 37,100 |
| 2011 | 4000 | 90,400 | 3000 | 13,300 | 3000 | 400 | 3400 | 34,500 | 2400 | 10,500 | 54,700 | 35,700 |
| 2012 | 4100 | 94,500 | 3000 | 13,300 | 3000 | 400 | 3400 | 37,900 | 3000 | 13,500 | 60,700 | 33,800 |
| 2013 | 4200 | 98,700 | 3000 | 13,300 | 3000 | 400 | 3400 | 41,300 | 3000 | 16,500 | 66,700 | 32,000 |
| 2014 | 4200 | 102,900 | 3000 | 13,300 | 3000 | 400 | 3400 | 44,700 | 3000 | 19,500 | 72,700 | 30,200 |
| 2015 | 4300 | 107,200 | 3000 | 13,300 | 3000 | 400 | 3400 | 48,100 | 3000 | 22,500 | 78,700 | 28,500 |
| 2016 | 4300 | 111,500 | 3000 | 13,300 | 3000 | 400 | 3400 | 51,500 | 3000 | 25,500 | 84,700 | 26,800 |
| 2017 | 4500 | 116,000 | 2800 | 13,100 | 3000 | 400 | 3400 | 54,900 | 3000 | 28,500 | 90,500 | 25,500 |
| 2018 | 4700 | 120,700 | | 10,100 | 3000 | 400 | 3400 | 58,300 | 3000 | 31,500 | 93,500 | 27,200 |
| 2019 | 4700 | 125,400 | | 7,100 | 3000 | 400 | 3400 | 61,700 | 3000 | 34,500 | 96,500 | 28,900 |
| 2020 | 4900 | 130,300 | | 4,100 | 3000 | 400 | 3400 | 65,100 | 3000 | 37,500 | 99,500 | 30,800 |
| 2021 | | | | 1,100 | 3000 | 400 | 3400 | 68,500 | 3000 | 40,500 | 102,500 | 27,800 |
| 2022 | | | | | 1100 | 400 | 1500 | 70,000 | 3000 | 43,500 | 105,500 | 24,800 |
| 2023 | | | | | | | | | 3000 | 46,500 | 108,500 | 21,800 |
| 2024 | | | | | | | | | 3000 | 49,500 | 111,500 | 18,800 |
| 2025 | | | | | | | | | 3000 | 52,500 | 114,500 | 15,800 |
| 2026 | | | | | | 8000 | | | 3000 | 55,500 | 117,500 | 12,800 |
| 2027 | | | | | | | | | 3000 | 58,500 | 120,500 | 9,800 |
| 2028 | | | | | | | | | 3000 | 61,500 | 123,500 | 6,800 |
| 2029 | | | | | | | | | 3000 | 64,500 | 126,500 | 3,800 |
| 2030 | | | | | | | | | 3000 | 67,500 | 129,500 | 800 |
| 2031 | | | | | | | | | 800 | 68,300 | 130,300 | |

[A]Data from _Commercial Nuclear Power 1984: Prospects for the United States and the World_, DOE/EIA 0438(84), November 1984. Includes discharge from decommissioned reactors.
[B]The MRS facility is assumed to reach a constant acceptance rate and discharge to the first repository as fast as the first repository can accept spent fuel. The MRS facility will stop accepting spent fuel when its inventory will fill the first repository.
[C]See footnotes B and C in Table 2-2.



HQ0005656

Pl. App. 59

HQR-003-1480

HQR003 1480