statements under oath that establish a genuine material issue of fact." Levi Strauss & Co., 742 F.2d at 1404.

PPL asserts that DOE's bad faith is self-evident through its implementation of the DCS process. Pl. Reply 30. Although PPL complains that DOE "did not allow utilities to identify 'all SNF and HLW [they wished] to deliver to DOE,' as permitted by the Standard Contract" in DCSs that contract holder utilities submitted, Pl. Reply 30, PPL never responded to DOE's DCS instructions, never complained about those instructions, and never submitted a DCS. In fact, and importantly, PPL did not have any acceptance allocations in at least the first ten years of the SNF acceptance queue, Def. App. 415, and, given that the acceptance allocations were developed in accordance with the contractual provision that generally requires DOE to accept SNF on an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. IV.B.5(a), PPL has no basis for asserting that it should have had allocations in 1998. Although PPL asserts without foundation that DOE "void[ed]" other utilities' DCSs, Pl. Reply 31, DOE certainly never "voided" any PPL DCSs since PPL never submitted any for approval and, further, under the "oldest fuel first" allocation system, had no

viable basis upon which to submit them.[7] Further, PPL has presented absolutely no evidence that DOE's decision to suspend approvals of DCSs was made for the purpose of "injuring" PPL. Given that PPL had no acceptance allocations in at least the first 10 years of the SNF acceptance

---

[7] Further, no approved DCSs were ever "voided." As Mr. Zabransky, now the DOE contracting officer for the Standard Contract, has testified, when DOE determined that it would not be able to begin SNF acceptance in 1998, it stopped making commitments to accept SNF. Def. Reply App. 15-16. A few DCSs that were in the process of being approved when that determination was made had not yet completed the approval process, either not yet having been approved by the contracting officer or not yet having been communicated to the contract holder. See Pl. App. 76-86; Def. Reply App. 16-17. "[I]t has never been doubted that any public officer in the Departments may correct his own errors, and open, reconsider, and reverse in whole or in part any case decided by himself." Rollins v. United States, 23 Ct. Cl. 106, 123 (1888); see Cotton v. United States, 29 Ct. Cl. 207, 225 (1894) ("[w]e have always understood that a public officer could open and reconsider any decision made by himself, like a court"). Even when a final decision is deemed "irrevocable" pursuant to statute or regulation, it becomes irrevocable only when the action described in the final decision has become an "accomplished fact," having been communicated to the interested party and implemented. See, e.g., Comptroller General Warren to the Secretary of War, B-28964, 22 Comp. Gen. 291, 292-93 (1942) ("[s]uch an action may be rescinded at any time before it is consummated by the giving of official notice thereof to the employee, but not thereafter"); Decision by Comptroller General, 3 Comp. Gen. 942, 944, 1924 WESTLAW 1178, at 3 (1924) ("before a deduction has been certified to this office for the purpose of raising a charge against the contractor, the Postmaster General may correct his own errors and open, reconsider, and reverse in whole or in part any case decided by himself"). PPL's insinuation that DOE's actions were improper is wholly unsupported. In any event, PPL has made no allegation that DOE voided its DCSs.

program, see Def. App. 415, and that PPL never submitted a DCS for approval, PPL cannot support an allegation that the suspension of the process was directed with any malicious intent at PPL.

Although PPL asserts that this Court in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), found that DOE breached its duty of good faith under the Standard Contract, see Pl. Reply 31-32, PPL has misread that decision. Unlike PPL, TVA had allocations in the first ten years of the repository under the "oldest fuel first" allocation system that the Standard Contract mandates. TVA submitted DCSs to DOE for approval based upon those allocations, but DOE was unable either to approve or to disapprove them. The Court found that, pursuant to Article V.B of the contract, DOE was required either to approve or to disapprove a submitted DCS within three months of receipt and that DOE's failure to do so constituted a partial breach of the Standard Contract. Id. at 674. The Court did not find an intent to injure the plaintiff there or a breach of the duty of good faith and fair dealing.

