IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed on June 5, 2007)

| | | |
|---|---|---|
| PPL SUSQUEHANNA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-70C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS

1. **Since the birth of commercial nuclear power, the Government (whether the Atomic Energy Commission or the Department of Energy ("DOE")) has consistently committed that federal facilities would be available for disposing of SNF and HLW. *See, e.g.*, *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 246 (4th Cir. 1987); 10 C.F.R. Pt. 50, App. F ¶ 3 ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government.").** (PPL Susquehanna).

UNITED STATES RESPONSE: Through this proposed finding of fact plaintiff attempts to imply that, prior to the execution of the Standard Contract at issue in this case, the United States had assumed some type of

obligation to plaintiff to dispose of its spent nuclear fuel ("SNF") and, to the extent that it owned any, its high-level radioactive waste ("HLW"). Plaintiff has not identified any factual support for any such allegation. Prior to plaintiff's execution of the Standard Contract, DOE had no obligation – either statutory or contractual – to accept plaintiff's SNF or HLW. Both the statement from the Code of Federal Regulations and the court decision to which plaintiff cites relate to the disposal of high-level radioactive fission product waste material that is generated from the reprocessing of SNF, not the disposal of SNF itself or HLW that does not result from reprocessing. See 10 C.F.R. Pt. 50, App. F, Titled "Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities" (emphasis added); 35 Fed. Reg. 17,530, 17,532 (Nov. 14, 1970) (in discussing the policy published in 10 C.F.R. Part 50, Appendix F, stating that "[t]he policy would also require that the [high-level radioactive fission product] waste be transferred, in solid form [after transformation from a liquid form], to a Federal repository no later than 10 years following a separation of the fission products from the irradiated fuel").

**2. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted.** (United States).

**3. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).** (United States).

**4. Also in these findings in the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A). ~~To solve this problem, the NWPA imposed upon the Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF.~~ *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW); *see also Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1372 (Fed. Cir. 2005) ("*Indiana Mich. III*") ("Congress enacted the NWPA to establish the Federal responsibility, and a definite Federal policy, for the disposal of spent nuclear fuel.") (internal quotation omitted) (citing, *inter alia*, 42 U.S.C. § 10131(b)(2)).** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States objects to the second sentence of this statement. While the United States acknowledges that the citation which forms the remainder of this paragraph contains the language that is attributed to those sources, the United States avers that none of this language shows that the "NWPA imposed upon the

Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF," as plaintiff claims. Instead, one of the four identified purposes of the NWPA was to "establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent fuel as may be disposed of in a repository." 42 U.S.C. § 10131(b)(1) (emphasis added). The United States Court of Appeals for the District of Columbia Circuit has recognized that the NWPA did not require the Department of Energy to begin SNF acceptance by January 31, 1998, at a repository or to have a repository available by that date. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, the NWPA does not identify or mandate any particular acceptance schedule for SNF, other than identifying that contracts for the acceptance of SNF shall provide that, "in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [HLW] or [SNF] involved as provided in this subtitle." 42 U.S.C. § 10222(a)(5)(B).

**5. The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222(a)(5)(B).** (PPL Susquehanna).

UNITED STATES RESPONSE: This statement is not a statement of fact, but is a legal interpretation of the language of the NWPA. The NWPA itself actually provides that contracts into which the Department of Energy enters pursuant to the NWPA shall provide that, "in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [HLW] or [SNF] involved as provided in this subtitle." 42 U.S.C. § 10222(a)(5)(B). Accordingly, the NWPA specified the date – January 31, 1998 – that DOE was to include in contracts regarding the date by which DOE, in return for the payment of fees, would begin accepting SNF from the contract holders.

**6. While the NWPA required the utilities to pay for the disposal program and to provide interim storage of SNF, ~~the utilities only bore those responsibilities "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ."~~ 42 U.S.C. §§ 10131(a)(4) & (5).** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States clarifies that the full cost of disposal is the responsibility of the generators and owners of the spent nuclear fuel. 42 U.S.C. §§ 10131(a)(4). Further, the statement here is a conclusion of law, rather than a statement of fact, that the Court may determine from a review of the NWPA itself.

**7. ~~Shortly after the NWPA's enactment, DOE acknowledged that it would provide any additional at-reactor storage that utilities required after 1998.~~ *See* 1983 Draft Mission Plan at 2-1, Pl. App. 55[1] ("Until 1998, each utility will be responsible for providing its own additional on-site interim storage . . . ."); Mission Plan for the Civilian Radioactive Waste Management Program at 381 (1985), Pl. App. 57 ("[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [*i.e.*, using a steady-state SNF acceptance rate of 3,000 MTU after a five-year ramp-up period], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites."); *see also* 42 U.S.C. § 10221(b) (requiring the submission of draft and final mission plans).** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States denies that it committed itself to accepting SNF at any particular rate through the Mission Plans. DOE was only required to provide estimates of how the program would work in its Mission Plans, and the Mission Plans explicitly state as

[1] "Pl. App." refers to "Appendix to Plaintiff's Reply In Support Of Its Motion For Summary Judgment On Liability And Response In Opposition To Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Defendant's Motion to Dismiss Count III of

much. *See* 42 U.S.C. s 10221(a)(9); App. 189. During the promulgation of the language of the Standard Contract, nuclear utilities requested that DOE include language in the Standard Contract obligating itself to accept SNF (after January 31, 1998) at the rate that it would identify in the statutorily-required Mission Plan. Def. App. 95; see Def. App. 32-36. DOE rejected that request and refused to create such an obligation. Accordingly, the rates of acceptance identified in the Mission Plan are, at best, DOE's hopes and goals for its program, which do not create contractual obligations and for which DOE cannot be held liable for failing to satisfy. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969). Further, soon after DOE submitted the Mission Plan to Congress for its review, Congress refocused the DOE program through substantial amendments to the NWPA, reducing the relevance of a Mission Plan that was based upon factual and statutory assumptions that were made irrelevant as a result of those amendments.

---

Plaintiff's Complaint" dated March 21, 2007.

**8. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing**

> **. . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.**

**<u>Id.</u> at § 10131(b).** (United States).

PPL RESPONSE: PPL states that the Government's proposed finding is incomplete. In enacting these provisions, Congress envisioned a *quid pro quo* under which DOE is "responsible for disposing of [HLW or SNF] . . . in permanent disposal facilities, beginning not later than January 1998, in return for payment of fees established by this section." H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792,

3825.[2] Congress' findings included the finding that "a national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors" and that "Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate . . . ." 42 U.S.C. §§ 10131(a)(2) & (3).

[2] Per this Court's Special Procedures Order ¶ 12, PPL has attempted to only respond to the Government's proposed facts without responding to inferences and on relevance grounds. PPL reserves its right to oppose the Government's proposed findings. For example, PPL believes that the Government's proposed findings regarding the draft Standard Contract and the comments from the public regarding the proposed Standard Contract are irrelevant to this case.

