# APPENDIX

**Tennessee Valley Authority v. U.S No. 01-249C July 12, 2005**

**Heritage Reporting Corporation**

**Page 1561 to Page 1810**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1561

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 1562

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1563

P R O C E E D I N G S

THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?
MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?
THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.
MR. LO RE: This is actually something I would prefer is just discussed off --
THE COURT: Let us do this right down by the reporter.
(Discussion off the record.)
THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?
MR. SMALL: Yes, Your Honor.
Whereupon--
CHRISTOPHER KOUTS

Page 1564

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. SMALL:
Q. Good morning, Mr. Kouts.
A. Kouts. Good morning.
Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?
A. Yes.
Q. Okay. And what is an M&O contractor again?
A. The M&O designation stands for management and operating contractor.
Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?
A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.
Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

Page 1737

contemplated while that document was in existence for the MRS, always contemplated higher acceptance rates, so that's the reason I answered the question that way.

Also, at that point in time, we were moving, as it says, in March of '95, after that, the program made a decision to go to a repository only and was no longer planning on developing an MRS, so the rates were no longer being used for planning purposes.

Q. Now, the next page of that testimony, Mr. Zabransky, you're asked the following question – I'm sorry, it's page 365. The question is, "Was the Department trying to minimize commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?"

MR. LO RE: And I will represent for the record, Your Honor, that Exhibit 5 to Mr. Zabransky's testimony is in fact the 1994 ACR that was published in March of 1995.

BY MR. LO RE:

Q. And, Mr. Zabransky, you answer, "I believe that was a consideration." Now, Mr. Zabransky, can you explain for the Court why you testified that you believed it was a consideration that the Department

Page 1738

was trying to minimize commitments in the issuance of the 1994 ACR that was issued in March of '95?

A. Well, at that point in time, all the Department had any hope of doing was to find some way of doing an MRS. That was still the hope they had in mind at that point in time, and an MRS would have had those limitations, so to go to any more than that, to commit to any more than those MRS limitations wouldn't have been appropriate.

So the extent that we were constrained, they were constrained to those quantities, yeah, they were trying to minimize their commitments to what they might be able to do. Anything above and beyond that, they clearly couldn't have done in that time frame.

Q. Now, Mr. Zabransky, if you could bear with me through one more transcript, I'm going to show you the testimony that you provided during the Yankee trial, and we're going to go to page 4166 of that testimony, and you're asked the following, starting at line 16, please:

"QUESTION: And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?"

MR. LO RE: And, again, for the record,

Page 1739

Your Honor, I will represent that the reference to the 1995 ACR is the 1994 ACR that was issued in March of '95.

BY MR. LO RE:

Q. And the answer is, "That may have been one of the considerations that went into that." And then you went on, Mr. Zabransky, and you were asked, "I'm not asking" – the question was:

"QUESTION: I'm not asking just what may have been. Is it your opinion that the Department was trying to minimize," it goes over to the next page, "its obligations by putting those rates in the 1995 ACR?"

And you answered, "In my opinion, that was probably one of the things we thought about, yes."

And then the question, another question, the follow-up question was, "Wasn't it your opinion that the Department, indeed, was trying to minimize its obligations?"

And, again, you answered, "And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates."

Now, my question to you, Mr. Zabransky, is why did you testify during the Yankee trial in response to the questions posed with respect to the

Page 1740

1994 ACR that was issued in March of '95 that it was, one of the considerations was, by the Department, was minimizing its obligations?

A. Well, again, as I think I just said, that's all they could possibly have hoped to have done, was to get an MRS somehow sited and built, but it would still have linkages, so to obligate themselves to promise any more than that wouldn't have made any sense, so they came up with a rate that was consistent with what they potentially could do, and they were putting forth that as what they were willing to obligate themselves to.

Q. Now, Mr. Zabransky, were you involved in the decision that DOE made to suspend the DCS process in 1997?

A. Yes, I was.

Q. And what was your involvement in that?

A. At that time, I was the contracting officer's technical representative, and during the review on DCSes, the discussion ensued as to was it appropriate to continue to process DCSes.

Q. And what was the result of that discussion, or those discussions?

A. The result of that discussion was that the Department ceased to process DCSes.

Page 1741

Q. And why did the Department make that decision?

A. Well, at that point in time, it was clear that, one, the DCSes were still coming in for given years like 2003, 2004. It was clear we weren't going to have a facility, and it was also clear that it wasn't appropriate to any longer keep signing up to commitments that we knew we couldn't meet, so it would have been inappropriate to keep processing them, given that we weren't going to be able to follow through.