Further, the plaintiff here has conceded that it would not have had any allocations in the first ten years of the SNF acceptance under the allocations and acceptance rates in the 1991, 1992, or 1995 ACRs. See

Pl. Reply 16. Further, even under the revised acceptance rates that PPL proposes, it would not have any SNF acceptance rights until 2004, at the earliest. See Pl. Reply App. 112 (in document containing rates that plaintiff believes appropriate, plaintiff's first SNF acceptance begins in the seventh year of SNF acceptance). Accordingly, PPL has no basis for complaining that DOE has already acted in bad faith towards PPL.[8]

Nothing in any of the evidence that PPL proffers demonstrates any specific intent by DOE to injure PPL, that DOE's actions were "motivated alone by malice," or that DOE's actions were part of a course of conduct that was "designedly oppressive" or "activated by animus" toward PPL. See Am-Pro, 281 F.3d at 1241. The only "evidence" is counsel's efforts to twist factual scenarios into something sinister – without any actual evidence of malicious intent. Counsel's speculation cannot form the basis of "clear and convincing evidence" of DOE's malicious intent. Because there is no evidence that supports PPL's claim for a breach of the duty of good faith and fair dealing, that claim should be dismissed.

---

[8] PPL's citation to Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991), at page 34 of its reply brief only serves to highlight the fact that, unlike the plaintiff in Solar Turbines, PPL has provided no evidence whatsoever of any specific malice or bad faith toward it by DOE.

## III. PPL HAS FAILED TO DISTINGUISH ITS TAKINGS CLAIM FROM ITS BREACH OF CONTRACT CLAIM, AND THE TAKINGS CLAIM SHOULD, THEREFORE, BE DISMISSED

### A. PPL's Complaint About Its Real Property Is Merely A Redescription Of Its Complaint About DOE's Failure To Satisfy Its Obligations Under The Standard Contract

It is well-settled in this Court that the concept of a taking has limited application when rights have been voluntarily created by contract. Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 494 (2002). "[I]nterference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a 'taking' for public use." Id. at 494 (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy.'" Id. at 495 (quoting Castle v. United States, 48 Fed. Cl. 187, 218 (2000), aff'd in relevant part, rev'd in part on other grounds, 301 F.3d 1328 (Fed. Cir. 2002)).[9]

---

[9] Numerous recent decisions dismissing takings claims based upon rights emanating from a contract that was breached have been issued by this Court and the United States Court of Appeals for the Federal Circuit. See, e.g., LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004); FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003)

Here, the "property right" about which PPL actually complains is its "right" to have the Department of Energy begin acceptance of SNF and/or HLW by January 31, 1998. That "right," to the extent that it exists, was created by the Standard Contract. PPL does not dispute that it has a contract-based remedy for the Department of Energy's delay in beginning SNF and/or HLW acceptance. In fact, as the Court is well aware, PPL is seeking damages for that partial breach as part of this very case. However, PPL apparently argues that its current takings claim – for a taking of its "real property" – is unrelated to its Standard Contract with DOE. See Pl. Reply, at 28-30, 33-34.

Yet, absent the Standard Contract, DOE would have absolutely no obligation to accept or dispose of PPL's SNF or HLW. To the contrary, absent the Standard Contract, PPL, and only PPL, would have the sole responsibility for the continued storage and disposal of its SNF and HLW. As a result, absent the Standard Contract, PPL would have to conduct

---

(affirming Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002)); Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 166 (2003); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002); Home Sav. of Am., F.S.B., 51 Fed. Cl. at 494-96; Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 566 (2001), aff'd, 48 Fed. Appx. 752 (Fed. Cir.2002).

exactly the same storage activities, at its own expense, that it now complains it has to conduct. That is, absent the Standard Contract, PPL would have to store its SNF upon its real property until and unless it could devise an alternative means of storage and/or disposal.