**9. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982).** (United States).

**10. The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" ~~described elsewhere in the statute.~~ Id.** (United States).

PPL RESPONSE: Section 10222(a)(1) refers only to activities in 10222(d) as the types of expenditures the Nuclear Waste Fund was meant to offset. In particular, the use of the Nuclear Waste Fund (into which utilities paid) was specifically to offset, *inter alia*, DOE's costs in developing, siting, researching, licensing, and constructing a repository. 42 U.S.C. § 10222(d); *see also Ala. Power Co. v. United States Dep't of Energy*, 307 F.3d 1300, 1312-13 (11th Cir. 2002).

**11. The NWPA also required that the contracts with the nuclear utilities provide that:**

> **(A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and**
>
> **(B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.**

**42 U.S.C. § 10222(a)(5).** (United States).

**12. The NWPA "effectively made entry into . . . contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses" to a utility unless it signed the Standard Contract. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000) (citing 42 U.S.C. § 10222(b)(1)(A)).** (PPL Susquehanna).

UNITED STATES RESPONSE: Although plaintiff has cited to a statement by the United States Court of Appeals for the Federal Circuit, it has identified no factual support for this statement. Further, given that plaintiff is not seeking revocation of its contract, this proposed finding is irrelevant to this case.

**13. On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).** (United States).

**14. "However, the DOE was not statutorily required to use the administrative rulemaking process or to even develop a Standard Contract. Rather, it did so because it preferred developing a contract with standard provisions that could be used with multiple contractees to the extent practicable."** ***See PSEG Nuclear, LLC v. United States*****, 465 F.3d 1343, 1350 (Fed. Cir. 2006) (citing 48 Fed. Reg. 5458, 5459 (Feb. 4, 1983)).** (PPL Susquehanna).

**15. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).** (United States).

PPL RESPONSE: PPL seeks to clarify that the NWPA required that the fees be paid for SNF generated "and sold." 42 U.S.C. § 10222(b). Furthermore, the Government's reliance on the proposed terms of the Standard Contract that were changed prior to PPL's (and all utilities') execution of the contract contradicts the Government's argument regarding the integration clause (see Proposed Finding No. 52).

**16. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. *See Pacific Gas & Electric Company v. United States*, 73 Fed. Cl. 333, 395 (2006) ("the parties' understanding of the Standard Contract throughout their dealings was that the ACR/APR and DCS/FDS process would form the basis for developing a firm spent fuel acceptance schedule.")** (United States).

PPL RESPONSE: PPL disagrees that the Standard Contract (through its APR, ACR, and DCS provisions) created a mechanism for determining the rate at which SNF would be accepted. *See Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 98 (2003) ("*Indiana Mich. II*") ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate. The Department of Energy did not consider these forms to be binding.") (footnote omitted), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004). Furthermore, the finding of fact in *Pacific Gas & Electric* cited above is not supported by the Standard Contracts, the ACRs, APRs, DCSs, or FDSs. *See id.* Furthermore, the *Pacific Gas & Electric* Court concluded that the

Government had breached the contracts in *Pacific Gas & Electric* before even analyzing the Government's interpretation of the Standard Contracts. *See Pacific Gas & Electric*, 73 Fed. Cl. at 338-39 ("Accordingly, as an initial matter, the court finds that defendant has partially breached the parties' contract in this case."). This result is further evidence that this Court need not determine the acceptance rate to conclude that the Government is liable for partial breach of the Standard Contracts. *See generally Maine Yankee*, 225 F.3d 1336 (concluding that the Government breached all the utilities contracts without reference to a rate of acceptance); *see also Sacramento Mun. Util Dist. v. United States*, 70 Fed. Cl. 332, 375 n.40 (2006) (concluding that the determination of the rate of acceptance was "highly speculative" and unnecessary for the determination of damages), *appeal pending*, No. 2007-5052 (Fed. Cir.).

**17. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:**

> **Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:**
>
> **(a) Except as may be provided for in paragraph (2) below, <u>acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule</u>. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;**
>
> **(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.**

**48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).**

(United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**18. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes ~~to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal~~:**

> **5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.**
>
> **6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.**

**48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6).** (United States).

PPL RESPONSE: PPL disagrees that the Proposed Standard Contract included any language "to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal." The Government has quoted a portion that relates to the APR, which as stated

in the selected quotation is merely a listing of the age of fuel as it is discharged from reactors starting with the oldest fuel discharged from a reactor. This section (either in the proposed or final signed PPL Standard Contract) says nothing about the acceptance rate. *See also* PPL's Response to Proposed Finding No. 15.

**19. The proposed contract further provided that, following DOE's issuance of planning documents, ~~rates of SNF acceptance, as well as~~ the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):**

> **. . . <u>The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below</u>. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.**

**48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).** (United States).

PPL RESPONSE: Plaintiff disagrees with the Government's characterization of the quoted material as setting a rate of acceptance. The DCS process described in the proposed Standard Contract (and PPL's Standard Contract) does not set a rate of acceptance. Indeed, the proposed Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual

capacity of the DOE disposal facility (or facilities) can accommodate," Proposed Standard Contract, Art. VI.B.3, 48 Fed. Reg. at 5464, PPL's Standard Contract, Art. VI.B.1, Def. App. 371, and provided that each standard contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. Proposed Standard Contract, Art. IV.B, 48 Fed. Reg. at 5463; PPL's Standard Contract, Art. V.B.2, Def. App. 368. *See also* PPL's Response to Proposed Finding No. 15.

**20. Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):**

> ***Article IV – Delivery of SNF and/or HLW* – <u>Sets forth the procedures to be followed by Purchaser, including</u> the requirement that the Purchaser describe the waste material to be delivered to DOE, <u>the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery</u>. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.**

**48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).** (United States).

PPL RESPONSE: *See* PPL's response to Proposed Findings No. 15 & 19.

**21. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:**

> **The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.**

**48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). (United States).**

PPL RESPONSE: The definition of “Delivery Commitment” did not appear in the final version of the Standard Contract published in the Federal Register on April 18, 1983 or in PPL’s Standard Contract with DOE. *See* Standard Contract, Article I, Def. App. 359-62. *See also* PPL’s Response to Proposed Finding No. 15.

**22. The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:**

> **Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.**

**48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).** (United States).

PPL RESPONSE: PPL responds that Art. IV.B. as quoted by the Government was also revised in the final version of the signed Standard Contract. *See generally* Standard Contract for Disposal of Spent Nuclear

Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16,590 (Apr. 18, 1983). Standard Contract, Def. App. 366-67. *See also* PPL's Response to Proposed Finding No. 15.