Q. And when you say, "it was clear we weren't going to have a facility," what do you mean by that?

A. Well, there was no, at that point in time, the repository was 2010, there was no -- I think we had had some efforts at interim storage legislation that hadn't come to fruition, and nothing was on the horizon that was going to intervene with an interim facility, so it was, and it was clear these were binding commitments at that point in time, and it was no longer appropriate to keep saying, yes, we'll be there in this given year, so we ceased processing at that point in time.

Q. Now, after the suspension of the DCS process in 1997, Mr. Zabransky, to your knowledge,

Page 1742

did DOE ever recommence the ACR process?

A. Yes, it did.

Q. And when was that?

A. In July of 2004, in anticipation of 2010 repository operations.

Q. Why don't we take a look at that? Could we pull up PX-36, please?

THE COURT: Mr. Lo Re, Mr. Shea, before we do that, the Court has several questions. I'm really hesitant to ask them now, but if I don't, I'm afraid they'll get lost in the shuffle.

MR. LO RE: That's fine, Your Honor.

THE COURT: I ordinarily would wait a while, especially for this kind of question, but when I ask it, you may object. If you even don't like the subject, you may object, let alone the form of the question. Mr. Zabransky, when, as precisely as you can give a time, did DOE suspend the DCS process?

THE WITNESS: My recollection is that it was early in the year, calendar year of 1997.

THE COURT: That was an assumption embedded in a couple of questions from Mr. Lo Re, what is the best of your recollection as to the circumstances in which the Department reached that decision?

THE WITNESS: The best of my recollection

Page 1743

was that the Department had been of the opinion that the DCS commitments were conditional and conditioned upon the existence of a facility constructed under the Act, and that after a court ruling, I believe in Indiana Michigan, the one case, that it was clear that that was not the case.

The Department's preliminary position was they were conditional obligations and not absolutes. It was not going to be sustained or was overturned, and at that point in time, it was no longer appropriate to enter into these binding obligations because we couldn't fulfill them.

THE COURT: From your prior testimony about PX-19, that is the 1994 ACR issued in March of 1995, and the TSLCC issued in September of 1995, you indicated that DOE had suspended the DCS -- or abandoned the MRS concept in 1995, is that correct?

THE WITNESS: That was my understanding, yes.

THE COURT: Sometime between March and September?

THE WITNESS: Sometime between the completion of that document, maybe prior to publication, but sometime between the '94 ACR and September of '95, yes.

Page 1744

THE COURT: Do you know when that was?

THE WITNESS: No, I do not know.

THE COURT: Do you know who made that decision?

THE WITNESS: I don't know. Mr. Kouts would have been in a better position to answer that than I am.

THE COURT: Why didn't the -- well, here's another question. You answered a question earlier that the repository system without interim storage was to open in 2010, is that correct?

THE WITNESS: Yes, that was on the schedule, yes.

THE COURT: And when was that schedule adopted?

THE WITNESS: I believe that was adopted prior to the 1991 ACR because that was the basis for the 12 years of -- the assumption was that the MRS would begin in 1998, and the repository would commence in 2010, and that would give you the 10,000 tons over that 12-year period, so that had to occur sometime around or prior to the '91 ACR.

THE COURT: My question is really a simple one. Why didn't DOE abandon the -- or suspend the DCS process after it had abandoned the MRS concept in

**Department of Energy**
Washington, DC 20585

NOV 0 3 2004

QA: N/A

John B. Carden III
Contract Manager
Procurement – TVAN Contracts
Tennessee Valley Authority
1101 Market Street
Chattanooga, Tennessee 37402-2801

Dear Mr. Carden:

This letter responds to your August 24, 2004 letter that replied to my July 28, 2004 letter announcing the resumption of the Delivery Commitment Schedule (DCS) process. Your letter indicates that Tennessee Valley Authority (TVA) will not be submitting DCSs for allocations accorded it by the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) until required by the schedule set forth in the disposal contract between TVA and the Department of Energy (DOE).

Your letter states that "TVA understands that DOE has abandoned the March 1995 APR/ACR waste acceptance allocation schedule." As an initial point of clarification, the method of allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is precisely the same as the method used in the 1995 APR/ACR. Specifically, both the 1995 APR/ACR and the 2004 APR/ACR utilize an "oldest fuel first" method of allocating acceptance positions in the acceptance queue as provided by the Standard Contract. That method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract.