Apparently, PPL believes that it can take an obligation created by contract, identify a breach of that contractual obligation, and, at the same time that it seeks contract damages for a breach of that obligation, seek additional damages resulting from the same breach of that same obligation under a takings theory merely by focusing on the alleged effects, rather than the cause or basis, of the breach. Here, PPL asserts that the Government has taken its real property because, by failing to meet its contractual obligations, DOE has required PPL to continue to store PPL's SNF, which PPL has elected to do on PPL's real property. Yet, the Government has not "taken" PPL's real property. The Government has not seized PPL's land or facilities. Further, the Government has not invaded PPL's land or facilities by placing Government property upon PPL's land or in PPL's facilities. As a result, PPL is complaining that it is being required to store PPL's SNF. The only Government obligation relating to PPL's SNF arises from, and will be identified by reference to, PPL's contract with

the Department of Energy. "Instead of conferring a right protected from a taking, 'the contract promised to either regulate [plaintiffs] consistently with the contract's terms, or to pay damages for breach.'" Franconia Assocs. v. United States, 61 Fed. Cl. 718, 737 (2004) (quoting Castle, 301 F.3d at 1342). PPL's efforts to distance its contract from its takings claim are wholly unpersuasive.

B. Given That PPL Still Controls And Has Sole Possession Of Its Real Property, The Government Has Not "Taken" PPL's Property Rights In Its Real Property

There are essentially two types of takings cases presented in actions under the Tucker Act. The first type is an outright Governmental seizure or occupation of private property: a physical taking. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992). Because PPL, not the Government, owns and holds title to SNF at issue in this case, PPL cannot argue that the Government has somehow physically invaded or occupied PPL's property or has required PPL to allow third parties to trespass upon its property. To the contrary, PPL, and only PPL, is in full possession of its real property and is storing the SNF that it owns and to which it holds title. Because the Government does not hold title to the SNF, PPL has no basis for seeking damages for a physical invasion or

occupancy of its property.[10]

The second type is a regulatory imposition that constrains an owner's continuing use of property: a regulatory taking. Such a taking occurs when regulations go "too far" and impinge upon private freedom. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). However, as previously discussed, the "right" to acceptance of PPL's SNF was not

[10] In its reply brief, PPL cites several cases to support its proposition that "a taking occurs where the Government forces a business to provide land and services for the benefit of the public." Pl. Reply 36. All of the cases upon which PPL relies to support this proposition involve situations in which the Government either physically occupied, and possessed, the real property at issue or required the real property owner to allow third parties physically to "invade" or trespass upon that real property. Here, PPL is the only entity in possession of PPL's property, precluding any physical invasion argument.

In addition, in its complaint, PPL does not appear to allege that DOE has required PPL to store PPL's SNF in any particular place. Although PPL has apparently elected to keep its SNF on the same real property upon which its nuclear power plant rests, PPL cannot identify any regulation or rule that DOE has issued that mandates its storage there. We acknowledge that the NRC's licensing requirements place restrictions upon any entity's ability to transport SNF to a new storage location. However, DOE has not imposed those restrictions upon PPL, and such restrictions must be expected in the highly-regulated nuclear industry. Further, several nuclear utilities are involved in the development of a private fuel storage facility, see 64 Fed. Reg. 18451 (Apr. 14, 1999), which, if approved, would allow for off-site storage. In any event, for purposes of this motion, it is unimportant whether DOE has implicitly required PPL to keep its SNF upon PPL's real property, given that any rights requiring DOE to accept and dispose of that material were created by contract.

created by statute or regulation, but by a contract between DOE and PPL. Although those terms of the Standard Contract that were promulgated through notice-and-comment rulemaking in the Federal Register should, like clauses from the Federal Acquisition Regulation, be interpreted by reference to the rules applicable to regulatory interpretation, see Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981), that rule of interpretation does not change the character of the action here: a claim for a breach of contract affecting rights created by contract. The "regulation" that created the terms of the Standard Contract did not create any agreement between DOE and any particular nuclear utility. No "agreement" existed until such time as the nuclear utility and DOE mutually executed the Standard Contract identifying the particular nuclear power generator to which the contract would apply. As a result, it is clear that no regulatory action has "taken" PPL's real property. Instead, PPL's use of its real property to store SNF that PPL contends DOE was otherwise obligated to accept under the terms of the Standard Contract relates to PPL's contract and gives rise only to a claim for breach of contract.