**23. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules, which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:**

> **Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of *DOE's notice of* disapproval.**

**48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).** (United States).

PPL RESPONSE: As noted in response to Proposed Finding No. 15, the Government's continued reliance on an earlier draft of the Standard Contract contradicts the Government's argument regarding the integration clause (in Proposed Finding No. 52).

**24. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.** (United States).

**25. DOE received numerous comments in response to the proposed rule.** (United States).

**26. One commenter, Northern States Power Company, stated that "[t]he context of the contract is inverted." Def. App. 38. (emphasis in original). The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." Def. App. 38.** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**27. Another commenter, Public Service Company of Colorado, stated that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months." Def. App. 51. (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**28. Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, suggested that the "definition of 'Delivery Commitment' (Article I.7) is unnecessary and should be deleted," since the term "'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. Def. App. 6.** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**29. Another commenter requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract <u>commitment</u> or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." Def. App. 108 (emphasis added); <u>see</u> Def. App. 120 (Comments (after Georgia Power), at 1).** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**30. Another commenter, Northeast Utilities, recognized that, in the proposed rule, "DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period." Def. App. 73 (emphasis added).** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**31. Another commenter, Mississippi Power & Light Company, stated as follows in its comments:**

> **Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: ". . . within a specified year, <u>and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B</u>."**

**Def. App. 85 (emphasis in original).** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**32. Yet another commenter suggested that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." Def. App. 106 (emphasis added); see Def. App. 116 ("[i]t should not be necessary to submit firm (within + or - 20%) commitment schedules sixty-three (63) months prior to the delivery date").** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**33. Another commenter, Cleveland Electric Illuminating Company, requested that the "Delivery Commitment Schedule" be changed "for the sake of additional clarification" to "Preliminary Delivery Commitment Schedule." Def. App. 53, 55.** (United States).

PPL RESPONSE: *See* Response to Proposed Finding No. 15.

**34. In their comments to the proposed rule, EEI and UNWMG ~~recognized the importance of having DOE receive Delivery Commitment Schedules from all contract holders for a given year~~:**

> **If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.**

**Def. App. 11.** (United States).

PPL RESPONSE: Plaintiff objects to the Government's characterization that these commenters "recognized the importance" of the procedure suggested. The quoted text does not necessarily support this characterization. *See also* PPL's Response to Proposed Finding No. 15.

**35. ~~Many~~ commenters suggested a contract change to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. Def. App. 100-01; <u>see</u> A. 53; 86.** (United States).

PPL RESPONSE: PPL disagrees that the cited comments necessarily support the Government's characterization that "[m]any commenters" suggested that negotiation was necessary. *See also* Response to Proposed Finding No. 15.

**36. On April 18, 1983, DOE issued the Standard Contract as a final rule.** (United States).

**37. The final rule, as promulgated, made ~~several important~~ modifications to the Standard Contract set forth in the proposed rule. *Compare* 48 Fed. Reg. 5458 (Feb. 4, 1983) *with* 10 CFR § 961.11.**

(United States).

PPL RESPONSE: PPL disagrees with the Government's characterization that "several important modifications" were made to the Standard Contract. This statement is also vague.

**38. First, although the proposed ~~rule~~ provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998.** (United States).

PPL RESPONSE: When the Government refers to the "proposed rule" in this proposed finding (and others), the Government is actually discussing the proposed terms and conditions of the Standard Contract.

**39. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998~~, after the commencement of "facility" operations~~:**

> **This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.**

**10 C.F.R. § 961.11, Art. II (emphasis added).** (United States).

PPL RESPONSE: Plaintiff disagrees with the Government's characterization of the effect of the change in the definition of facility. First, in *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), the D.C. Circuit specifically rejected the Government's argument that the language in the NWPA "after

commencement of facility operations" relieved the Government of any obligation to begin removing waste in January 1998. *Id.* at 1276-77. In addition, as the *Indiana Michigan* decision recognized, Congress and DOE expected that DOE would have a repository in operation by January 1998. *See id.* at 1277.

**40. PPL's Standard Contract – indeed all of the Standard Contracts – embodies the reciprocal obligations mandated by the NWPA, pursuant to which PPL agreed to pay fees in return for DOE's obligation to begin disposing of SNF no later than January 31, 1998. *See Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000). Specifically, Article II of the Standard Contract (like the final draft contract quoted above) states: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." Standard Contract, Art. II, Def. App. 363.** (PPL Susquehanna).

**41. In promulgating the final terms of its Standard Contract, DOE recognized, "The 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date." 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983).** (PPL Susquehanna).

**42. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:**

> **The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.**

**Id. § 961.11, Art. I.10 (emphasis added)** (United States).

PPL RESPONSE: *See* Response to Finding No. 39.

**43. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:**

> **The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.**

**48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).** (United States).

PPL RESPONSE: *See* Response to Finding No. 39.

**44. As for the <u>order</u> of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.** (United States).

**45. The Standard Contracts (including PPL's) provide that, notwithstanding the age of SNF, priority may be given to SNF removed from a reactor that "has reached the end of its useful life and has been shut down permanently for whatever reason." Standard Contract, Art. VI.B.1(b); Def. App. 371-72. Priority may also be given to "emergency deliveries."** ***Id.*****, Art. V.D, Def. App. 369. To date, no such priorities have been given.** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States clarifies that the grant of any such priority is in the sole discretion of the Department of Energy, pursuant to the express language of the contract clauses cited.

**46. ~~As for identification of the~~ rate ~~of SNF acceptance,~~ although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:**

> **Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.**

**10 C.F.R. § 961.11, Art. IV.B.5.b.** (United States).

PPL RESPONSE: PPL disagrees with the Government's introductory

clause ("As for the identification of the rate of SNF acceptance . . . ."), which has no relationship with the rest of the paragraph describing the use of the ACR for "planning purposes." Moreover, as stated, the Standard Contract and ACRs themselves explicitly provided that the ACRs were not binding on either party and, pursuant to the Standard Contract, the ACRs were to be reissued every year. *See* Standard Contract, Art. IV.B.5.b, Def. App. 367; 1987 ACR, Def. App. 210; 1988 ACR at 1, Def. App. 212; 1990 ACR at 2, Pl. App. 65; 1991 ACR at 1-2, Def. App. 407-08; 1995 APR/ACR at 1, Def. App. 291; 2004 APR/ACR at 1, Pl. App. 110.

**47. As the "Sectional Analysis of Contract" portion of the final rule provided, ~~DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule~~:**

> **The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).**

**48 Fed. Reg. at 16591.** (United States).

PPL RESPONSE: PPL disagrees with the Government's characterization of the quoted material. The Federal Register notice, as quoted by the Government, merely states that the definition was "adequately addressed" by other provisions of the contract. 48 Fed. Reg. at 16,591. EEI's comments on the proposed draft contract stated, "[t]he definition adds nothing and could be inconsistent with Article IV.B and Appendix B." Def. App. 6.