With regard to the acceptance schedule identified in the 2004 APR/ACR, that schedule reflects DOE's current planning for acceptance of SNF at the Yucca Mountain repository once operations begin in 2010, assuming that various factors upon which DOE's planning is based remain unchanged.

With regard to your suggestion that DOE has "abandoned" the 1995 APR/ACR "schedule," it is unclear whether you are referring to the rates at which DOE now anticipates it will be able to accept SNF from Purchasers under the Standard Contract beginning in 2010 or whether, instead, you are referring to an abandonment of the DCSs that were approved in conjunction with the 1991 ACR, the 1992 ACR, and the 1995 APR/ACR. Because TVA has never obtained any approved DCSs, we presume that TVA wants to ensure that DOE anticipates its ability to approve DCSs to be submitted in the future based upon the allocations identified in the 2004 APR/ACR. To the extent that TVA's concern relates to DOE's ability to approve future-submitted DCSs, we anticipate that, based upon current progress at the Yucca Mountain site, we will approve DCSs submitted in accordance with the allocations identified in the 2004 APR/ACR. Although Purchasers are certainly entitled to submit DCSs requesting acceptance of

Printed with soy ink on recycled paper

SNF under different allocation scenarios, DOE does not anticipate that it will be able to approve those requests in light of its obligations to allocate SNF acceptance positions to all Purchasers on an "oldest fuel first" basis and in light of the limitations upon the amount of SNF that DOE can accept in any given year. However, Articles V.B, V.C, and XVI of the Standard Contract provide a mechanism for resolving any disputes about acceptance allocations and disapprovals of DCS submissions.

To the extent that TVA has concerns about the interrelationship between previously approved DCSs and any new DCSs that DOE receives, the DCS approval process should eliminate those concerns. DOE understands that, when it approved DCSs from 1992 through 1997, it created commitments to accept specific amounts of SNF from specific Purchasers during specific periods of time, and, as you know, DOE's delay in accepting SNF in accordance with those DCSs is now the subject of litigation in the United States Court of Federal Claims. Although DOE had hoped when the earlier DCSs were being reviewed beginning in 1992 that it would be able to begin SNF acceptance in 1998 for storage in a monitored retrievable storage facility and based its acceptance rates upon that scenario, DOE currently anticipates being able to begin SNF acceptance at the Yucca Mountain repository in 2010. Because of the different types of facilities contemplated for acceptance in 1998 and in 2010, DOE believes that, once it begins accepting SNF, it will be in a position to accept SNF at a different rate at a repository than it had anticipated when it previously reviewed and approved DCSs for acceptance at a monitored retrievable storage facility. Accordingly, in the 2004 APR/ACR, we have identified new allocations based upon anticipated acceptance rates that are higher than those in the 1991, 1992, and 1995 ACRs.

Because of the increased anticipated acceptance rates and the currently anticipated acceptance dates, it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs, which contain allocations that do not conform to the current anticipated rates. In addition, Purchasers may now wish to change the location from which the SNF is to be accepted or the dates of discharge identified in the original DCS submissions. Accordingly, any new DCSs that Purchasers submit may reflect these changes or request acceptance of the additional SNF covered by the new allocations granted. We anticipate that any new DCSs that are approved will replace, rather than supplement, the previously approved DCSs. To eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs, we will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are approved actually replace, rather than supplement, the previously approved DCSs. That agreement will be reflected in any future DCS approvals.

Please contact me if you have any questions.

Sincerely,

David Zabransky
Contracting Officer
Office of System Analysis & Strategy Development

The Secretary of Energy
Washington, DC 20585

December 17, 1992

The Honorable J. Bennett Johnston
Chairman
Committee on Energy and Natural Resources
United States Senate
Washington, D.C. 20510-6150

Dear Mr. Chairman:

Thank you for your letter of December 10, 1992, requesting information on the Department's plans to assure that receipt of spent nuclear fuel (SNF) from reactors can begin in 1998. You also requested information on progress toward disposal, which I will address in a separate letter.

Enclosed for your information is a summary of my new strategy to provide SNF interim storage in 1998. It will broaden and complement existing siting efforts and use a more effective SNF management system. We will complete planning and begin implementation of the described actions by December 31, 1992. In implementing the strategy we will establish productive working relationships with affected and interested constituencies.