### C. PPL's Assertion That The Federal Circuit Has Already Permitted Spent Nuclear Fuel Plaintiffs To Pursue Contract And Takings Claims Concurrently Is Unfounded And Misleading

PPL contends that the United States Court of Appeals for the Federal Circuit has "allowed a utility, on identical facts, to maintain both a breach of contract claim and a takings claim," citing Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl. Reply 38-39. However, PPL's interpretation of the Maine Yankee decision is inaccurate and misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract and takings claim in this Court. However, the Federal Circuit found that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses contained in the Standard Contract did not encompass the delay at issue in this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that the Maine Yankee plaintiff "was not required to invoke the contract's disputes clause before bringing suit" and that its taking count "cannot be viewed as constituting avoidable delays under that

clause." Id. at 1342-43.

Contrary to PPL's contention, the Federal Circuit in Maine Yankee did not make any determination that the plaintiff's takings claim stated a viable cause of action. The only motion that the Court considered was a jurisdictional motion requesting dismissal based upon the plaintiff's failure to exhaust its administrative remedies. The Federal Circuit was neither presented with nor considered arguments regarding the viability of a takings claims outside the context of the Standard Contract. PPL's suggestion that the Federal Circuit has somehow ruled favorably upon the merits of its takings claim is simply unfounded.

PPL also cites several cases from this Court to support its argument that it may assert a takings claim that clearly flows from a contractual obligation. Pl. Reply 41 & 44. As the Court is aware, in our motion to dismiss, we identified SNF cases in which takings claims substantially similar to PPL's claim were dismissed because they were "grounded on the SNF contracts that [plaintiffs] executed with the United States." Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished); see PG&E, 70 Fed. Cl. at 780 (2006) (utility plaintiff's "claim for a taking is dependent upon the existence of the

Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy"); Canal Elec. Co. v. United States, 65 Fed. Cl. 650, 656 (2005) ("Plaintiff has not shown that it is entitled to damages under a theory independent of the rights accorded Canal Electric under the Standard Contract"); Commonwealth Edison, 56 Fed. Cl. at 656. In response, PPL cites to this Court's unpublished decision in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003), which allowed the plaintiff to proceed with its takings claim through trial, as evidence that it can recover upon both a breach of contract claim and takings claim as a result of DOE's delay. However, in Yankee, a case over which Senior Judge Merow presided, the only reason that the Court identified for allowing the takings claim to proceed was the Court's concern that the plaintiff's allegations about the Government's failure to dispose of Greater-Than-Class-C radioactive waste ("GTCC waste") under the Low Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA"), 42 U.S.C. §§ 2041b-2041i, might somehow create a taking. Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. at 5 (Fed. Cl. June 26, 2003) (if GTCC waste is not covered by the Standard Contract, "a continued presence of GTCC on plaintiff's site despite defendant's

statutory obligation" under the LLRWPAA "to dispose [o]f it could, conceivably, form the basis for a taking claim").[11] Here, PPL has made no allegations about GTCC waste or complained about DOE's alleged failure to remove GTCC waste, precluding its reliance upon the rationale of the Yankee decision. In fact, in another SNF case over which Senior Judge Merow is also presiding, the Court dismissed the plaintiff's takings claim in its entirety where the plaintiff had made no allegations regarding GTCC

---

[11] With all due respect, the Court's suggestion that a takings claim could exist based upon DOE's failure to act in accordance with a statute is incorrect. No entity has a property right in a rule of law, as "the law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch v. United States, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("if every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever'") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1104 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute. . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred"), cert. denied, 517 U.S. 1243 (1996). "Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004). Nevertheless, because PPL is not basing its takings claim upon the alleged failure to dispose GTCC waste, Senior Judge Merow's concerns in Yankee are irrelevant to the takings claim in this action.

waste. Southern Nuclear, No. 98-614C, slip op. at 5.