Furthermore, PPL objects to the Government's statement that, despite deletion of the definition for "delivery commitment," the "purpose" of DCSs as reflected in that definition somehow was retained in the final Standard Contract. The final Standard Contract as signed by the parties should be interpreted in its own right and in accordance with the purpose of

the NWPA. *Roedler v. United States Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"). An interpretation of PPL's Standard Contract should be without reference to the "purpose" of a rejected definition from the proposed draft contract that has no bearing on the purpose of the NWPA.

**48. ~~Accordingly, adopting the purpose of the DCSs from the proposed rule~~, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 ~~annual capacity report ("ACR") and~~ acceptance priority ranking ("APR"), contract holders would ~~be required to~~ begin submission of DCSs (beginning January 1, 1992) for ~~any~~ SNF and/or HLW that they wanted DOE to accept 63 months later:**

> **1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.**
>
> **2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall**

> **advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.**

**10 C.F.R. § 961.11, Art. V.B (emphasis added)** (United States).

PPL RESPONSE: PPL repeats its prior response to Finding No. 47, noting that DOE cannot rely on the "purpose" of a deleted definition of "delivery commitment," absent the need to implement the intent and purpose of the NWPA. Furthermore, the Government attempts a sleight of hand by attempting to characterize the quoted language of the Standard Contract Art. V.B, which explicitly refers to the "acceptance priority ranking" not the "annual capacity report" and allows a utility to submit a DCS for "all" SNF the utility wishes to have picked up, not simply "any" SNF.

**49. Unlike the proposed rule, the DCS submission provision of the final Standard Contract included ~~a requirement~~ that, if a contract holder found a DCS that DOE required to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)."** **<u>Id.</u>** (United States).

PPL Response: Negotiation is not a "requirement" of the Standard Contract, Art. V.B.2, Def. App. 368.

**50. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptable schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:**

> **Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).**

**10 C.F.R. § 961.11, Art. V.C.** (United States).

**51. As noted above, Article V of the Standard Contract addresses "Delivery of SNF and/or HLW." That article states that a utility shall "deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW." Standard Contract, Art. V., Def. App. 367-70.** ~~**The article does *not* state that DOE's obligation is contingent upon a utility first submitting a DCS. DOE's obligation to take SNF from utilities also is referenced in several other Standard Contract articles, none of which conditions the obligations expressed therein upon the submission of a DCS.**~~ ***See* Standard Contract, Arts. II, IV.B. & VI, Def. App. 363, 366-67, 370-73.** (PPL Susquehanna).

UNITED STATES RESPONSE: The Government notes that the Standard Contract mandates that, "beginning January 1, 1992, the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months after receipt." Standard Contract, Art. 5.B.1 (Def. App. 368). PPL has not identified any other manner in which A utility contract holder would notify DOE about the type of fuel that it sought to have accepted and the method of transport that it sought to use, so that DOE could arrive at the site prepared to accept the spent nuclear fuel,

other than the DCS process. Further, absent some commitment by the contract holder that, if DOE arrived with appropriate casks at the utility's site at a particular date and time, the utility would be prepared to deliver SNF to DOE, the contract simply could not function. DOE could not be expected simply to wait at every nuclear utility site with the hope that, at some point, that utility would deliver some SNF to DOE. The DCS submission and approval process constituted a commitment by both DOE and the utility contract holder through which the date for acceptance of particular amounts of SNF at particular sites was defined. Plaintiff has not identified any other manner in which the contract, from a practical standpoint, could function.

**52. Finally, the final Standard Contract contained an integration clause, ~~precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract~~:**

> **This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.**

**10 C.F.R. § 961.11, Art. XXII.** (United States).

PPL RESPONSE: PPL objects to the Government's assertions regarding this clause of the Standard Contract because the Government's assertions are conclusions of law. Additionally, as PPL has previously stated, the Government's assertions regarding this clause are inconsistent with the Government's reliance on pre-contractual statements and earlier drafts of the Standard Contract.

**53. In 1983, Pennsylvania Power & Light Company, which was at that time the majority owner of Susquehanna Steam Electric Station, executed a Standard Contract with DOE, which was later assigned to PPL. See Complaint ¶¶ 5, 11.** (United States).

**54. PPL's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983, 10 C.F.R. § 961.11. Def. App. 358-401.1.** (United States).

PPL RESPONSE: PPL notes that the "final rule" included more than the terms and conditions for the Standard Contract, it also included "rules." *See* 10 C.F.R. §§ 961.1 – 961.5.

**55. In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).** (United States).

**56. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, ~~DOE noted the importance of the Annual Capacity Report that would be issued in 1991, which would provide the basis for the submission of DCSs~~:**

> **Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.**

**A. 207 (emphasis added).** (United States).

PPL RESPONSE: PPL disagrees with this proposed finding because the Government mischaracterizes the quoted portion of the 1987 Mission Plan Amendment, which the Government implies refers to the 1991 Annual Capacity Report ("ACR"). PPL notes that the "acceptance priority rankings for spent-fuel receipt by DOE" does not refer to the ACR, but rather to the

acceptance priority ranking ("APR"), which is nothing more that a list of fuel assemblies discharged from reactors ranked by the date of discharge. Standard Contract Art. IV.B.5.a, 48 Fed. Reg. at 16,601; PPL Standard Contract, Art. IV.B.5(a), Def. App. 367. For example, the 1991 APR published by DOE does nothing other than indicate the order among utilities in which SNF will be removed, and says nothing about the rate at which the Government will accept SNF. *See, e.g.*, 1991 APR at 4; Def. App. 223. Further responding, PPL disagrees with the Government's characterization of the "importance" of the 1991 ACR (and that such report "would provide the basis for the submission of DCSs") because, among other things, the quoted statement does not even refer specifically to the 1991 ACR, but only to the 1991 APR. In addition, nothing in the Standard Contract required utilities to submit DCSs identifying for delivery *only* those SNF allocations set forth in the ACR.

**57. Beginning in 1987, in compliance with the language of the Standard Contract, DOE issued an "Annual Capacity Report."** (United States).

PPL RESPONSE: Notwithstanding the contractual requirement that these ACRs be issued annually, PPL Standard Contract, Art. IV.B.5(b), Def. App. 367, DOE failed to issue ACRs after 1995 until 2004 (and has not issued another ACR since).

**58. DOE's ACRs expressly stated that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." A. 210; 212; 216.** (United States).