I believe this new strategy for the Department and the Congress will produce the results needed to begin SNF receipt in 1998 and will maintain the Nation's options for sustained use of nuclear power as established in the Energy Policy Act of 1992. I urge your continued leadership for congressional action to achieve our mutual goals.

Sincerely,

James D. Watkins
Admiral, U.S. Navy (Retired)

Enclosure

cc:
The Honorable Malcolm Wallop
Ranking Minority Member



HQR-038-0090

PLAINTIFFS'
EXHIBIT # 82

# A NEW STRATEGY FOR MANAGEMENT OF COMMERCIAL SPENT NUCLEAR FUEL

## Background

The National Energy Strategy and the Energy Policy Act of 1992 envision continued use of nuclear power, along with other supply sources, to meet the country's needs for more electricity to support a growing economy and to replace aging existing capacity, and to remain within existing and emerging environmental laws such as the Clean Air Act. Progress on, and a timely solution to, the management and disposal of spent commercial nuclear fuel is essential to avoid premature and unwarranted shutdowns of operating nuclear plants, to permit renewals of existing plant licenses to provide life extensions from 40 to 60 years, and to enable new orders of advanced-design nuclear plants.

The Department of Energy has been working to a plan that would enable start of spent fuel removal from nuclear plant sites and receipt at a Monitored Retrievable Storage (MRS) facility by January 1998, and start of spent fuel disposal at a repository by 2010. In May 1992, in a letter to Northern States Power, the Department stated that it would assess progress in implementing that plan and report the results of its assessment to the Congress in January 1993. The Department further stated that should it become clear that its planned actions and progress towards interim milestones would not ensure that it could accept spent nuclear fuel by 1998, it would take whatever actions were necessary and in accordance with the law to meet its obligations under the Nuclear Waste Policy Act (NWPA). Further, it would seek additional legislative authority if appropriate.

The results of that assessment and the new actions planned are described below.

## MRS Facility and Siting

The Office of the Nuclear Waste Negotiator, established under the NWPA as amended in 1987, has spent more than two years seeking a voluntary host and site for an MRS facility. That office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned. Thus, alternative actions are required.

The Department has examined potential alternative actions and has concluded the following:

(1) It now appears that a multiple purpose and standardized container system for spent fuel receipt, storage, transport, and disposal can be developed to reduce costs, minimize required handling of spent fuel assemblies, and provide more efficient storage at both an interim storage site and nuclear plant sites. Such a system would simplify the design of a storage facility, but would require expeditious development and certification to be effective.

(2) to meet the needs and expectations of the nuclear industry, the Department should plan for use of Federal Government sites for interim storage.

Accordingly, storage capacity for spent nuclear fuel at any Federal Government site or sites should be made available for use by January 1998. The Department has prepared a generic schedule showing the actions necessary to utilize a Government site or sites by that time.

The Department should be authorized and required by the Congress to select candidate Federal sites by December 31, 1993. A detailed, specific schedule for site selection and readiness to receive spent fuel by January 1998 should also be required to be submitted to the Congress by December 31, 1993.

## Standardized Container System

The Department will immediately refocus spent fuel container design activities on development of a standardized system with capability for receipt, dry storage, transport, and disposal of spent fuel. Such a standardized system has been endorsed by a recent resolution of the Edison Electric Institute UWASTE Committee.

As of December 15, 1992, an expedited schedule for developing, manufacturing, testing and certifying such a container system and its elements was completed by the Department. The certification schedule was reviewed informally with the Nuclear Regulatory Commission on December 17, 1992.

Current work on MRS facility siting will be terminated and design work will be redirected toward the modular canister concept. By December 31, 1992, the simplification of the MRS facility that may be possible through use of a standardized system will be defined.

## Budget Adjustments

The Department is recommending to the Office of Management and Budget that the Nuclear Waste Fund be taken off-budget, in a revolving fund, for FY 1994 and makes a similar recommendation to the Congress. The off-budget concept would permit the Department to apply whatever resources are necessary to meet program needs and schedules, subject to Congressional appropriation.

## Potential Compensation for Delay Costs

Some electric utility companies and state regulatory commissions have expressed a concern for compensation by the Federal government for on-site spent fuel storage costs due to potential delays in Department start of receipt of spent fuel in January 1998.

HQR-038-0092

As a contingency action, the Department will promptly explore possible concepts of compensation and resolution of utility equity issues based upon payment or credit from the Nuclear Waste Fund and on no increase in the millage fee. If such an approach is found to be justified and practicable, the Department will notify the Congress of whatever new legislation may be required in order to provide such compensation.