PPL also cites to this Court's decision denying a motion to dismiss one of the SNF plaintiff's takings claims in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) ("SMUD"), where the Court stated that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. at 442. With all due respect, we disagree with the Court's decision to the extent that it applies to rights created by a contract with the Government. The fact that the plaintiff's rights to removal of SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking. Indeed, the Court implicitly acknowledged this principle by deciding to bifurcate the breach of contract and takings trials and concluding that a takings trial would only be conducted if SMUD lost on its breach of contract claim. Further, the Court's decision to deny the Government's motion to dismiss appears based in large part upon the belief that takings claims are necessarily fact specific, but this Court has not hesitated to dismiss takings claims that fail to state a claim. See, e.g., Granite Mgt., 55 Fed. Cl. at 166; Westfed Holdings, 52 Fed. Cl. at 152; Home Sav., 51 Fed. Cl. at 494-96. This

Court should not disrupt the well-settled Federal Circuit precedent which clearly provides that, if an obligation is created by a contract with the Government, the proper remedy for the Government's breach of that right is through a breach claim, not a taking.[12]

Plaintiff's reliance upon the Federal Circuit's decision in Prudential Insurance Co. of America v. United States, 801 F.2d 1295 (Fed. Cir. 1986) is also unavailing. Pl. Reply 46. In Prudential, the issue before the Court was whether foreseeability of damages for breach of a lease agreement should be measured as of the date of contract execution or the date that the lease was breached. Id. at 1300. Concluding that foreseeability of damages for breach of a lease agreement should be measured as of the date of contract execution, the Court noted in dicta that, "[a]lthough this

---

[12] PPL also cites to this Court's decision to reserve judgment upon whether the plaintiff could state a claim for a taking under the Standard Contract in Detroit Edison Company v. United States, 56 Fed. Cl. 299 (2003). As we discussed in our motion, although we respectfully disagree with the decision in Detroit Edison, even the reasoning in that case does not prevent the Government from prevailing upon its motion in this case. In Detroit Edison, the Court chose not to dismiss the takings claim at that "point in the litigation" because a "more fully developed record" would allow it to assess whether the property right implicated was outside of the rights granted under the Standard Contract. Id. at 302-03. Here, there is no doubt that any right that PPL has to require DOE to accept its SNF was created through its contract with DOE.

may place a more difficult burden on a lessor seeking consequential damages against the government as a holdover tenant, lessors may have an alternative avenue of relief under the Takings Clause of the Fifth Amendment." Id. at 1300 n.13. Indeed, the plaintiff in Prudential had not brought a takings claim based upon the Government's hold-over of the lease.

Any doubt as to the viability of the Federal Circuit's dicta in Prudential has been resolved in its more recent decision in Castle, 301 F.3d 1328. In Castle, the Federal Circuit expressly rejected the notion that a takings claim may be brought as an alternative to a breach of contract claim, holding that, where a plaintiff's rights were created by a contract with the Government and the plaintiff retains its contractual remedies following a breach, it may not maintain a takings claim based upon the Government's breach of that contract. Id. at 1341-42; see Zoeller v. United States, 65 Fed. Cl. 449, 461-62 (2005) (rejecting takings claim predicated upon termination of lease agreement, noting that the Government had not deprived plaintiff of contractual rights stemming from the breach of the agreement); Bailey, 53 Fed. Cl. at 256-57 (no taking of contract rights exists unless Government "takes" range of remedies associated with

vindication of contract), aff'd, 341 F.3d 1342 (Fed. Cir. 2003); Integrated Logistics Support Sys. Int'l, Inc. v. United States, 42 Fed. Cl. 30, 34 (1998) (plaintiff "cannot exploit the Fifth Amendment to amend unilaterally a contract in an effort to rectify what hindsight reveals as an unappealing bargain").