**59. Similarly, the 1991 ACR and the 1995 APR/ACR upon which utilities were asked to rely (through DOE's 1991 DCS Instructions) when completing their DCSs also expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers." 1991 ACR at 1-2, Def. App. 407-08; 1995 APR/ACR at 1, Def. App. 291. In fact, all other ACRs included this same language. *See* 1987 ACR, Def. App. 210; 1988 ACR at 1, Def. App. 212; 1990 ACR at 2, Pl. App. 65; 2004 APR/ACR at 1, Pl. App. 110.** (PPL Susquehanna).

**60. Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:**

> **Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. <u>In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules</u> to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.**

**A. 210; 213; 216 (emphasis added).** (United States).

**61. DOE provided the following guidance regarding the DCSs in the 1991 ACR:**

> **The Purchasers' allocations for each delivery year are presented in Tables A.1 through A. 10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser."**

**Def. App. 408.** (United States).

**62. In order for DOE to assume SNF acceptance in 1998 at an MRS, DOE had to assume that Congress would change the NWPA and lift the linkage between the construction of the repository and the MRS. (DOE made that assumption but chose not to assume that Congress would also lift the 10,000 MTU capacity linkage for an MRS.) *See* 1991 ACR at 4, 5 tbl. 2.1, Def. App. 410, 411 ("The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation."); 1995 APR/ACR at 4, Def. App. 294 (using the same nominal rates in table 1 as were in the 1991 ACR's Table 2.1). No such amendment to the NWPA lifting the linkages was ever enacted.** (PPL Susquehanna).

**63. PPL did not have any allocations in the first 10 years of SNF acceptance under the 1991 or 1995 ACRs. See generally Def. App. 420-445.** (United States).

**64. Had DOE used ~~the appropriate acceptance rate~~ (a 3,000 MTU steady-state rate after a five year ramp-up period), PPL, in fact, would have had its first deliveries accepted by DOE no later than 2004 (in the sixth year of the waste management system's operation). *See* 2004 APR/ACR at 2 (Tbl. 1) & 3, Pl. App. 111-12; *see also* 1990 ACR at 11, Pl. App. 73 (showing that Pennsylvania Power & Light Company – PPL's predecessor-in-interest – would have its first pick-up in the sixth year of the waste management system using a 3,000 MTU steady-state rate).** (PPL Susquehanna).

UNITED STATES RESPONSE: The Government objects to PPL's characterization of a 3,000 MTU steady-state rate after a five year ramp-up period as "the appropriate acceptance rate." Rather, the Government contends that "the parties contemplated that the use by DOE of an MRS facility beginning in 1998 with a 10,000 MTU capacity limitation would have allowed DOE to meet its statutory and contractual obligations under the Standard Contract." Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 395 (2006), appeal pending, No. 04-5046 (Fed. Cir. docketed Jan. 24, 2007). Nothing in the Standard Contract or the NWPA requires such an acceptance rate.

**65. The 1991 and 1992 ACRs contained identical projected SNF acceptance rates for the first ten years of SNF acceptance:**

**Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel**

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

**A. 411; 473.** (United States).

PPL RESPONSE: PPL notes that the 1991 and 1992 ACRS actually attached calendar years ("1998" to "2007") to this table. Def. App. 411, 473. However, DOE removed the calendar years in the 1995 APR/ACR and inserted the "Year 1" through "Year 10" designations. Def. App. 294.

**66. By 1992, DOE was claiming that, if it had no facility, it had no legal obligation to begin performance. Letter from James Watkins, Secretary of Energy, to Allen J. Keesler, Jr., Chairman, American Committee on Radwaste Disposal (May 27, 1992), Pl. App. 115 ("If, contrary to our current expectations, we are not able to begin spent fuel receipt at an MRS facility by January 31, 1998, the Department has determined that it is not legally obligated to accept SNF."); Letter from John W. Bartlett, DOE, to Commissioner Krista Sanda, Minnesota Department of Public Service (Feb. 14, 1992), Pl. App. 116 ("Neither the NWPA nor the Standard Contract imposes an unconditional obligation on the Department to accept SNF by January 31, 1998.").** (PPL Susquehanna).

UNITED STATES RESPONSE: In the cited letters, DOE expressly identified its expectation that it would begin SNF acceptance by a Monitored Retrievable Storage facility by January 31, 1998, in compliance with the Standard Contract.

**67. It was "evident that litigation was 'fairly foreseeable' by the agency as early as September 30, 1991 . . . ."** ***Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 316 (2002).** (PPL Susquehanna).

UNITED STATES RESPONSE: Plaintiff cites no factual support for this statement. The comment upon which plaintiff relies is based upon the fact that the nuclear utilities as a whole have been extremely litigious since the Standard Contract was originally executed, having filed a significant number of actions challenging DOE actions under the NWPA in the United States Courts of Appeals for the District of Columbia, Second, Sixth, Ninth, and Eleventh Circuits.

**68. In 1994, DOE published a "Notice of Inquiry" in the Federal Register with the preliminary interpretation (earlier expressed in the letters cited in proposed finding No. 66) of its duties and "announced that it could not begin disposing of nuclear waste by January 31, 1998, as the [Standard] [C]ontract required, because the repository it planned to build to store the waste would not be available until at least 2010."** ***Maine Yankee*****, 225 F.3d at 1338;** ***see Notice of Inquiry*****, 59 Fed. Reg. 27,007, 27,007-08 (May 25, 1994).** (PPL Susquehanna).

**69. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), again denying that DOE had a statutory and contractual obligation to begin disposing of SNF by January 31, 1998. *See* 60 Fed. Reg. 21,793 (May 3, 1995).** (PPL Susquehanna).

**70. The D.C. Circuit rejected this interpretation of the NWPA. *See Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) ("*Northern States I*"); *Indiana Mich. Power Co. v. U.S. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("*Indiana Mich. I*").** (PPL Susquehanna).

**71. In 1995, DOE issued a combined Acceptance Priority Ranking and Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." Def. App. 291.** (United States).

PPL RESPONSE: The 1995 APR/ACR, like the ACRs before it, states that the APR/ACR was "for planning purposes only," was "not contractually binding," provided "only an approximation of the system throughput rates," and was "subject to change." 1995 APR/ACR at 1, 4, Def. App. 291, 294. The 1995 APR/ACR also states that DOE "will further define and specify the system operating and waste acceptance parameters as the Program progresses, and inform the Purchasers accordingly." 1995 APR/ACR at 4, Def. App. 294.

**72. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, shown above. Def. App. 294. The 1995 ACR also contained the following statement:**

> **The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. . . . The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.**

**Def. App. 293-94.** (United States).

PPL RESPONSE: As noted above in PPL's Response to Finding No. 65, the 1995 APR/ACR no longer even included years for the chart of acceptance rates, but used "Year 1" through "Year 10." 1995 APR/ACR at 4, Def. App. 294. Also, by letter dated December 17, 1992 the Secretary of Energy informed Senator Johnston the following regarding the MRS and the Nuclear Waste Negatiator's lack of progress in siting an MRS: "That office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned. Thus, alternative actions are

required." Supplemental Appendix ("Supp. App.") at 8; *see also* Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994) ("Thus far, neither the efforts of the Department nor any other organization, including the Office of the Nuclear Waste Negotiator, have achieved the level of success needed to realize significant progress in locating and developing a site by 1998."); *see also* Proposed Finding No. 75. Furthermore, the letter stated that "MRS facility siting will be terminated and design work will be redirected toward the modular canister concept." Supp. App. at 9.