### D. The Cases That PPL Cites To Support Its Ability To Recover Under Both Contract And Takings Theories Do Not Support Its Argument

PPL argues that "a takings claim is appropriate where 'the government ha[s] taken away the range of remedies associated with the vindication of a contract.'" Pl. Reply 44 (quoting Castle, 48 Fed. Cl. at 219). We do not disagree with that quotation of the relevant law. However, PPL's only allegation that it will not be permitted to pursue the full range of remedies that its contract provides – an allegation that is not included in its complaint – is that, "[o]ver the last several years, the Government has asserted numerous rationales for excusing its failure to perform its obligations under the Standard Contract and has systematically attempted to either eliminate or restrict Plaintiff's full range of remedies." Pl. Reply 44.

To the extent that PPL is relying upon unidentified positions that the

Department of Energy has taken outside the context of litigation to support a takings claim, PPL's reply brief itself establishes that various appellate courts have rejected those Department of Energy positions to which PPL is now referring. See Pl. Reply 44-45 (citing the Northern States, Indiana Michigan, and Alabama Power decisions and asserting that, in each case, the court "reject[ed]" the Department of Energy's position). In fact, PPL's reply brief establishes that, in fact, PPL has had ample protection from the courts in defending against those "positions" by the Department of Energy that it does not like. Clearly, its "range of remedies" has not been abrogated, precluding any basis for a takings claim.

Alternatively, PPL claims that the Government has somehow imposed "another damages-limiting initiative . . . . [by attempting] in other spent nuclear fuel cases to impose an SNF acceptance rate schedule upon the court and parties that contradicts virtually every system design or other document published by DOE during the last twenty years." Pl. Reply 45. Yet, PPL cannot argue, and has not argued, that the Government's litigation positions somehow eliminate PPL's full range of contract remedies. The Government has attempted in other litigation to define the meaning of the terms of the Standard Contract. This Court will evaluate

those definitions and determine whether they are correct. If the Court determines that the Government's position is correct, it means that the Standard Contract did not provide PPL with the scope of contract "rights" that it presently asserts. If the Court determines that the Government's position is not correct, the Court will presumably reject the Government's position and determine the appropriate meaning of PPL's contract. Either way, PPL has no basis for arguing that the Government's positions somehow "limit" PPL's range of contractual remedies. If the contract did not provide PPL with the rights that it now claims, PPL has no basis for seeking damages for a breach of those non-existent rights, and the Court will determine the validity of each party's positions.

The same can be said about PPL's claim that the Government's intention to assert its defense based upon the "Unavoidable Delays" provision of the contract would constitute a taking. Pl. Reply 45. Such an assertion would not constitute an abrogation of an outstanding contract, as plaintiff suggests, but rather a simple reliance on a clause of the contract. If the Federal Circuit determines that such reliance is proper that again would indicate that the contract did not provide PPL with the rights it now claims.

PPL also cites to this Court's decision in Integrated Logistics Support Systems Int'l, Inc. v. United States, 42 Fed. Cl. 30 (1998), to support its ability to recover both for a breach of the Standard Contract and for a taking of its real property. Pl. Reply 42. In Integrated Logistics, although the plaintiff alleged a breach of an express contract by the Government, the plaintiff also alleged claims that the Government had breached an unwritten implied-in-fact contract that was "entirely unrelated" to the express contract and, "in the alternative, a compensable taking of its [personal] property." Integrated Logistics, 42 Fed. Cl. at 33, 36. The Court found that, because it could not "conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials" that the Government allegedly took from the plaintiff, "and because plaintiff has alleged facts sufficient to support the converse," the plaintiff had alleged a potentially viable takings claim. The Court's denial of the Government's motion to dismiss was premised upon the plaintiff's factual allegations that the express contract did not relate to the materials of which the Government had taken physical possession.