**73. The 1995 ACR further provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Def. App. 291. (emphasis added).** (United States).

**74. The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Def. App. 291.** (United States).

**75. The allocations assumed that DOE would accept Standard Contract holders' SNF at a maximum rate of 900 MTU annually, utilizing the capacity of a Monitored Retrievable Storage Facility ("MRS"). ~~But, the MRS, which was never sited, designed, licensed, or constructed, was no longer an option by the time DOE issued the 1995 APR/ACR.~~ *See Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) ("*Indiana Mich. II*"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004); Deposition of DOE's David Zabransky (Apr. 17, 2002) ("Zabransky Dep.") at 345, Pl. App. 13 ("At that point in time in 1994 . . . [t]here was no active program looking for a voluntary MRS"); Trial Testimony from *Northern States Power Co. v. United States* of DOE's Christopher Kouts at 3476, Pl. App. 40 (acknowledging that in order to have a facility by 1998, DOE would have had to have a site for an MRS by 1993).** (PPL Susquehanna).

UNITED STATES RESPONSE: The Government contends that DOE did not abandon the MRS concept until after the completion of the 1994 ACR. *See* Trial Testimony from *Tennessee Valley Authority v. United States* of DOE's David Zabransky 1743:13-25, Supp. App. at 4.

**76. DOE continued to use the ~~low~~ rates in the 1995 APR/ACR from the 1991 ACR ~~in order to minimize its liability~~. *See* Zabransky Dep. at 364-65 (Apr. 18, 2002); Pl. App. 19A-20:**

> **Q. Why did the Department publish a document to be used as the basis for delivery commitment schedules [the 1995 ACR] using rates which it was not using itself for the purpose of planning the system?**
>
> **A. The Department carried over the rates it had in the previous ACR and did not change them.**
>
> **Q. Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using [the 1995 ACR]?**
>
> **A. I believe that was a consideration.**
>
> **Q. Were there any other considerations that you can think of for using those rates?**
>
> **A. There was no other basis to develop any other rates at that point in time.**

(PPL Susquehanna).

UNITED STATES RESPONSE: The Government objects to the characterization of the rates in the 1995 APR/ACR as “low,” as nothing in the Standard Contract required a higher rate of acceptance or any particular rate of acceptance. Further, the Government objects to PPL’s

characterization of Mr. Zabransky's testimony as addressing an effort to limit "liability." To the contrary, Mr. Zabransky has explained that his concern was with committing to accept more fuel than it would be permitted to store at an MRS. *See* Trial Testimony from *Tennessee Valley Authority v. United States* of DOE's David Zabransky 1737:11-1740:12, Supp. App. at 3.

**77. On May 11, 1992, the DOE contracting officer issued a letter to each of the contract holders, along with instructions for the submission of DCSs. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." See, e.g., Def. App. 143-52, 153-62, 163-72.** (United States).

**78. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Def. App. 145, 155, 165.** (United States).

**79. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Def. App. 145, 155, 165.**

(United States).

**80. The DCS instructions further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Def. App. 145, 155, 165.** (United States).

**81. In these same instructions, DOE explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." 1991 DCS Instructions ¶ 7(c), Def. App. 146. In these instructions, DOE informed utilities that the 1991 ACR rates were an "approximation" and were for "planning purposes." 1991 DCS Instructions ¶ 7(c), Def. App. 146. Nowhere in these instructions did DOE claim that DCSs constituted contractually binding commitments.** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States agrees that the DCS instructions stated that, "[i]n the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchaser." Def. App. 146 ¶ 7(c). However, the United States disagrees that the instructions did not indicate to the contract holder that the approved DCS would constitute a binding commitment, subject to further definitization through the submission and approval of a Final Delivery Schedule ("FDS"), as contemplated by Article IV of the Standard Contract. Under the contract mechanisms for defining the specific SNF that DOE would accept at specific times from a particular contract holder, the DCS was necessary to establish the baseline upon which the FDS

would then be submitted. The amount of SNF that the utility contract holder could ask DOE to accept in its FDS for a given year was limited by the amount of SNF that DOE had committed itself to accepting for that year in the preceding DCS. As the cover letter accompanying the DCS instructions informed the contract holders, "[a]fter a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers." Def. App. 143. Without an approved DCS, the contract holder could not then submit a FDS, the final document in the acceptance commitment process. Accordingly, the DCS set the baseline against which the amount of SNF that DOE would accept from the contract holder in a given year would be defined. Further, the fact that the DCS did not establish a commitment by the utility is belied by the certification language that DOE included in the DCS instructions: "An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE." Def. App. 151 ¶ 3.0.

**82. ~~Contrary to Standard Contract requirements, DOE did not allow utilities to submit DCSs identifying "all SNF and or HLW [they wished] to deliver to DOE."~~ Standard Contract Art. V.B.1.; Def. App. 368; *see id.*, Art. V.B.2, Def. App. 368 ("Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%) . . . until the submission of the final delivery schedule.").** (PPL Susquehanna).

UNITED STATES RESPONSE: DOE did not prevent utilities from submitting DCSs indicating their wish to submit a greater amount of fuel. Such requests would be resolved first through the DCS process and then, if necessary, through the contract's dispute resolution process. Standard Contract Art. V.B & V.C; Def. App. 368-369.

**83. ~~Rather,~~ in the 1991 ACR and in separate instructions to utilities, DOE required that utilities submit DCSs identifying for delivery ~~*only*~~ those SNF allocations reflected in DOE's most recent ACR. 1991 ACR at 7, Def. App. 413; 1991 DOE Instructions for Completing the Appendix C Delivery Commitment Schedule ("1991 DCS Instructions") ¶ 7(a), Specific Instructions ¶ 2.7, Def. App. 146, 150. ~~Those directions, however, were completely at odds with the procedures set forth in the Standard Contract.~~ *Indiana Mich. II*, 57 Fed. Cl. at 98 ("[T]he Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'").**

(PPL Susquehanna).

UNITED STATES RESPONSE: See Response to Finding No. 82.

**84. PPL is a relatively new operating unit, having started its commercial operations on or about September 10, 1982. Def. App. 392-393. The first SNF discharges at Susquehanna Steam Electric Station, Units 1 and 2, did not occur until 1986, over 20 years after discharges at other older nuclear facilities. Def. App. 243-244.** (United States).

**85. ~~According to the 1995 APR/ACR, PPL did not have any allocation in 1998 or in any of the first 10 years of the SNF acceptance queue~~. Def. App. 296. PPL has never submitted a DCS to DOE.** (United States).

PPL RESPONSE: As noted previously, the 1995 APR/ACR did not use specific calendar years, but instead used "Year 1" through "Year 10." 1995 APR/ACR at 4, Def. App. 294. Furthermore, by 1995, the Government had already announced that it would not be able to accept any spent nuclear fuel prior to 2010, at the earliest. Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994) ("[T]he Department currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010.").

**86. ~~DOE itself did not consider DCSs to be binding.~~ *See* Deposition of Nancy Slater Thompson at 5, 98 (June 13, 2002), Pl. App. 47-48 (Acting Division Director of the Regulatory Coordination Division in DOE's OCRWM stated, "In my personal opinion, they [DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them."); Deposition of Alan Brownstein at 9-10, 377-78 (Apr. 10, 2002), Pl. App. 48C-48D (the senior policy adviser to the Director of DOE's OCRWM acknowledging that the DCSs were for planning purposes); Deposition of Alan Brownstein at 282 (June 14, 2002), Pl. App. 53 ("The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes.").** (PPL Susquehanna).

UNITED STATES RESPONSE: "[U]se of the acceptance rate and allocations in the 1991 ACR and APR and the amount of spent fuel listed for collection in [a utility's] approved DCSs is the most suitable – and perhaps only – 'method of determination independent of a party's mere 'wish, will, and desire' . . . by virtue of the agreement itself [and] by commercial practice or other usage or custom.'" *Pacific Gas*, 73 Fed. Cl. at

399.

**87. As noted above, the Standard Contract required DOE to approve or disapprove DCSs within three months of their submission. Standard Contract, Art.V.B.1, Def. App. 371-72. ~~Notwithstanding this express contract obligation, DOE, in fact, refused to approve or disapprove DCSs submitted by utilities in 1996 and thereafter.~~ *See* Zabransky Dep. at 32 (Apr. 17, 2002), Pl. App. 5 (admitting that DOE had DCSs submitted to it that it has neither approved nor disapproved).** (PPL Susquehanna).

UNITED STATES RESPONSE: DOE ceased approving DCSs IN 1997 because "[i]t was clear we weren't going to have a facility, and it was also clear that it wasn't appropriate to any longer keep signing up to commitments that we knew we could meet . . . ." *See* Trial Testimony from *Tennessee Valley Authority v. United States* of DOE's David Zabransky 1740:13-1741:23, Supp. App. at 3-4. That cessation of DCS approvals did not affect plaintiff, which never submitted any DCSs in the first place.

**88. Beginning in March 1997, DOE issued letters to nearly all utilities in which DOE stated that it could not approve or disapprove their DCSs. *See* DOE Letters, Pl. App. 87-100; *see also Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 521 (2006) ("*Tenn. Valley Auth. II*") ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract."); *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 370-71 (2005) (concluding that DOE "abandoned" the DCS process in 1997).** (PPL Susquehanna).

UNITED STATES RESPONSE: The United States disagrees with plaintiff's assertion that it sent letters to "nearly all utilities" stating that it could not approve or disapprove their DCSs. In actuality, DOE sent letters to those utility contract holders that had submitted DCSs for approval in late 1996 and/or early 1997, informing them that DOE was unable to approve or disapprove their submissions at that time and excusing those contract holders from invoking the DCS dispute resolution process until further notice. Pl. App. 87-100. Since plaintiff did not submit a DCS for approval in 1996 or 1997, and has never submitted a DCS, plaintiff was never sent such a letter.

89. ~~**Furthermore, around the same time that DOE began to "hold" DCSs submitted by utilities, DOE also unilaterally voided DCSs that had been submitted by utilities in 1996 and had been previously approved.**~~ ***See* Voided DCSs, Pl. App. 76-86; Zabransky Dep. at 596, 603-04 (Apr. 19, 2002), Pl. App. 23, 30-31; *Energy Northwest v. United States*, 69 Fed. Cl. 500, 505 (2006); *Sys. Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 731 (2005) ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved.").** (PPL Susquehanna).

UNITED STATES RESPONSE: No approved DCSs were ever "voided." A few DCSs that were in the process of being approved when DOE decided that it should not commit to accept additional fuel without a storage facility had not yet completed the approval process, either not yet having been approved by the contracting officer or not yet having been communicated to the contract holder. *See* Pl. App. 76-86. Stopping the approval process at this point did not constitute an action "voiding" approved DCSs. *See, e.g.*, *Comptroller General Warren to the Secretary of War*, B-28964, 22 Comp. Gen. 291, 292-93 (1942) ("separation of an employee does not become effective unless and until the employee

receives proper notice thereof," and "[s]uch an action may be rescinded at any time before it is consummated by the giving of official notice thereof to the employee, but not thereafter"). In any event, no DCS that plaintiff submitted was ever voided, given that plaintiff never submitted any DCSs to DOE for approval.

**90. DCSs submitted after 1995 would not have been approved by DOE, as acknowledged by DOE's Mr. Zabransky – currently DOE's Contracting Officer and formerly the Contracting Officer's Technical Representative. Zabransky Dep. at 353 (Apr. 18, 2002), Pl. App. 17 (acknowledging that "[b]ecause of the suspension of the DCS process it's impossible for a utility to have a DCS approved"); Zabransky Dep. at 42 (Apr. 17, 2002), Pl. App. 7 (admitting that, given the Department of Energy's "current guidance" at that time, it was not possible for a utility to get a DCS approved);** ***Sys. Fuels*****, 66 Fed. Cl. at 731 ("Thus, according to DOE's current Contracting Officer, it would have been impossible for a nuclear utility to obtain approval for their DCSs during that time period.");** ***see also Vermont Yankee Nuclear Power Corp. v. United States*****, 73 Fed. Cl. 236, 243 n.7 (2006).** (PPL Susquehanna).

**91. DOE's current Contracting Officer's Technical Representative has acknowledged that DOE believed it could unilaterally cut off its obligations by no longer approving DCSs. *See* Trial Transcript from *Northern States Power Co. v. United States* of Thomas Pollog at 3720-21, Pl. App. 43 ("Q: So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs? A: That's what we try to do, yes."). In so doing, DOE intended to limit its liability to utilities. *See* Trial Transcript from *Northern States Power Co. v. United States* of Thomas Pollog at 3722-23, Pl. App. 43; *id.* at 3739, Pl. App. 45 ("Q: Were you trying to reduce the amount DOE would pay due to its delay in accepting the amounts covered by approved DCSs? A: Yes. When I say approved, I mean – if it wasn't approved, then it was – there was no liability anymore. We would not have an obligation for that.").** (PPL Susquehanna).

UNITED STATES RESPONSE: As the trial court judge acknowledged in *Northern States*, the trial witness' use of the term "liability" differs from the use that the plaintiff attempted to provide it. By ceasing the approval of new DCSs, DOE would stop creating additional obligations to nuclear utility contract holders that it would be unable to fulfill, beyond

those that it had already created by approving DCSs. Plaintiff's effort to make this decision sound nefarious is wholly unsupported by any cited testimony.

92. ~~**DOE's failure to begin accepting, transporting, and disposing of SNF from Susquehanna constitutes a breach of contract.**~~ ***See Maine Yankee*, 225 F.3d at 1343.** (PPL Susquehanna).

UNITED STATES RESPONSE: DOE had not breached its Standard Contract with PPL at the time PPL filed the instant lawsuit because PPL had not submitted any DCSs to DOE for approval that DOE did not satisfy and because PPL had no allocations through that time that DOE did not satisfy. *See* Def. App. 415. Moreover, the Standard Contract contains an "Unavoidable Delays" clause that excuses liability for delays encompassed within that clause. The United States Court of Appeals for the District of Columbia has issued a writ of mandamus barring DOE from invoking that clause to cover the delays at issue here. The issue of the validity of that writ of mandamus is currently pending before the United States Court of Appeals for the Federal Circuit in Nebraska Public Power District v. United States, No. 07-5083 (Fed. Cir. docketed Mar. 15, 2007). The Government respectfully reserves its right to address the "Unavoidable Delays" clause in the contract to the extent that, and when, it is permitted to do so.

**93. "~~The breach involved all the utilities that had signed the contract – the entire nuclear electric industry."~~ *Id.* at 1342.** (PPL Susquehanna).

UNITED STATES RESPONSE: Defendant incorporates by reference its response to Finding No. 92.

**94. In 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs ~~and effectively acknowledging that the entire process conducted in the 1990s was irrelevant.~~ 2004 DCS Instructions, Pl. App. 101-06. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. 102. DOE's current Contracting Officer's Technical Representative, Thomas Pollog, has acknowledged that DCSs that were to be submitted per the 2004 APR/ACR were meant to replace, not supplement, previously approved DCSs. Trial Testimony from *Northern States Power Co. v. United States* of Thomas Pollog at 3604, 3725, Pl. App. 42, 44. Like its previous 1991 DCS Instructions, the 2004 DCS Instructions stated that the rates of acceptance were an "approximation" and for "planning purposes." 2004 DCS Instructions ¶ 7(a), Pl. App. 102. Nowhere in these instructions did DOE claim that DCSs constituted contractually binding commitments.** (PPL

Susquehanna).

UNITED STATES RESPONSE: The Government denies that the entire process conducted in the 1990s was irrelevant. “[U]se of the acceptance rate and allocations in the 1991 ACR and APR and the amount of spent fuel listed for collection in [a utility’s] approved DCSs is the most suitable – and perhaps only – ‘method of determination independent of a party’s mere ‘wish, will, and desire’ . . . by virtue of the agreement itself [and] by commercial practice or other usage or custom.’” *Pacific Gas*, 73 Fed. Cl. at 399. Further, as DOE informed contract holders that submitted new DCSs in 2004, they would need to account for the prior DCSs approved in the 1990s as part of their 2004 DCSs. *See* Supp. App. at 5-6.

**95. DOE re-suspended the DCS process in December 2004. *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 339-40 (2005) ("However, this resumption of the DCS process was very brief. By the end of 2004, DOE had again suspended the DCS process, advising that 'the resumption of the DCS process was premature' and declaring that DOE would resume the DCS process '[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository.'") (Judge Lettow quoting letter from DOE to another contract-holder).** (PPL Susquehanna).

**96.** ~~**PPL has already incurred mitigation-related costs resulting from DOE's breach, including some pre-breach mitigation costs.**~~ ***See Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("*Indiana Mich. III*") (concluding that "mitigation damages are available for pre-breach costs should the obligee elect to treat the obligor's breach as partial").** ~~**In PPL's case, these costs include, for example, constructing an independent spent fuel storage installation ("ISFSI") at the Susquehanna plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up.**~~ ***See* Declaration of Andrew Dyszel ¶¶ 6-7 (Exhibit A to PPL's Memorandum in Support of its Motion for Summary Judgment on Liability).** (PPL Susquehanna).

UNITED STATES RESPONSE: Defendant incorporates by reference its response to Finding No. 92. In addition, defendant has not had any discovery relating to plaintiff's damages or the reasons that plaintiff incurred any of the costs that it claims to have incurred. Having had no discovery relating to plaintiff's damages (and without the submission of any damages claim by plaintiff in this case), the Court should not make a factual finding that plaintiff has incurred damages caused by defendant's delay until defendant is afforded such an opportunity, particularly when plaintiff

submitted its declaration only as an attachment to a reply brief after the Government had filed its response to plaintiff's motion for summary judgment on liability.

**97. DOE announced last year that Yucca Mountain will not open before 2017. *See* Statement of Edward F. Sproat III, Director Office of Civilian Radioactive Waste Management U.S. Department of Energy Before the Subcommittee on Energy and Air Quality Committee on Energy and Commerce U.S. House of Representatives (July 19, 2006), *available at* www.ocrwm.doe.gov/info_library/program_docs/testimonies/July_19_Sproat_testimony.pdf (visited Jan. 29, 2007). Unofficially, DOE officials have stated that 2020 is more likely. *See* Erica Werner, *Yucca Mountain chief predicts application in 2008, dump by 2020*, Las Vegas Sun, (Mar. 31, 2006), *available at* http://www.lasvegassun.com/sunbin/stories/nevada/2006/mar/31/033110451.html (visited Feb. 5, 2007).** (PPL Susquehanna).

UNITED STATES RESPONSE: Although plaintiff's proposed finding is irrelevant to its current motion, DOE has officially announced that Yucca Mountain will not open before 2017. The remainder of plaintiff's representations regarding "unofficial" comments by "DOE officials" is unsupported, given that a newspaper article, which is the sole support for plaintiff's statement that "2020 is [a] more likely" opening date, constitutes

inadmissible hearsay and, in any event, is not a position of DOE.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
by s/ Daniel S. Herzfeld
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

s/Sonia M. Orfield
by s/ Daniel S. Herzfeld
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington D.C. 20530
Tele: (202) 353-0534
Fax: (202) 307-2503

June 5, 2007

Attorneys for Defendant

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Bryan A. Snapp
**PPL Corporation**
Two North Ninth Street
Allentown, Pennsylvania 18101-1179
(610) 774-4397
(610) 774-6726 (fax)

s/ Alex D. Tomaszczuk
by s/ Daniel S. Herzfeld

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
PPL Susquehanna, LLC