Here, however, the Standard Contract plainly encompasses the parties' rights and obligations relating to PPL's SNF and HLW. Although

PPL asserts that its real property interests relating to the land upon which its nuclear power plants stand are separate from its contract, see Pl. Reply 43, absent the Standard Contract, PPL, not the Federal Government, would be solely responsible for the storage and disposition of PPL's SNF and HLW. Further, the Government has not taken physical possession of PPL's real property. Instead, PPL remains in possession and control of its real property. In addition, absent the Standard Contract, PPL cannot identify any physical invasion or seizure of its real property by the Government, which, absent a contract, might entitle it to compensation under the Fifth Amendment. Accordingly, this Court's decision in Integrated Logistics provides no support to PPL. Instead, PPL complains about the alleged effects of the Government's partial breach of the Standard Contract. See A&S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995)

PPL also attempts, with no success, to distinguish the Allegre Villa case from the facts and issues here. However, as we stated in our response, the Allegre Villa holding and rationale are directly applicable here. Here, PPL entered into the Standard Contract with the Government, and, like the plaintiffs in Allegre Villa, is in privity with the Government. In

contrast, the plaintiffs' contracts in Cinega Gardens and Chancellor Manor were with third parties, not with the Government, precluding any basis for a breach of contract claims against the Government. Allegre Villa v. United States, 60 Fed. Cl. 11, 19 (2004). PPL should not be allowed to state both a breach of contract claim and a takings claim that are both clearly based on the terms and conditions of the Standard Contract.

## IV. DEFENDANT'S REQUEST FOR LIMITED DISCOVERY ON LIABILITY ISSUES IS APPROPRIATE UNDER THESE CIRCUMSTANCES

The Government requested limited discovery of any material supporting the claim that the Government had understood PPL to be making – namely, that it was entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the "oldest fuel first" requirement of the Standard Contract – in the event that the Court is considering granting plaintiff's motion for summary judgment regarding liability. PPL opposes that request, asserting that it has not actually taken these positions. Pl. Reply 51. However, PPL's motion still raises key factual issues upon which the Government has not had discovery. Specifically, the Government has not received any documentation showing that there was any method other than dry storage by which it could have

stored its fuel between the year 2000, when it admits it would have run out of space regardless of DOE's delay, and the years when DOE would have accepted its fuel under the rate proposed by each party. To the extent that any alternative methods existed, DOE has not received any materials indicating that PPL would have chosen to use those methods rather than dry storage. Moreover, factual issues remain regarding (1) PPL's historical understanding of the purpose of the delivery commitment schedules and its understanding of the meaning of the Standard Contract's acceptance schedule provisions, both at the time of contract formation and subsequently; (2) the bases upon which PPL's understanding of the contract provisions rests; and (3) the actual reasons that PPL declined to submit delivery commitment schedules to DOE.

Summary judgment should not be granted when one party has yet to be afforded its opportunities for pretrial discovery. A party cannot be deprived of the discovery needed to place at issue material factual questions in opposition to a motion for summary judgment. When discovery is reasonably directed to facts essential to justify the party's opposition, such discovery must be permitted or summary judgment refused. RCFC 56(f), which mirrors Rule 56(f) of the Federal Rules of Civil

Procedure, provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The normal summary judgment requirement – that a nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" – is "qualified by [RCFC 56(f)'s] provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." Opryland USA, Inc. v. The Great Am. Music Show, Inc., 970 F.2d 847, 852 (Fed. Cir. 1992) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 250 n.5 (1986)). Accordingly, summary judgment should not be granted when one party has yet to exercise its opportunities for pretrial discovery. National Life Insurance Co. v. Solomon, 529 F.2d 59, 60 (2d Cir. 1975). RCFC 56(f) motions, therefore, are liberally granted. Gregory Lumber Co. v. United States, 9 Cl. Ct. 503, 532 (1986) (embracing with approval a liberal construction of Rule 56(f)). As the Government has not received materials addressing key issues raised in PPL's motion, limited discovery should be granted to allow

the Government to fully oppose PPL's motion for summary judgment regarding liability.

CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment upon Counts I and II of plaintiff's complaint and our motion to dismiss Count III of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

Of Counsel:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

s/Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington D.C. 20530
(202) 353-0534
(202) 307-2503

Attorneys for Defendant

April 11, 2007

CERTIFICATE OF FILING

I hereby certify that, on this 11th day of April 2007, a copy of the foregoing "Defendant's Reply to Plaintiff's Response To Defendant's Motion for Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Motion to Dismiss Count III of Plaintiff's Complaint" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield